# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

John M. Agnello
Melissa E. Flax
CARELLA, BYRNE, BAIN, GILFILLAN,
  CECCHI, STEWART & OLSTEIN
5 Becker Farm Rd.
Roseland, NJ  07068
Telephone:  973.994.1700
Facsimile:  973.994.1744

Kenneth J. Jurek
Daniel N. Christus
Linda A.O. Lamberson
MCDERMOTT WILL & EMERY LLP
227 West Monroe Street, Suite 4400
Chicago, Illinois  60606-5096
Telephone:  312.372.2000
Facsimile:  312.984.7700

ATTORNEYS FOR MARS, INC.

| | |
|---|---|
| MARS, INC.,<br><br>        Plaintiff,<br><br>vs.<br><br>NATRACEUTICAL, S.A., NATRA U.S., INC.<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 2:07-CV-1574 (SRC)(MF)

**PLAINTIFF MARS, INC.'S
MEMORANDUM IN SUPPORT
OF ITS APPLICATION FOR AN
ORDER TO SHOW CAUSE FOR
<u>PRELIMINARY INJUNCTION</u>**

Dockets.Justia.com

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    STATEMENT OF FACTS .....................................................................................3

    A.     The Parties to This Lawsuit .........................................................................3
    B.     The Science Behind Cocoa Polyphenols .....................................................5
    C.     Mars Has Expended Vast Time and Resources in Developing Cocoapro®
        and Its CP Ingredients and CP-Based Products ..........................................6
    D.     The Infringed Patents: United States Patent Nos. 6,312,753 and 6,790,966 ...........8

III.   ARGUMENT ..........................................................................................................8

    A.     Overwhelming Evidence Shows that Mars Has a Likelihood of Success on
        the Merits .....................................................................................................9
          1.     Claim Construction Standards ........................................................10
          2.     Properly Construed Claims Must Be Applied
               to the Accused Product ....................................................................11
          3.     Patents Are Presumed Valid ............................................................12
          4.     Defendants Infringe Claims 15 and 16 of the '753 Patent ............13
               a.     The Proper Construction of Claim 15 of the '753 Patent .............13
               b.     Defendants Infringe Claim 15 of the '753 Patent ........................14
               c.     The Proper Construction of Claim 16 of the '753 Patent .............14
               d.     Defendants Infringe Claim 16 of the '753 Patent ........................15
           5.     Defendants Infringe Claims 1, 2, 3, 4 and 23 of the '966 Patent ............15
               a.     The Proper Construction of Claim 1 of the '966 Patent .............15
               b.     Defendants Infringe Claim 1 of the '966 Patent ..........................16
               c.     The Proper Construction of Claim 2 of the '966 Patent .............17
               d.     Defendants Infringe Claim 2 of the '966 Patent ..........................17
               e.     The Proper Construction of Claim 3 of the '966 Patent .............17
               f.     Defendants Infringe Claim 3 of the '966 Patent ..........................18
               g.     The Proper Construction of Claim 4 of the '966 Patent .............18
               h.     Defendants Infringe Claim 4 of the '966 Patent ..........................18
               i.     The Proper Construction of Claim 23 of the '966 Patent ...........19
               j.     Defendants Infringe Claim 23 of the '966 Patent ........................19
               k.     Infringement Conclusions ...............................................................19
    B.     Mars Will Be Irreparably Harmed if Defendants Are Not Preliminarily
        Enjoined ......................................................................................................20
          1.     Economic Considerations Weigh Heavily in Favor of a Preliminary
               Injunction ........................................................................................22
          2.     Other Irreparable Harm Factors Weigh Heavily in Favor of a
               Preliminary Injunction ....................................................................24
    C.     The Balance of Hardships Tips Strongly in Favor of Mars .......................27
    D.     It Is in the Public Interest to Preliminarily Enjoin Defendants ..................28
    E.     Expedited Discovery Is Warranted in This Case ........................................29

IV.    CONCLUSION ....................................................................................................29

# TABLE OF AUTHORITIES

**Page**

## CASES

*A.K. Stamping Co., Inc. v. Instrument Specialties Co., Inc.*, 106 F. Supp. 2d
   627 (D.N.J. 2000) ...............................................................................9-12, 20, 21, 28

*Allan Block Corp. v. E. Dillon & Co.*, 2005 U.S. Dist. LEXIS 13566 (D. Minn.
   2005), *aff'd*, 170 Fed. Appx. 130 (Fed. Cir. 2006)..................................................25

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343 (Fed. Cir. 2001)...................9, 12

*Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085 (Fed. Cir. 1998).....................12

*Canon, Inc. v. GCC Int'l Ltd.*, 450 F. Supp. 2d 243 (S.D.N.Y. 2006) ...........................20, 21, 28

*Christiana Indus., Inc. v. Empire Elecs.*, Case No. 06-12568, 2006 U.S. Dist.
   LEXIS 54210 (E.D. Mich. Aug. 4, 2006)................................................................20

*eBay, Inc. v. Mercexchange, LLC*, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006) ...........................20

*Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446 (Fed. Cir. 1988)....................9, 20, 21, 25, 27, 28

*Jacobson v. Cox Paving Co.*, 19 U.S.P.Q. 2d 1641 (D. Ariz. May 16, 1991),
   *aff'd*, 949 F.2d 404 (Fed. Cir. 1991)..................................................................21

*Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985 (Fed. Cir. 1999)........................10, 11

*Lawman Armor Corp. v. Winner Int'l, Inc.*, Case No. 01-1605, 2002 U.S. Dist.
   LEXIS 1431 (E.D. Pa. Jan. 22, 2002)................................................................21, 28

*Mars, Inc. v. H.J. Heinz Co. L.P.*, 377 F.3d 1369 (Fed. Cir. 2004)...................................13

*MBO Labs., Inc. v. Becton, Dickson & Co.*, 474 F.3d 1323 (Fed. Cir. 2007) ...........................11

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, 194 F.R.D. 618
   (N.D. Ill. 2000) ....................................................................................29

*Metrologic Instruments, Inc. v. Symbol Techs., Inc.*, 460 F. Supp. 2d 571 (D.N.J.
   2006)...............................................................................................11

*Oakley, Inc. v. Sunglass Hut Int'l.*, 316 F.3d 1331 (Fed. Cir. 2003) ....................9, 10, 11, 12, 27

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364 (Fed. Cir. 2005) ...........................9, 10, 11

*Philadelphia Newspaper, Inc. v. Gannett Satellite Info. Network*, No. 98 CV
   2782, 1998 U.S. Dist. LEXIS 10511, at *4 (E.D. Pa. July 15, 1998)...................................29

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct.
   1332 (2006)...........................................................................................10

*Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970 (Fed. Cir. 1996)................................20, 21, 22

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359 (Fed. Cir.
   2001)................................................................................................12

*Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir.
   1998)................................................................................................10

*Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368 (Fed. Cir. 2006)......................................8, 9, 12

*Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573 (Fed. Cir. 1983), *cert.
   denied*, 464 U.S. 996 (1983)......................................................................27, 28

*Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357 (Fed. Cir. 2002) ...................................................................................9, 10, 11

*Telebrands Direct Response Corp. v. Ovation Commc'ns, Inc.*, 802 F. Supp. 1169 (D.N.J. 1992) .........................................................9, 20, 21, 22, 27, 28

*Teledyne Indus., Inc. v. Windmere Products, Inc.*, 433 F. Supp. 710 (S.D. Fla. 1977) ................................................................................................25

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) ...........................................11

*Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) .........................28

## STATUTES

35 U.S.C. § 283 .........................................................................................................1, 9

35 U.S.C. § 282 .........................................................................................................12

## RULES

Fed. R. Civ. P. 65........................................................................................................1

37 C.F.R. §1.75(c) ................................................................................................18, 19

## OTHER AUTHORITIES

MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993), attached as Exhibit 18 to the Decl. of M. Flax............................................................14, 16, 19

Plaintiff Mars, Inc. ("Mars") applies to this Court, under 35 U.S.C. § 283 and Fed. R. Civ. P. 65, for a preliminary injunction against Defendants Natraceutical, S.A. and Natra U.S., Inc. ("Defendants"). Defendants infringe certain Mars patents that relate to cocoa polyphenol powders and extracts. Unless Defendants are enjoined forthwith from infringing Mars' patents, Mars will suffer irreparable harm to its extensive and valuable research and development efforts, its business plans, well-deserved reputation, goodwill and business relationships.

Mars, therefore, respectfully requests that this Court enjoin Defendants from making, using, importing, exporting, offering to sell, and/or selling in the United States, products that infringe U.S. Patent Nos. 6,312,753 and 6,790,966 ("the '753 patent" and "the '966 patent," respectively), including without limitation all formulations and concentrations of Defendants' CocoanOX products, pending final resolution of this dispute.

## I.    **INTRODUCTION**

In addition to being a leading global manufacturer of chocolates and various name-brand food products, Mars is well-known for its research in the field of cocoa science and its technological improvements regarding cocoa plant farming, cultivation, harvesting and processing. This case involves ground-breaking products derived from Mars' research.

Mars has researched extensively polyphenol compounds found in unfermented and underfermented cocoa beans. In the early 1990s, Mars discovered a link between human health and cocoa polyphenols ("CPs"), but also recognized that traditional cocoa processing techniques essentially destroyed much of the polyphenols. For over 15 years, Mars, in collaboration with leading universities in research funded by Mars, sought to understand the link between health and CPs, and to support scientifically and clinically the significant health benefits that could be derived from CPs. Mars also discovered new ways to process cocoa to preserve and maximize the retention of CPs, enabling the development of products, and even medicines, that benefit from these compounds.

The importance of Mars' research and its possible far-reaching implications dictated a careful, disciplined approach, where product development was secondary to science.

Accordingly, when developing its products, Mars held itself to the elevated standard often associated with drug development instead of the more traditionally accepted standards used in the food industry. Rather than focusing on taste tests, Mars funded clinical trials to measure and document health benefits. Rather than rush to market, Mars looked into questions regarding efficacy, benefits, dosages, side reactions, delivery systems and potential interfering substances. In doing so, Mars unlocked the secrets of CPs that have the potential to prevent and/or treat health conditions that are the leading causes of death and disability around the world, such as cardiovascular disease, diabetes, dementia, and many other issues of health that depend on vascular health and healthy circulation. Mars' approach towards CPs earned Mars' CP-based brands and products a reputation of being backed by solid science; this reputation is recognized by members of the scientific and medical communities alike. Mars also has proven that which many thought was laughable just a decade ago: cocoa products can be good for you!

Now, after investing more than 15 years, and in excess of $30 million, Mars stands at the threshold of recouping its investment through the introduction of new product lines, the strengthening of existing ones, and by sharing its technology with other industries and markets that can benefit from Mars' reputation, technology and products in this field. Going forward, there are plans for new patented pharmaceuticals. However, as Mars moves forward, it is met with a very real and impending threat by Defendants to destroy what Mars has worked so hard to create. Defendants have not published peer-reviewed articles about CPs; rather, they publish sales brochures on their accused products premised on the unsubstantiated hypothesis that Defendants' CP products provide health benefits no matter what. Defendants have not scrutinized the potential end-uses of CP powders or extracts they sell; instead, they make infringing CP products, which they offer and sell to any and all comers for purely pecuniary gain – without any regard to scientific or medical considerations for the end-products that incorporate their powders or extracts. The implications of Defendants' infringement not only threaten to irreparably harm Mars' business, Defendants' actions threaten to destroy the hard-earned reputation Mars has built around its patented CP products and processes.

In this memorandum, Mars will demonstrate conclusively that the preliminary injunctive relief sought herein should be granted forthwith. It is axiomatic that Mars should not be forced to compete against its own patented CP products embodied in Defendants' CocoanOX; and, Mars has the exclusive right to prevent such competition. However, Defendants' actions come at a critical juncture in Mars' plans for CPs. Mars is poised to introduce new CP products and to license its valuable technology in ways that enhance the science-based reputation of CPs that is vital to all of Mars' efforts. Mars' efforts and plans will be severely obstructed and the reputation Mars has earned in the market for CP products is in substantial jeopardy because of Defendants' continuing infringement. Moreover, as money damages are woefully inadequate, Mars will have no recourse or means to counteract the irreversible damage that Defendants' infringing sales and activities will continue to cause Mars regarding its CP research and technology efforts, business plans and reputation.

## II.    STATEMENT OF FACTS

### A.    The Parties to This Lawsuit

Mars is a Delaware corporation, having a place of business located at 800 High Street, Hackettstown, New Jersey 07840. It is a leading global manufacturer of various name-brand food products[1] and is one of the world's top producers of chocolate. (Ex. 1, ¶ 9)[2]. Mars also has had a longstanding commitment to health research, particularly focusing on the health and nutritional aspects in naturally occurring food compounds. One such research project has involved the family of polyphenol compounds found in cocoa, including flavanols. *Id.* at ¶ 10.

In recent years, CPs increasingly have been lauded and extensively researched by the medical community and nutritional experts. The growing attention that CPs have received has been due, in large part, to Mars' involvement in CP science research. (Ex. 1, ¶ 11). Indeed,

---

[1]  Mars manufactures such popular branded products as Uncle Ben's rice and M&M's, Mars, Milky Way, Snickers, Dove and Twix confectionaries.

[2]  All Exhibits filed in support of this Memorandum are attached to the Decl. of Melissa E. Flax, filed contemporaneously herewith, in which she attests that each Exhibit is a true and correct copy of the original.

Mars is the global pioneer in this field of research, investing vast resources into research on the potential health benefits of CPs and new techniques for growing, harvesting and processing the cocoa beans to maximize polyphenol retention. *Id.* at ¶¶ 18-19, 21. Because of Mars' overarching commitment to this ground-breaking research, scientists, doctors and nutritional experts have discovered real health benefits attributable to CPs.

Defendants Natraceutical, S.A. and Natra, U.S., Inc.[3] also are engaged in the business of extracting and selling active elements from natural products. Natraceutical, S.A., is a company existing under the laws of Spain, with its principal place of business located at Autovía A3, Exit 343, Camí de Torrent, s/n., 46930 Quart de Poblet, Valencia, Spain. It is reported to be a subsidiary of a Spanish listed company called Grupo Natra. (Ex. 3).

Defendant, Natra U.S., Inc. is a Delaware corporation, with offices in California and New Jersey. According to the New Jersey Department of State, Natra U.S. has an office located at 120 Circle Drive North, Piscataway, New Jersey 08854. Upon information and belief, Natra U.S., Inc. is a wholly-owned subsidiary of Natraceutical S.A. and is the alter ego and agent of Natraceutical S.A. in the United States. Natraceutical S.A. represents that Natra U.S., Inc. develops a market for and sells all Natraceutical products in the U.S., including the accused product, "CocoanOX." (Ex. 4).[4]

In complete disregard of Mars' patent rights, and in an effort to free-ride on the coattails of Mars' success and tireless efforts in cultivating a U.S. market for Mars' patented CP products, Defendants have commenced selling products in the U.S. market that are covered by claims of the patents at issue. Specifically, Defendants have sold in the U.S. cocoa powders and extracts under the name CocoanOX with various concentrations of polyphenols, products which Natra

---

[3] It is Mars' understanding that Natraceutical, S.A. manufactures the products at issue in this action and that it works closely with Natra U.S., Inc. in developing a market for and selling CocoanOX in the U.S. (Ex. 2).

[4] Other companies, presently unknown to Mars, may be purchasing and using the infringing products, or cooperating with Defendants in their infringement, and may themselves be infringing Mars' patents relating to end-products.

U.S., Inc. showboats as "the latest in innovation." (Ex. 4). Further, Defendants have embarked on a widespread marketing crusade to increase U.S. and international sales of CocoanOX and related products. As a part of that effort, Defendants intend to promote and sell CocoanOX at an important international trade show in Chicago in late July 2007. *See, infra,* pp. 23-24. Significantly, Mars also is registered to attend that trade show to promote its CP products on the heels of announcements planned for early July regarding Mars' CP plans. (Ex. 1, ¶ 35).

**B.    The Science Behind Cocoa Polyphenols.**

In recent years, the health and nutritional benefits of plant polyphenols have received much acclaim from the scientific community and nutritional experts. Cocoa is a unique source of certain polyphenols. Cocoa polyphenols are found in cocoa beans, which come from the tropical plant *Theobroma cacao*. (Ex. 5, p. 2). CPs are sometimes referred to as "cocoa flavanols."[5] *Id.*; *see also* Ex. 1, ¶¶ 17-18.

Because of Mars' vision and resulting publications and its research partners in universities, many health benefits of CPs now are a matter of public knowledge. CPs have been attributed with improving cardiovascular health by: (1) improving and supporting healthy blood vessel function, which benefits healthy blood flow; (2) decreasing platelet reactivity, which is similar to the effects seen with taking baby aspirin; and (3) increasing the production of nitric oxide, which can relax (or dilate) blood vessel walls, improve circulation and reduce the risk of blood clotting. (Ex. 5, p. 3; *see also* Exs. 6 and 7). Researchers also have linked CPs to treating diabetes, strokes and vascular dementia and other impairments within the brain. (Ex. 9, p. 1).

These "heart-healthy" polyphenols, however, are fragile and mostly were destroyed by the traditional methods of processing cocoa. (Exs. 7 and 8). Therefore, not only was Mars' idea of researching the health and nutritional aspects of CP on the cutting edge, but its vision to invest

---

[5] "Flavanols" are a distinct group of plant compounds within the "flavonoid" sub-family of polyphenols. (Ex. 5, p. 2)

the time and resources necessary to develop methods of processing cocoa to retain, maximize and extract polyphenols was truly revolutionary. (Ex. 1, ¶ 16).

### C.    Mars Has Expended Vast Time and Resources in Developing Cocoapro® and Its CP Ingredients and CP-Based Products

When Mars first embarked on its plan to research the health benefits of CPs and to develop processes to maximize available CPs, its competitors apparently did not appreciate these benefits at the time, likely concluding that such efforts lacked benefits. In the end, Mars' foresight prevailed. For more than 15 years, Mars has been a global leader in cocoa science research and has invested more than $30 million to lead this research and product development. (Ex. 10, p. 3; *see also* Ex. 1, ¶¶ 13, 36). Mars has collaborated on research projects with top scientists from around the world, including researchers at leading universities like Harvard[6] and the University of California – Davis[7], to explore the health benefits of CPs, resulting in over 100 peer reviewed publications. (Ex. 11, p. 1; *see also* Ex. 10, p.3). In 2005, the *Journal of the American College of Cardiology* named Mars' collaborative research effort on the effect of CPs on circulatory health as one of the year's worldwide highlights in cardiology – "the first food product study to earn this recognition." (Ex. 12, p. 3)

The results of Mars' unrivaled and unwavering dedication to CP research has led to the development of patented processes under the "Cocoapro®" name for preserving, maximizing, retaining and extracting polyphenols found in cocoa. Mars also is a leader in developing a market for CP-enhanced products and in educating the public of the benefits of various cocoa-based formulations. (Ex. 1, ¶¶ 15, 20 and 22).

---

[6] "The mounting scientific evidence on cocoa [polyphenols] is extraordinary. This is a scientific breakthrough that could well lead to a medical breakthrough." Dr. N. Hollenberg, Professor of Medicine, Harvard Medical School. (Ex. 5, p. 3).

[7] "It is clear that cocoa [polyphenols] represent an intriguing new area of research with significant implications for nutrition and cardiovascular health." Dr. C. Keen, Professor of Nutrition and Internal Medicine, University of California – Davis. (Ex. 11, p. 1).

Mars' research has enabled it to develop various CP-based end-products and ingredients, which enjoy the well-deserved reputation for being based on strong science. Specifically, Mars has developed and is engaged in efforts to sell and license a line of CP ingredients, namely, CP-enhanced cocoa powders and extracts under the Cocoapro name. Significantly, Cocoapro is the most studied cocoa in the world in terms of discovering the health impact and benefits of polyphenols. (Ex. 10, p. 3). Cocoapro powders and extracts have been used to develop and manufacture cocoa-based end-products for consumers, including chocolate bars and beverages. (Ex. 9, p.1). Other non-cocoa based applications are under development along with an ongoing series of clinical efficacy tests. Mars' efforts to sell and license its CP powders and extracts are targeted towards companies that are committed to promoting the health benefits of CPs and to producing products that meet Mars' high quality standards, including efficacy tests. (Ex. 13, ¶ 3).

Mars also has developed and sells a line of CP-enriched end-products that are marketed under the "CocoaVia®" trademark and brand name, which contain a patented combination of Cocoapro CP and sterols. Mars first introduced its CocoaVia products into the retail U.S. market in or around March 2005. (Ex. 1, ¶ 24; Ex. 11, p. 1). These CP-based products have been available in select grocery stores, drugstores and mass merchandise retailers across the country and also can be purchased over the Internet. Products include a variety of chocolate bars, granola-like bars, chocolate covered almonds and raisins and a chocolate-based beverage. (Exs. 8 and 14).

Other Mars products also utilize Mars' CP technology. In fact, Mars plans, in the very near future, to expand its line of products with enhanced CP content. Details are confidential at this time.

The rave reviews from scientists, doctors and nutritional experts about the numerous health benefits attributable to Mars' CP products, combined with Mars' ground-breaking achievements in cocoa science research and in developing processes by which it can extract and maximize polyphenols, has left Mars' competitors eager to enter this market, including some

who failed to appreciate Mars' vision. These competitors would now free-ride on Mars' success, hard work, investments and reputation. Natraceutical, S.A. and Natra U.S., Inc. are the first to have done just that, and in the process, they have infringed at least two of Mars' patents.

### D.    The Infringed Patents: United States Patent Nos. 6,312,753 and 6,790,966

To date, Mars has obtained more than 30 U.S. patents resulting from its work on CPs. (*See, e.g.,* Ex. 10, p. 3). At least two of these patents are now at issue, as Defendants have infringed at least U.S. Patent Nos. 6,312,753 and 6,790,966 ("the '753 patent", Ex. 15, and "the '966 patent," Ex. 16, respectively).[8] The '753 patent, entitled "Cocoa Components, Edible Products Having Enriched Polyphenol Content, Methods of Making Same and Medical Uses," issued to Mars as the assignee of its employee inventors on November 6, 2001. Defendants infringe at least claims 15 and 16 of the '753 patent by making and selling their CocoanOX 12 product. The '966 patent, entitled "Cocoa Extracts Containing Solvent-Derived Cocoa Polyphenols from Defatted Cocoa Beans," issued to Mars as the assignee of its employee inventors on September 14, 2004. Defendants infringe at least claims 1, 2, 3, 4 and 23 of the '966 patent by making and selling its CocoanOX 45 product.[9]

## III.    ARGUMENT

To be entitled to a preliminary injunction, the moving party must show: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if an injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) an injunction against the defendant(s) will have a favorable impact on the public interest. *See, e.g., Sanofi-Synthelabo v. Apotex, Inc.,* 470 F.3d

---

[8]   Several more of Mars' patents may be implicated after discovery identifies Defendants' processes, its customers and end-products containing the accused products.

[9]   Because the process by which Natraceutical S.A. makes CocoanOX is conducted in secret in Spain, Mars at this time only can surmise whether Defendants are infringing other Mars patents relating to process or product by process patent claims. Mars also has patent claims directed to food products containing a CP extract like that made by Natraceutical S.A. At this time, Mars has been unable to discover the identities of CocoanOX purchasers in the United States and the products in which CocoanOX is an ingredient, which may give rise to contributory infringement or inducement to infringe. Moreover, Defendants offer CocoanOX in other concentrations which Mars has not been able to procure and test.

1368, 1374 (Fed. Cir. 2006) (affirming the grant of preliminary injunctive relief against the alleged infringer) (*citing Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)); *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 429 F.3d 1364, 1372 (Fed. Cir. 2005) (affirming the order granting the patentee's motion for a preliminary injunction); *A.K. Stamping Co., Inc. v. Instrument Specialties Co., Inc.*, 106 F. Supp. 2d 627 (D.N.J. 2000) (granting a preliminary injunction in a patent infringement action); *Telebrands Direct Response Corp. v. Ovation Commc'ns, Inc.*, 802 F. Supp. 1169, 1178 (D.N.J. 1992) (granting the patentee's motion for a preliminary injunction); *see also* 35 U.S.C. § 283 (a court may grant injunctive relief in patent cases "in accordance with the principles of equity to prevent the violation of any right secured by patent"). These four factors, taken individually, are not dispositive. Indeed, no one factor is determinative; rather, the court must balance each of these factors against one another and against the extent of the relief sought. *See Tate Access Floors, Inc. v. Interface Architectural Res., Inc.*, 279 F.3d 1357, 1365 (Fed. Cir. 2002); *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed. Cir. 1988). Applying these factors here compels the grant of a preliminary injunction.

A.      **Overwhelming Evidence Shows that Mars
          Has a Likelihood of Success on the Merits.**

In order to demonstrate a likelihood of success on the merits, a patentee must show that, in light of the presumptions and burdens that will exist at a trial on the merits, (1) the defendant likely infringed the patents-in-suit and (2) the patentee's infringement claim will likely withstand the alleged infringer's challenges to the validity and enforceability of the patents-in-suit. *See Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003) (the court affirmed the grant of a preliminary injunction as the plaintiff was able to show infringement was likely at trial and the defendant made no substantial challenge of validity); *Sanofi-Synthelabo*, 470 F.3d 1368; *A.K. Stamping*, 106 F. Supp. 2d 627.

Assessing the "likelihood of infringement [in a preliminary injunction motion], like a determination of patent infringement at a later stage in the litigation, requires a two-step analysis." *See, e.g., Oakley Inc.*, 316 F.3d at 1339. Courts must (1) determine the scope and

meaning of the asserted claims and then (2) compare the properly construed claim to the accused product or method to determine whether every claim limitation or its equivalent are present in the accused products. *Id.*; *see also Pfizer*, 429 F.3d at 1372 ("Determining the likelihood of infringement requires two steps, first claim construction and second a comparison of the properly construed claims to the accused product."). While claim construction is a question of law to be determined by the court, claim comparison is a question of fact. *Oakley*, 316 F.3d at 1339; *A.K. Stamping*, 106 F. Supp. 2d at 634.

### 1.    <u>Claim Construction Standards.</u>

"Claim interpretation begins, as always, with the language of the claims." *Tate*, 279 F.3d at 1370 (*citing Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999)). In construing claim language, it is important to keep in mind that the claims, not the written description, define the scope of coverage. *See, e.g., Johnson Worldwide*, 175 F.3d at 989-90.  It is improper to import limitations from the written description into the claims. *Id.* at 989-90 (*citing Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998)). Further, the scope of a claim is not limited to a preferred embodiment. *Id.* at 992 (*citing Renishaw*, 158 F.3d at 1248).

Claim terms are to be given their ordinary and accustomed meaning. *Tate*, 279 F.3d at 1370. ("[A] court must presume that the terms in the claim mean what they say, and, unless otherwise compelled, give full effect to the ordinary and accustomed meaning of the claim terms."); *see also Pfizer*, 429 F.3d at 1373; *Johnson Worldwide*, 175 F.3d at 989 (there is a heavy presumption in favor of the ordinary meaning of claim language). The ordinary and customary meaning of a claim term is what a person of ordinary skill in the art would have understood the claim term to mean at the time of the invention. *Pfizer*, 429 F.3d at 1373 (*citing Phillips v. AWH Corp.*, 415 F.3d 1303,1313 (Fed. Cir. 2005), *cert. denied*, 126 S. Ct. 1332 (2006)); *Johnson Worldwide*, 175 F.3d at 989.  The person of ordinary skill in the art is deemed to have read a specific claim term in the context of the entire patent, including the specification, and not just in the context of the particular claim in which the disputed term appears. *Pfizer*, 429 F.3d at 1373.

Further, in construing claims, courts first look to the intrinsic evidence of record. *Metrologic Instruments, Inc. v. Symbol Techs., Inc.*, 460 F. Supp. 2d 571, 582-83 (D.N.J. 2006) ("In interpreting a disputed claim, the court looks primarily to the intrinsic evidence in the record.") (*citing Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *see also Tate,* 279 F.3d at 1372, n4. Intrinsic evidence includes the patent, including the claims, the remainder of the specification and the prosecution history. *Metrologic Instruments,* 460 F. Supp. 2d at 583. Extrinsic evidence, such as dictionaries, treatises, and expert and inventor testimony, also may be helpful in construing claim terms if an analysis of the intrinsic evidence does not provide clarity with respect to a disputed claim term. *Id.* at 585 (*citing Vitronics*, 90 F.3d at 1583)); *MBO Labs., Inc. v. Becton, Dickson & Co.,* 474 F.3d 1323, 1329 (Fed. Cir. 2007).

Additionally, inventors may specifically define claim terms in the specification of a patent and act as their own lexicographers. *Vitronics*, 90 F.3d at 1582; *Johnson Worldwide*, 175 F.3d at 990 (where patentee has chosen to be his or her own lexicographer by defining a claim term, that definition controls over the term's ordinary meaning).

Finally, in the context of preliminary injunctive relief, courts "may engage in a rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." *Pfizer*, 429 F.3d at 1377. Indeed, claim construction is based on a conclusion that is subject to change as the record develops even after a district court's decision to grant or deny a motion for a preliminary injunction. *Id.; see also Oakley*, 316 F.3d at 1345, n3 (district courts can issue "tentative" or "rolling" claim constructions when faced with construing claim language on an expedited basis.)

### 2. **Properly Construed Claims Must Be Applied to the Accused Product.**

After the disputed claim terms have been properly construed, the claims must be compared to the accused product to determine whether the accused product infringes the patents at issue. Patent infringement can be either literal or under the doctrine of equivalents. *See, e.g., A.K. Stamping*, 106 F. Supp. 2d at 639. To prove infringement, a patentee must demonstrate that an accused product or method meets every claim limitation or its equivalent. *Pfizer*, 429 F.3d at

1372; *Oakley*, 316 F.3d at 1339. "To establish literal infringement, every limitation set forth in a claim must be found in an accused product." *A.K. Stamping*, 106 F. Supp. 2d at 638 (citations omitted). An accused product that does not literally infringe a patent can still be found to infringe a patent under the doctrine of equivalents. Under this doctrine, a patent is infringed by an accused product if "it performs substantially the same function in substantially the same way to obtain the same result." *Id.* at 638.

### 3.   Patents Are Presumed Valid.

To obtain a preliminary injunction, a patentee also must demonstrate that the patentee's infringement claim will likely withstand any challenge by the alleged infringer to the validity and enforceability of the patents-in-suit. *See, e.g., Oakley*, 316 F.3d at 1339. It is well-settled that a patent is presumed valid at each and every stage of litigation in a patent infringement action. *See Sanofi-Synthelabo*, 470 F.3d at 1374; *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.*, 134 F.3d 1085, 1088 (Fed. Cir. 1998) ("a patent is presumed valid ... at every stage of the litigation"); *A.K. Stamping*, 106 F. Supp. 2d at 649 (*citing* 35 U.S.C. § 282). Thus, "the burden of proving invalidity is with the party attacking validity." *Oakley*, 316 F.3d at 1339. "[I]f [the alleged infringer] fails to identify any persuasive evidence of invalidity, the very existence of the patent satisfies [the patentee's] burden on validity." *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1363-64 (Fed. Cir. 2001); *Canon Computer*, 134 F.3d at 1088 (same).

Should the defendant in a preliminary injunction action challenge the validity of a patent by raising "substantial questions" of invalidity, the patentee is not required to establish the patent's validity "beyond question." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1359 (Fed. Cir. 2001). Rather, the burden is to show that there is a "reasonable likelihood that the attack on its patent's validity would fail." *Oakley*, 316 F.3d at 1339 (a patentee must show that the defendant's challenge "lacks substantial merit"). In other words, the patentee "must demonstrate that ... at least one of [the] allegedly infringed claims will ... likely withstand the validity challenges presented by the accused infringer." *Amazon.com*, 239 F.3d at 1351.

### 4.    Defendants Infringe Claims 15 and 16 of the '753 Patent.

The accused CocoanOx 12 product literally has each and every element of properly construed claims 15 and 16 of the '753 patent.

### a.    The Proper Construction of Claim 15 of the '753 Patent.

Claim 15 of the '753 patent (Ex. 15) reads "Partially defatted cocoa solids containing at least about 50,000 µg of total cocoa procyanidins per gram of nonfat cocoa solids."[10] The claim terms of claim 15 should be construed as follows:

"**Partially defatted cocoa solids**" means the solids portion(s) derived from shell-free partially defatted cocoa beans. This definition is derived from the specification. (Ex. 15, col. 11, ll. 6-8). The portion of the phrase referring to "partially defatted" carries its ordinary and customary meaning. "Partially defatted" means some, but not all, of the fats are removed. These definitions are consistent with their use in the specification. The specification discloses exemplary, non-limiting methods of producing partially defatted cocoa solids, including screw pressing or hydraulic pressing cocoa beans to remove cocoa butter, which is a fat normally contained within the cocoa bean. The cocoa butter is partially removed to form the partially defatted cocoa solids. (Ex. 15, col. 4, ll. 53-63, col. 22, l. 62-col. 24, l. 19).

"**Containing**" is an "open" claim term that permits additional elements besides those specifically recited but does not enable removal of elements specifically recited. *See Mars, Inc. v. H.J. Heinz Co. L.P.*, 377 F.3d 1369, 1375-76 (Fed. Cir. 2004).

"**At least about 50,000 µg**" carries its ordinary meaning, which means greater than or equal to about 50,000 micrograms, without an upper limit.

"**Total cocoa procyanidins**" means the total amount of procyanidin monomers and procyanidin oligomers.[11] The '753 patent specifies that procyanidins include both the monomers

---

[10] When originally issued, claim 15 read "Partially defatted cocoa solids containing at least about 50,000µg of cocoa procyanidin pentamer per gram of nonfat cocoa solids" A Certificate of Correction was issued on May 18, 2004 certifying that the claim, as issued, was incorrect, and corrected the claim by removing the term "cocoa procyanidin pentamer" and replacing it with "total cocoa procyanidins." (Ex. 15).

and oligomers. For example, Table 4 of the '753 patent, titled "Procyanidin Levels ppm (μg/g) in defatted powder with varying degrees of fermentation" (Ex. 15, col. 35, l. 40), shows amounts of "Monomer," as well as oligomers, such as "Dimer," "Trimer," etc. Moreover, the "Total" column illustrates that total procyanidins shown in Table 4 includes the monomers as well as the oligomers. (*See also Id.* at col. 39, ll. 46-48, with reference to Table 5; Table 11, and Table 12). Therefore, the term "total cocoa procyanidins" means the total amount of procyanidin monomers and procyanidin oligomers.

"**Nonfat cocoa solids**" carries its ordinary meaning. "Nonfat" means having fats removed. MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 790 (10th ed. 1993), Ex. 18. "Nonfat cocoa solids," thus, means the cocoa solids without fats.

### b.    Defendants Infringe Claim 15 of the '753 Patent.

CocoanOX 12, made and sold by Defendants, clearly infringes claim 15 of the '753 patent. CocoanOX 12 comprises partially defatted cocoa solids that are derived from cocoa. In particular, the Certificate of Analysis for CocoanOX 12, obtained from Defendants (Ex. 19), shows that CocoanOX 12 is derived from cocoa beans. CocoanOX 12 has a fat content of about 11%, whereas a cocoa bean has a fat content of approximately 58%. (Ex. 20, ¶¶ 18, 43-45). CocoanOX 12 is, thus, partially defatted in that some, but not all, of the fats have been removed. CocoanOX 12 contains at least about 50,000 μg of total cocoa procyanidin per gram of nonfat cocoa solids. In fact, analysis of CocoanOX 12 indicates that the total procyanidin content of CocoanOX 12 is approximately 77,000 μg per gram of nonfat cocoa solids. *Id.* at ¶ 19.

### c.    The Proper Construction of Claim 16 of the '753 Patent.

Claim 16 (Ex. 15) reads: "Partially defatted cocoa solids containing at least about 5,000 μg of cocoa procyanidin pentamer per gram of nonfat cocoa solids." Certain claim terms are

---

[11] The structures of "procyanidin monomers" and "procyanidin oligomers" includes compounds shown in the '753 patent at col. 11, ll. 21-54. (Ex. 15).

identical in Claim 16 as in Claim 15, and should be construed consistently with Claim 15 above. Other claim terms in Claim 16 should be construed as follows.

"**At least about 5,000 µg**" carries its ordinary meaning, which means greater than or equal to about 5,000 micrograms, without an upper limit.

"**Cocoa procyanidin pentamer.**" A "procyanidin pentamer" is a specific compound in cocoa; it is a procyanidin oligomer having 5 base monomer units. (Ex. 15, col. 12, ll. 1-2). "Cocoa procyanidin pentamer" thus means the procyanidin oligomer having five base monomer units contained within the cocoa solids.

> ### d.    Defendants Infringe Claim 16 of the '753 Patent.

CocoanOX 12, made and sold by Defendants, clearly infringes claim 16 of the '753 patent. CocoanOX 12 comprises partially defatted cocoa solids that are derived from cocoa. (Ex. 19). CocoanOX 12 has a fat content of 11%, whereas a cocoa bean has a fat content of approximately 58%. (Ex. 20, ¶¶ 18, 43-45). CocoanOX 12 is, therefore, partially defatted in that some, but not all, of the fats have been removed from CocoanOX 12. CocoanOX 12 contains at least about 5,000 µg of cocoa procyanidin pentamer per gram of nonfat cocoa solid. In fact, analysis of CocoanOX 12 indicates that the cocoa procyanidin pentamer content of CocoanOX 12 is approximately 5,500 µg per gram of nonfat cocoa solids. *Id.* at ¶ 20.

> ### 5.    Defendants Infringe Claims 1, 2, 3, 4 and 23 of the '966 Patent.

The accused CocoanOX 45 product literally has each and every element of the properly construed claims 1-4 and 23 of the '966 patent.

> ### a.    The Proper Construction of Claim 1 of the '966 Patent.

Claim 1 of the '966 patent (Ex. 16) reads: "A crude cocoa extract prepared by solvent extracting ground, defatted cocoa beans, which extract comprises a mixture of solvent-derived cocoa polyphenols." The claim terms of claim 1 should be construed as follows:

"**Crude cocoa extract**" means an extract derived from cocoa beans including cocoa polyphenols and xanthine alkaloids such as theobromine and caffeine. "Cocoa extract" means an extract from cocoa beans. "Crude" means that the cocoa extract includes the cocoa polyphenols,

as defined below (Ex. 21, p. 4; Ex. 16, col. 8, l. 49 to col. 9, l. 33), as well as xanthine alkaloids such as theobromine and caffeine. (*See* Ex. 22, p. 6; Ex. 16, col. 9, ll. 39-67).

"**Ground, defatted cocoa beans**" carries its ordinary meaning. "Ground" is past tense for "grind," which means reduced to powder or small fragments. (Ex. 18, p. 513). "Defatted" means having fat removed therefrom. *Id.* at 301. Thus, "ground, defatted cocoa beans" means cocoa beans that have been reduced to powder or small fragments and that have fat removed.

"**Solvent-derived cocoa polyphenols**" carries its ordinary meaning. "Derived" means obtained or received from a source. (Ex. 18, pp. 311-12). Therefore, "solvent-derived cocoa polyphenols" means cocoa polyphenols obtained from a source through the use of a solvent. The source is the ground, defatted cocoa beans. As such, "solvent-derived cocoa polyphenols" means cocoa polyphenols obtained from the ground, defatted cocoa beans through the use of a solvent.

"**Cocoa polyphenols**" means polyphenols derived from cocoa, including but not limited to procyanidin monomers and procyanidin oligomers. (*See* Ex. 16, col. 2, ll. 48-54, and FIG. 3).

"**Mixture of solvent-derived cocoa polyphenols**" means "containing more than one cocoa polyphenol." Specifically, the ordinary definition of "mixture" is a portion of matter containing two or more compounds. (Ex. 18, p. 746).

### b.    Defendants Infringe Claim 1 of the '966 Patent.

CocoanOX 45, made and sold by Defendants, clearly infringes claim 1 of the '966 patent. CocoanOX 45 is a crude cocoa extract because CocoanOX 45 is an extract that contains cocoa polyphenols and xanthine alkaloids. Specifically, CocoanOX 45 contains more than one cocoa polyphenol. Ex. 20, ¶¶ 11-14, 21-23. As such, CocoanOX 45 is a mixture of cocoa polyphenols. CocoanOX 45 also contains the spectrographic fingerprint for caffeine and theobromine from cocoa, which are commonly known as xanthine alkaloids. *Id* at. ¶¶ 24-29. The amounts of the xanthine alkaloids theobromine and caffeine are consistent with an extract. *Id.* at ¶29. Indeed, the Certificate of Analysis for CocoanOX 45, obtained from Defendants, refers to CocoanOX 45 as an "extract." (Ex. 23).

In addition, CocoanOX 45 is prepared by solvent extracting ground, defatted cocoa beans. Analysis of CocoanOX 45 indicates the presence of ethanol, a solvent used to extract cocoa polyphenols from ground, defatted cocoa beans to form a cocoa extract. Ex. 23 at ¶¶ 38-42. Moreover, the Certificate of Analysis for CocoanOX 45 fails to list fat as a component of CocoanOX 45 under its physicochemical profile.[12] (*Id.*). Therefore, CocoanOX 45 is derived from defatted cocoa beans.

Finally, the CocoanOX 45 contains a mixture of solvent-derived cocoa polyphenols. (Ex. 20, ¶¶ 38-42). CocoanOX 45 further contains cocoa polyphenols of procyanidin monomers and procyanidin oligomers. *Id.* at ¶¶14, 23. These cocoa polyphenols are present in CocoanOX 45 after extraction of ground, defatted cocoa beans with ethanol and are, thus, solvent-derived. *Id.* at ¶42.

### c.    The Proper Construction of Claim 2 of the '966 Patent.

Claim 2 of the '966 patent (Ex. 16) reads:"[A] crude cocoa extract which comprises a mixture of cocoa polyphenols." The claim terms of claim 2 of the '966 patent should be construed consistently with the same claim terms construed above with respect to claim 1.

### d.    Defendants Infringe Claim 2 of the '966 Patent.

CocoanOX 45, made and sold by Defendants, clearly infringes claim 2 of the '966 patent. As in Claim 1, CocoanOX 45 is a crude cocoa extract. As in Claim 1, CocoanOX 45 contains a mixture of cocoa polyphenols.

### e.    The Proper Construction of Claim 3 of the '966 Patent.

Claim 3 of the '966 patent (Ex. 16) reads: "[T]he extract of claim 1 or 2, wherein the cocoa polyphenols comprise catechin, epicatechin, and procyanidin oligomers thereof." Claim 3 depends from either independent claim 1 or independent claim 2. The claim terms of claim 3 of the '966 patent should be construed consistently with claims 1 and 2, above. "Catechin,

---

[12]  Compare to the Certificate of Analysis of CocoanOX 12 (Ex. 19), which shows the "Fat content (AOAC)" of CocoanOX 12 under its physicochemical profile.

epicatechin, and procyanidin oligomers thereof" are described in the '966 patent at col. 2, ll. 48-54. (*See also* Ex. 16; FIG. 3).

### f.     Defendants Infringe Claim 3 of the '966 Patent.

Claim 3 depends from either independent claim 1 or independent claim 2. Therefore, to infringe claim 3, a product must include all of the limitations of dependent claim 3 in combination with the limitations of independent claim 1 *or* all of the limitations of dependent claim 3 in combination with the limitations of independent claim 2. *See 37 C.F.R. §1.75(c)*. As shown above, Defendants infringe both claim 1 and claim 2 of the '966 patent. Claim 3 is likewise infringed because CocoanOX 45 includes each and every element of dependent claim 3 in combination with claims 1 or 2. The cocoa polyphenols within CocoanOX 45 are catechin, epicatechin and procyanidin oligomers thereof. Specifically, analysis of CocoanOX 45 indicates the presence of catechin, epicatechin, dimers, trimers, tetramers, pentamers, hexamers, heptamers, octamers, nonamers, decamers, undecamers and dodecamers. (Ex. 20, ¶¶ 14 and 23).

### g.     The Proper Construction of Claim 4 of the '966 Patent.

Claim 4 of the '966 patent (Ex. 16) reads: "The extract of claim 3, wherein the oligomers are dimers through dodecamers." Claim 4 depends from dependent claim 3, which depends from either claim 1 or independent claim 2. The claim terms of claim 4 of the '966 patent should be construed consistently with claims 1, 2 and 3 above.

"**Dimers through dodecamers**" carry their ordinary meaning: oligomers having two base monomer units (dimers), three base monomer units (trimers), four base monomer units (tetramers), five base monomer units (pentamers), six base monomer units (hexamers), seven base monomer units (heptamers), eight base monomer units (octamers), nine base monomer units (nonamers), ten base monomer units (decamers), eleven base monomer units (undecamers) and twelve base monomer units (dodecamers). (*See, e.g.,* Ex. 16, col. 2, ll. 38-54, FIG. 3).

### h.     Defendants Infringe Claim 4 of the '966 Patent.

Claim 4 depends from dependent claim 3, which depends from either independent claim 1 or independent claim 2. Therefore, to infringe claim 4, a product must include all of the

limitations of dependent claim 4 in combination with the limitations of dependent claim 3 and independent claim 1 *or* all of the limitations of dependent claim 4 in combination with the limitations of dependent claim 3 and independent claim 2. *See 37 C.F.R. §1.75(c).* As shown above, Defendants infringe claims 1, 2 and 3 of the '966 patent. Claim 4 is likewise infringed because CocoanOX 45 includes each and every element of dependent claim 4 in combination with claims 1 and 3 or 2 and 3. CocoanOX 45 contains oligomers of dimers through dodecamers.     (Ex. 20, ¶¶ 14 and 23).

### i.     The Proper Construction of Claim 23 of the '966 Patent.

Claim 23 (Ex. 16) reads: "The extract of claim 1 or 2 in dry form." Claim 23 depends from either independent claim 1 or independent claim 2. The claim terms of claim 23 of the '966 patent should be construed consistently with claims 1 and 2, above, and as follows.

"**Dry**" carries its ordinary meaning, and means free or relatively free of liquid and especially water. (Ex. 18, p. 356).

### j.     Defendants Infringe Claim 23 of the '966 Patent.

Claim 23 depends from either independent claim 1 or independent claim 2. Therefore, to infringe claim 23, a product must include all of the limitations of dependent claim 23 in combination with the limitations of independent claim 1 *or* all of the limitations of dependent claim 23 in combination with the limitations of independent claim 2. *See 37 C.F.R. §1.75(c).* As shown above, Defendants infringe both claims 1 and claim 2 of the '966 patent. Claim 23 is likewise infringed because CocoanOX 45 includes each and every element of dependent claim 23 in combination with claims 1 or 2. CocoanOX 45 is in dry form, as evidenced by the sample of CocoanOX 45 that was analyzed, which arrived in a packet in dry powder form. (Ex. 20, ¶ 9).

### k.     Infringement Conclusions.

In summary, CocoanOX 12 literally infringes at least claims 15 and 16 of the '753 patent, while CocoanOX 45 literally infringes at least claims 1, 2, 3, 4 and 23 of the '966 patent. Moreover, a patent is presumed valid when issued by the U.S. Patent and Trademark Office;

thus, Mars has satisfied its burden on issues of validity. Based on the foregoing, Mars has demonstrated that it likely to succeed on the merits of its infringement action against Defendants.

### B. Mars Will Be Irreparably Harmed if Defendants Are Not Preliminarily Enjoined.

The second factor that a patentee seeking a preliminary injunction must show that it will suffer irreparable harm if the injunction is not granted. It is well-settled that "[t]he right to exclude others from a specific market, no matter how large or small that market, is an essential element of the patent right." *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 976 (Fed. Cir. 1996). Further, "because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." *Id.* (*citing Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1456-57 (Fed. Cir. 1988); *see also A.K. Stamping Co., Inc. v. Instrument Specialties Co., Inc.*, 106 F. Supp. 2d 627, 655 (D.N.J. 2000) (citations omitted).[13] Injunctive relief preserves the legal interests of the parties against "future infringement which may have market effects never fully compensable in money." *Hybritech*, 849 F.2d at 1457; *Telebrands Direct Response Corp. v. Ovation Commc'ns, Inc.*, 802 F. Supp. 1169, 1178 (D.N.J. 1992) (same).

> Competitors change the marketplace. Years after infringement has begun, it may be impossible to restore a patentee's (or an exclusive licensee's) exclusive position by an award of damages and a permanent injunction. Customers may

---

[13] In *eBay, Inc. v. Mercexchange, LLC*, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006), the Supreme Court addressed the proper analysis for *permanent* injunctive relief. Courts are now interpreting what impact *eBay* has in granting preliminary injunctive relief in patent infringement actions. At least one district court has held that the Supreme Court in *eBay* did not invalidate the presumption of irreparable harm for preliminary injunctions upon a showing of validity and infringement. *Christiana Indus., Inc. v. Empire Elecs.*, Case No. 06-12568, 2006 U.S. Dist. LEXIS 54210, at *5 (E.D. Mich. Aug. 4, 2006) (Ex. 24) (denying a motion to reconsider the order granting a preliminary injunction against the alleged infringer). Rather, the Supreme Court held only that "courts err by categorically granting permanent injunctive relief on a showing of infringement and validity, without analyzing the traditional four factors for injunctive relief;" and, in so holding, "the Court reiterated that the grant or denial of injunctive relief rests with the equitable discretion of the court ... consider[ing] the[se] four factors." *Id; eBay*, 126 S. Ct. at 1839; *see also Canon Inc. v. GCC Int'l Ltd.*, 450 F. Supp. 2d 243, 251 (S.D.N.Y. 2006) ("The Supreme Court [recently] has reminded district courts considering requests for injunctive relief in patent cases that the traditional rules of equity apply…").

have established relationships with infringers. The market is rarely the same
when a market of multiple sellers is suddenly converted to one with a single seller
by legal fiat. Requiring purchasers to pay higher prices after years of paying lower
prices to infringers is not a reliable business option.

*Polymer*, 103 F.3d at 975-76.

Various "economic" considerations, such as lost market share, the dollar amount

expended on product development and reduced profits, are "specifically among the factors that

courts consider" in holding that a patentee will suffer irreparable harm. *A.K. Stamping Co.*, 106

F. Supp. 2d at 655. Other factors that also can weigh in favor of finding irreparable harm, and

are relevant to the case at hand, include whether: (1) the patent at issue covers a new field of

technology; (2) there is a lot of research being done in this field; (3) this is a field where

technological advances can occur quickly; (4) the patentee and the alleged infringer are direct

competitors trying to influence the same group of consumers; (5) the continued infringement

would disparage the reputation of the patentee or its product; (6) in the absence of the injunction,

other potential infringers will be encouraged to infringe;[14] and (7) the defendant is judgment

proof.[15] *See, e.g., Hybritech*, 849 F.2d at 1457 (enumerating various factors); *Lawman Armor*

*Corp. v. Winner Int'l, Inc.*, Case No. 01-1605, 2002 U.S. Dist. LEXIS 1431, at *50-51 (E.D. Pa.

Jan. 28, 2002) (Ex. 25) (listing factors); *Jacobson v. Cox Paving Co.*, 19 U.S.P.Q. 2d 1641, 1659

(D. Ariz. May 16, 1991), *aff'd*, 949 F.2d 404 (Fed. Cir. 1991), (listing factors).

Defendants' continued infringement of Mars' patents imminently and irreparably has

harmed Mars in several ways.

---

[14] *See, specifically, Telebrands Direct Response Corp. v. Ovation Commc'ns, Inc.*, 802 F. Supp.
1169, 1178 (D.N.J. 1992) (in finding irreparable harm, the court noted that the alleged infringer's
unauthorized use of the patented design will, among other things, encourage other companies to
infringe with similar "knock-off" products and will disparage the reputation of the "genuine"
patented product as it becomes intertwined in consumers' mind with cheap imitations).

[15] *See, specifically, Canon, Inc. v. GCC Int'l Ltd.*, 450 F. Supp. 2d 243, 256 (S.D.N.Y. 2006)
(one of the factors the court relied on in finding irreparable harm was the fact that defendant was
a foreign corporation, with overseas operations; thus, locating and attaching assets sufficient to
satisfy a monetary award would be "exceedingly difficult").

1.    **Economic Considerations Weigh Heavily
in Favor of a Preliminary Injunction.**

Defendants' CocoanOX products are CP powders and extracts, which are ingredients that can be used in various end-products. Mars also produces CP powders and extracts. Mars' CP powders and extracts are used internally in producing Mars' end-products, and are being offered for sale to appropriate third parties as a part of a licensing agreement that enables licensees to use Mars' CP powders and extracts in their end-products. As such, Mars and Defendants are direct competitors.

Moreover, Defendants' CocoanOX is being offered for sale to persons who compete directly with Mars at the end-product level. Defendants' activities thus enable Mars competitors to compete against Mars' CP products in a market developed by Mars through vast expenditures of time and money in research, consumer education and product development.

These competitive realities are the very "economic considerations" that courts rely on for a finding of irreparable harm. The competition offered by Defendants and Defendants' customers will cause Mars' business relationships to suffer, sales and profits to be lost, and may cause price erosion regarding CP powders, extracts and end-products containing CPs. Defendants' sales of infringing products, whether or not to direct competitors of Mars, also constitutes lost opportunities for Mars and will undermine Mars' continued efforts to develop current and potential customer relationships and customer goodwill. Loss of relationships, goodwill and reputation cannot be measured and compensated with money damages. Mars' hard work and proprietary rights should not be diluted by Defendants' infringing activities. *See, e.g., Polymer*, 103 F.3d at 975-76; *Telebrands*, 802 F. Supp. at 1178.

In fact, Defendants now are launching a wide scale marketing crusade to increase U.S. sales of CocoanOX at the most crucial juncture of Mars' plans. Defendants are claiming that CocoanOX is "the latest in innovation" (Ex. 4) as they plan to promote and sell their CocoanOX products at the IFT 2007 Annual Meeting and Food Expo ("IFT Expo"), in Chicago, Illinois, which runs from July 28, 2007, through August 1, 2007. (Exs. 26 and 27). Significantly, Mars is also registered as an exhibitor at the IFT Expo to promote its CP-enriched products. (Ex. 1, ¶

35).  That trade show closely follows announcements that Mars plans to make at a Botanical

Conference in Chicago on July 6 regarding the future of its CP business and products.

Standing alone, Defendants' appearance at the July 2007 IFT Expo will cause imminent

and irreparable harm to Mars.  The IFT Expo is the major forum at which food companies launch

new products and entice buyers to purchase such products, providing essential information about

product performance, availability and price.  Indeed, the IFT Expo reports that "70% of IFT

attendees go there to find new products." (Ex. 28, p. 1).  It then states that "IFT is the only place

where the hottest global food trends – and the products geared to meet those trends – are put on

display.  It is, in short, the future of food." *Id.*

Indeed, "50% of IFT attendees go to no other trade shows…. Because IFT delivers the

only true one-stop trends and information shop in the food world – including Special Interest

Pavilions specifically designed to showcase important and emerging foods and food

technologies." (Ex. 28, p. 1).  Additionally, "87% of IFT attendees make or have influence over

their company's buying decisions." *Id.* at p. 2.  The IFT Expo then goes on to explain:

> Face-to-face meetings are more important to business than they've ever been….
> [I]n-person one-on-one dialogue has no substitute.  Nowhere is this more apparent
> than at IFT, where buyers rely on exhibitors to help solve their problems and give
> new insight into their businesses.
>
> Each year more than 2,000 exhibitors come to IFT with new product innovations
> in tow.  Among them are over 500 ingredient companies representing 2,500+
> newtechnology [sic] and applications ideas.

*Id.* at pp. 3.  The IFT Expo also offers a variety of marketing programs and IFT pre-show

promotions to help exhibitors succeed in showcasing and selling their products.  (Ex. 29).  That

Defendants plan to market and sell their infringing CocoanOX products at the IFT Expo in July

demonstrates how imminent the harm is to Mars and how crucial it is that Defendants be

preliminarily enjoined from causing such harm.

But the harm to Mars caused by Defendants' participation in the IFT Expo in July does

not stand alone.  Coming as it does on the heels of planned announcements by Mars regarding

the future of Mars CPs, and because Defendants will square off at the Expo in a face-to-face confrontation with Mars, Defendants' exhibition and sales of CocoanOX at the IFT trade show will undermine Mars' efforts and detract from Mars' plans, products and announcements.

### 2.    Other Irreparable Harm Factors Weigh Heavily in Favor of a Preliminary Injunction

The irreparable harm that threatens Mars goes well beyond pure "economic considerations." Mars' CP-enhanced products have received rave reviews regarding their potential health benefits.

> With heart disease remaining the nation's number one killer, American[]
> [consumers] increasingly are looking for options to improve their heart health.
> Now there's a new product [CocoaVia] hitting the store shelves that will allow
> them to satisfy their passion for chocolate while being good to their heart.

(Ex. 11, p.1, referring to Mars' CocoaVia products).

Defendants' infringing sales activities and business methods regarding CP products threatens to destroy not only the solid science-based reputation of Mars' CP products, but also the reputation of the entire CP market created by Mars through its verified scientific research. Mars can find no evidence that Defendants have conducted clinical trials or other research to establish that their products provide the benefits that are provided by Mars' products. Instead, Defendants merely seek to free ride on Mars' work, simply hoping that their products produce the same results. This profit-oriented, cavalier approach jeopardizes the entire market for CP products.

Similarly, CP ingredients cannot, without research, be added to just any product. CPs may react differently with different substances. Defendants are not conducting this research either. Their ingredients apparently are available to anyone who wants to purchase them without regard to calories, dosages, interfering substances or appropriateness of the product to which the ingredient is to be added. These activities also threaten to destroy the entire CP market and Mars' CP brands and products as well.

Mars will sell its CP products only to companies committed to promoting the health benefits of CPs and to producing products that both meet Mars' high standards of quality and preserve the reputation for CPs developed by Mars. Mars will – but Defendants will not – (a) control the amount of CP that is used in products to ensure that an efficacious dose is used rather than merely a nominal amount; (b) proscribe caloric intake limitations – it does little good and may be harmful to the consumer and to CPs' reputation to put CP in a high calorie product; (c) require rigorous testing to assure efficacy of CP in its licensees' products; and (d) limit the products that contain CPs to those that ensure that CPs are used only to make healthy products consistent with Mars' reputation that its CP products are based on solid science. (Ex. 13, ¶ 3). If CP is indiscriminately added to just any product – like junk food for example – Mars will be irreparably harmed, and Defendants are offering to do just that.

A showing that CocoanOX is inferior to Mars' patented CP products is not necessary to show irreparable harm. *Teledyne Indus., Inc. v. Windmere Prods., Inc.*, 433 F. Supp. 710, 740 (S.D. Fla. 1977). Irreparable harm is shown if consumers may equate the attributes of the infringing product to the patented product. A patentee should not be required during the pendency of a case to endure even a slight possibility that its product reputation will be adversely affected by infringing product. *Id*; *see also, Allan Block Corp. v. E. Dillon & Co.*, Case No. 04-3511, 2005 U.S. Dist. LEXIS 13566, at *20 (D. Minn. July 1, 2005) (Ex. 30), *aff'd*, 170 Fed. Appx. 130 (Fed. Cir. 2006). This is particularly true where, as here, the infringing product has not been extensively tested to verify that it actually produces the same benefits as a thoroughly tested patented product. Mars cannot easily rebuild a reputation lost at the hands of a competitor who floods the market with an infringing product(s) that is not scientifically validated.

Several other factors weigh heavily in Mars' favor of finding irreparable harm. *See, e.g., Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988) (enumerating various factors). For example, Mars' CP research and technology is on the cutting edge; there have been ground-breaking discoveries regarding the health benefits attributable to CPs, and such discoveries have received much acclaim from the medical and scientific experts. (Ex. 1, ¶ 19).

Further, Mars' resulting patented CP products and the processes by which CPs can be extracted and retained from cocoa beans while being processed are truly revolutionary. Mars' proprietary position regarding CPs encourages Mars to continue to research new and more effective ways to advance its CP technology. Defendants' continuing infringement will stifle those efforts.

It is also significant to remember that Defendants' infringing products consist of CP compounds. (Ex. 20, ¶¶ 14, 23). These powders and extracts are purchased in large quantities by food manufacturers to be used as one of the ingredients in these manufacturers' finished, ready-to-eat products. (Ex. 1, ¶ 29). Many of Defendants' targeted purchasers likely are Mars' competitors. Once the CP powder or extract has been combined with other ingredients in the finished, ready-to-eat products, it becomes virtually impossible to determine the *source* of such powder or extract. It is a laborious task to conduct an infringement analysis of CP-enriched end-products and then be compelled to institute suit against each company who purchased its CP ingredients from Defendants. The possibility of the need for repetitive litigation exacerbates the irreparable harm suffered by Mars.

Moreover, Mars' CP technology has wide-ranging uses beyond chocolates or cocoa-based food products. It can be used in other aspects of the food industry, as well as in beverages and in the medical and pharmaceutical industries. (Ex. 9, p.1; *see also* Ex. 13, ¶ 2). As such, Mars' patents are ripe for licensing opportunities in these other fields. Companies considering a license in a particular field also may want proprietary rights in their products, which means that the value of such a license, although not quantifiable, is far greater when competition is excluded as promised by federal patent laws. (Ex. 13, ¶ 4).

Further, if Defendants are not preliminarily enjoined, Mars has reason to believe that other direct competitors will enter the U.S. market and promote and sell CP-based products that also infringe Mars' patents. Mars already is aware of at least one other foreign-based chocolate manufacturer, Barry Callebaut, that is making and selling outside of the U.S. CP-based products, marketed under the brand name "Acticoa." (Ex. 31). Allowing Defendants to continue to

infringe Mars' patents through a final resolution at trial many months from now is tantamount to an open invitation to potential entrants to launch their CP products in the U.S. *now*.

Finally, it is uncertain whether Mars would be successful in having any monetary judgment enforced against Defendants. It appears that most, if not all, of Defendants' assets are located overseas. Natra U.S. is a wholly-owned subsidiary of Natraceutical and is the alter ego and agent of Natraceutical in the U.S. It appears that Natra U.S. possesses few, if any, assets in the U.S. and acts solely as the gateway for Natraceutical S.A. to establish a market and customer-base in the U.S. for its products. As the bulk of Defendants' operations are likely in Spain, locating and attaching assets sufficient to satisfy a monetary award would be difficult.

In sum, Defendants should not be permitted to continue to infringe Mars' patents and sell products that directly compete with Mars' own patented CP products. Based on the timing of Defendants' national marketing crusade, and of Mars' announcements regarding its CP products, and the manner in which Defendants market and sell CocoanOX, the irreparable harm to Mars is even more acute. As monetary damages are wholly inadequate, Mars requests that this Court enter an order preliminarily enjoining Defendants from continuing to infringe Mars' patents during the pendency of this case.

### C.  **The Balance of Hardships Tips Strongly in Favor of Mars.**

The third factor in a preliminary injunction analysis is the balance of hardships, where the threatened injury to the patentee should the injunction be denied is weighed against the injury to the accused infringer if the preliminary injunction is granted. *See Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1346 (Fed. Cir. 2003); *see also Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988). In patent infringement actions, the balance of hardships does not favor a defendant who "took a calculated risk that it might infringe [plaintiff's] patents." *Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed. Cir. 1983), *cert. denied*, 464 U.S. 996 (1983). "One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against a continuing infringement destroys the business so elected." *Telebrands*, 802 F. Supp. at 1179 (the defendant's "plea of hardship" was rejected since it was

aware of the risks of its "legally precarious business venture") (*citing Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n.12 (Fed. Cir. 1986) (reversed on other grounds)).

Here, Defendants were aware of Mars' innovative achievements in cocoa science research and CP technology. Defendants are in the business of manufacturing and selling CP ingredients. As such, they must stay on top of the latest industry advances. With over 100 publications and more than 30 patents that relate to Mars' involvement in CP research over the past 15 years, Defendants cannot now credibly argue that they were unaware of Mars' patented CP products and processes and Mars' scientific contributions.

**D.    It Is in the Public Interest to Preliminarily Enjoin Defendants.**

The final factor concerns the impact that injunctive relief would have on the public interest and focuses on whether there exists some "critical public interest" that would be harmed by the grant of injunctive relief. *See Hybritech*, 849 F.2d at 1458 (citations omitted). There is simply no public interest that is served by permitting patent infringement. *A.K. Stamping Co., Inc. v. Instrument Specialties Co., Inc.*, 106 F. Supp. 2d 627, 655 (D.N.J. 2000) ("no public interest is served by allowing patent infringement"); *Telebrands*, 802 F. Supp. at 1179; *Lawman Armor Corp. v. Winner Int'l, Inc.*, Case No. 01-1605, 2002 U.S. Dist. LEXIS 1431, at *55 (E.D. Pa. Jan. 22, 2002) ("Where a likelihood of infringement has been shown, the public interest is almost always served by vindicating the patentee's rights.") (*citing Smith*, 718 F.2d at 1581)). Accordingly, "[t]here is a strong public interest in ensuring that valid patents are enforced." *Canon, Inc. v. GCC Int'l Ltd.*, 450 F. Supp. 2d 243, 257 (S.D.N.Y. 2006).

Given the way Defendants sell their infringing products to all comers without scientific validation of all those potential uses, public policy favors the preliminary injunction. As Mars has demonstrated a likelihood of infringement and has met the remaining factors necessary for a preliminary injunction, the public interest is best served by preliminarily enjoining Defendants from continuing to infringe Mars' patents. *See Lawman*, 2002 U.S. Dist. LEXIS 1431, at *55 ("Where a likelihood of infringement has been shown, the public interest is almost always served by vindicating the patentee's rights.") (*citing Smith*, 718 F.2d at 1581)).

**E.     Expedited Discovery Is Warranted in This Case.**

"[E]xpedited discovery is particularly appropriate" in the context of preparation for a preliminary injunction hearing. *Philadelphia Newspaper, Inc. v. Gannett Satellite Info. Network*, No. 98 CV 2782, 1998 U.S. Dist. LEXIS 10511, at *4 (E.D. Pa. July 15, 1998); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. O'Connor*, 194 F.R.D. 618 (N.D. Ill. 2000). Here, Mars' request for expedited discovery is reasonable and should be granted. First, as demonstrated above, Mars is at risk of imminent, irreparable harm as a result of Defendants' continued infringing activities and sales of its CocoanOX and related products. Indeed, Defendants intend to promote and sell CocoanOX at an important trade show in Chicago in late July 2007 in an effort to increase U.S. sales of and exposure to their infringing products. To prevent such injury, Mars submits that a preliminary injunction is necessary.

Nonetheless, to adequately prepare for the preliminary injunction hearing, including developing a sufficient evidentiary record, Mars needs discovery on various issues relating to the nature and extent of Defendants' infringement. For example, Mars has been unable to discover the identities of CocoanOX purchasers in the U.S., as well as the products in which CocoanOX is an ingredient and the concentrations of CocoanOX used to make such products. Through limited expedited discovery Mars will be able to establish the magnitude of Defendants' infringement, and in turn, will be able to further demonstrate to the Court the extent of the irreparable harm that Defendants' infringement continues to cause Mars.

**IV.     CONCLUSION**

Mars' evidence of likelihood of success and irreparable harm is overwhelming. Moreover, the balance of hardships and public interest factors tip in Mars' favor. Plaintiff Mars, Inc. thus respectfully requests that this Court enter an order preliminarily enjoining Defendants from continuing to infringe Mars' patents as alleged in the complaint during the pendency of this case, and which specifically enjoins any exhibition or sales activities regarding CocoanOX at the IFT Expo in July 2007. Mars also respectfully submits that this Court grant Mars' request for

expedited discovery, and grant such further relief as this Court deems just under the circumstances.

Dated: April ⟨2⟩, 2007

CARELLA, BYRNE, BAIN, GILFILLAN,
CECCHI, STEWART & OLSTEIN

By: _____
        JOHN M. AGNELLO

5 Becker Farm Rd.
Roseland, NJ  07068

Kenneth J. Jurek
Daniel N. Christus
Linda A.O. Lamberson
MCDERMOTT WILL & EMERY LLP
227 West Monroe Street, Suite 4400
Chicago, Illinois  60606-5096

ATTORNEYS FOR MARS, INC.

CHI99 4801688-6.002227.0120

- 30 -