# EXHIBIT 22

Dockets.Justia.com

Application No. 10/342,772
Response to 7/16/03 Office Action
Docket No. 5677-196

*171/*



CERTIFICATE OF MAILING
I hereby certify that this correspondence is being deposited with the
United States Post Office as first class mail in an envelope addressed
to: Commissioner for Patents,  P.O. Box 1450, Alexandria, VA
22313-1450 on
Date:          10/1/03
Name:       Felicia D'Agostino
Signature:  _____
                                Clifford Chance US LLP

| | | |
|---|---|---|
| Appl. No. | : | 10/342, 772 |
| Applicant | : | Leo J. Romanczyk, Jr. et al.. |
| Filed | : | January 15, 2003 |
| For | : | Cocoa Extracts Containing Solvent – Derived Cocoa Polyphenols from Defatted Cocoa Beans |
| TC/A.U. | : | 1711 |
| Examiner | : | Nathan Nutter |
| Docket No. | : | 5677-196 |

Honorable Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

**RECEIVED**

**OCT 0 8 2003**

**TC 1700**

## AMENDMENT

Sir:

In response to the Office Action of July 16, 2003, please amend the above-identified application as
follows:

**Amendments to the Claims** are reflected in the listing of claims which begins on page 2 of this paper.

**Remarks** begin on page 4 of this paper.

Page 1 of 6

NYB 1429879.1

Application No. 10/342,772
Response to 7/16/03 Office Action
Docket No. 5677-196

This listing of claims will replace all prior versions and listings of claims in the application.

**Listing of Claims**

Claim 27.    (currently amended) A crude cocoa extract prepared by solvent extracting ground, defatted cocoa beans, which extract comprises ~~at least one~~ a mixture of solvent-derived cocoa ~~polyphenol~~ polyphenols.

Claim 28.    (currently amended)  A crude cocoa extract which comprises a mixture of cocoa polyphenols.

Claim 29.    (original) The extract of Claim 27 or 28, wherein the cocoa polyphenols comprise catechin, epicatechin, and procyanidin oligomers thereof.

Claim 30.    (original) The extract of Claim 29, wherein the oligomers are dimers through dodecamers.

Claim 31.    (original) The extract of Claim 27 or 28, wherein the crude cocoa extract is fractionated into monomeric and oligomeric fractions.

Claim 32.    (original) The extract of Claim 31, wherein the monomeric fractions comprise epicatechin and catechin.

Claim 33.    (original) The extract of Claim 31, wherein the oligomeric fractions comprise cocoa procyanidins selected from the group consisting of dimers through dodecamers.

Claim 34.    (original) The extract of Claim 31, wherein the fractions are pooled fractions.

Claim 35.    (original) The extract of Claim 27 or 28, which is prepared from freeze dried cocoa beans.

Claim 36.    (original) The extract of Claim 27 or 28, wherein the cocoa beans are fermented.

Claim 37.    (original) The extract of Claim 27 or 28, wherein the cocoa beans are unfermented.

Claim 38.    (original) The extract of Claim 27 or 28, wherein the cocoa beans are selected from the group consisting of Trinitaro, Forastero, and Criollo cocoa beans.

Page 2 of 6

NYB 1429879.1

Application No. 10/342,772
Response to 7/16/03 Office Action
Docket No. 5677-196

Claim 39.    (original) The extract of Claim 27 or 28, which is purified by gel permeation chromatography.

Claim 40.    (original) The extract of Claim 27 or 28, which is purified by preparative high performance liquid chromatography.

Claim 41.    (original) The extract of Claim 39, which is purified by preparative high performance liquid chromatography.

Claim 42.    (original) The extract of Claim 40, wherein the preparative high performance liquid chromatography is reverse phase preparative high performance liquid chromatography.

Claim 43.    (original) The extract of Claim 40, wherein the preparative high performance liquid chromatography is normal phase preparative high performance liquid chromatography.

Claim 44.    (original) The extract of Claim 27 or 28, wherein the solvent comprises acetone and water, methanol and water, or ethyl acetate.

Claim 45.    (original) The extract of Claim 44, wherein the solvent is acetone and water.

Claim 46.    (original) The extract of Claim 44, wherein the solvent is methanol and water.

Claim 47.    (original) The extract of Claim 44, wherein the solvent is ethyl acetate.

Claim 48.    (original) The extract of Claim 27 or 28 in liquid form.

Claim 49.    (original) The extract of Claim 27 or 28 in dry form.

Claim 50.    (original) The extract of Claim 49 in lyophilized form.

NYB 1429879.1

Application No. 10/342,772
Response to 7/16/03 Office Action
Docket No. 5677-196

**Remarks**

The Examiner is thanked for the withdrawal of the §102(b) rejection over Zeigler et al.

A.  **Election/Restriction**

Because Applicants amended the claims to include a broader recitation for the invention in Claim 28, and all claims dependent thereon, the following restriction was made:

1.  A crude cocoa extract; and

2.  A cocoa extract.

It is the Examiner's position that newly amended Claims 28 and 29 (28) to 50 (28) are directed to an invention that is independent or distinct from the invention originally claimed because the crude extract and the extract of Claims 28 and 29 differ in purity.

Since Applicant received an action on the merits for the originally presented invention, i.e., the crude cocoa extract, this invention has been constructively elected by original presentation for prosecution on the merits. Accordingly, the Examiner has withdrawn Claims 28 and 29/28-50/28 from consideration.

B.  **Applicants' Response to Restriction Requirement**

It is respectfully pointed out that there is no language in Claim 28 regarding the purity of the cocoa extract. To clarify that Claims 27 and 28 were and are intended to define the same extract Claim 28 has been amended to indicate that the extract is a "crude" extract. Withdrawal of the Restriction Requirement is respectfully requested.

C.  **Double Patenting**

1.  U.S. 5,554,645

Claims 27, 29/27, 30/27, 35/27, 37/27-43/27, 48/27 and 49/27 are rejected under the judicially-created doctrine of obviousness-type double patenting over Claims 1-9 and 12-14 of U.S. Patent No. 5,554,645. Although the conflicting claims are not identical, the Examiner believes they are not patentably distinct because a "substantially pure cocoa extract" would embrace a crude extract produced by the same methods.

Page 4 of 6

NYB 1429879.1

Application No. 10/342,772
Response to 7/16/03 Office Action
Docket No. 5677-196

### 2.  U.S. 6,225,338

Claims 27, 29/27, 31/27, 32/27, 35/27, 36/27, 40/27, 42/27 and 44/27-49/27 are rejected under the judicially created doctrine of obviousness-type double patenting over Claims 1-17 of U.S. Patent No. 6,225,338.  Although the conflicting claims are not identical, the Examiner believes they are not patentably distinct because the patented claims embrace a crude extract by their broad recitations.

### 3.  U.S. 6,517,841

Claims 27 and 29/27 to 50/27 are rejected under the judicially-created doctrine of obviousness-type double patenting over Claims 1-29 of U.S. Patent No. 6,517,841.  Although the conflicting claims are not identical, the Examiner believes they are not patentably distinct, because the patented claims embrace a crude extract by their broad recitations.

### 4.  U.S. 6, 562, 863

Claims 27, 29/27-38/27, 40/27-42/27 and 44/27-50/27 are rejected under the judicially-created doctrine of obviousness-type double patenting over Claims 1-17 of U.S. Patent No. 6,562,863.  Although the conflicting claims are not identical, the Examiner believes they are not patentably distinct because a "partially-purified, solvent-derived cocoa extract" would embrace a crude extract produced by the same methods.

### D.  Applicants' Response To The Obviousness-Type Double Patenting Rejections

### 1.  U.S. 5,554,645

It is believed the rejection should be over Claims 1-5 of the '645 patent.  Claims 6-9 are directed to an antineoplastic composition.  Claim 12-14 are to a lyophilized antineoplastic composition, an antioxidant or preservative composition, and a toporsomerase-inhibiting composition.

It is respectfully submitted that "a substantially pure cocoa extract" in not the same as "a crude cocoa extract" as pointed out by the Examiner in the Restriction Requirement.  More importantly, the claims of the '645 patent are limited to "polyphenol(s) consisting essentially of oligomers 3 through 12."  The present claims "comprise a mixture of cocoa polyphenols" (see Claims 27 and 28) which can include monomers and dimers (see Claims 29 and 30).

### 2.  U.S. 6225,338

Page 5 of 6

NYB 1429879.1

Application No. 10/342,772
Response to 7/16/03 Office Action
Docket No. 5677-196

It is respectfully submitted that crude cocoa extract Claims 27 and 28 cannot be obvious over the xanthine alkaloid-free cocoa extract claims of the '338. As the Examiner pointed out in the Restriction Requirement, crude cocoa extract claims and purified cocoa extract claims are "independent or distinct inventions." The xanthine alkaloid-free extract is a purified extract, not a crude extract.

### 3. U.S. 6,517,841

It is respectfully submitted that the present crude cocoa extract claims are not obvious variants of the solid composition claims and liquid preparation claims of the '841 patent. The solid compositions and liquid preparations contain a solvent-derived cocoa extract whose purity is not specified. A composition which contains an extract cannot be the same as the extract itself.

### 4. U.S. 6,562,863

It is respectfully submitted that a partially-purified, solvent-derived cocoa extract cannot be the same as a crude cocoa extract. See the disclosure in Example 3A regarding the partial purification of the crude procyanidins from Example 2 by liquid chomatography on Sephadex LH-20 and the elution of the xanthine alkaloids (caffeine and theobromine). See the discussion in Example 3B regarding the partial purification of the procyanidins from Example 2 (i.e., the crude procyanidins) and from Example 3A (i.e., decaffeinated and detheobrominated procyanidins) by reverse phase HPLC or normal phase HPLC.

### Closing

Entry of the amendment is respectfully requested. No new matter is presented.

Withdrawal of the obviousness-type double patenting rejection and an early allowance are respectfully requested.

Respectfully submitted,

Date: _October 1, 2003_

Clifford Chance US LLP
200 Park Avenue
New York, NY 10166-0153

_Margaret B. Kelley_
Margaret B. Kelley
Reg. No. 29,181
Telephone: (212) 878-3145

Page 6 of 6

NYB 1429879.1

# EXHIBIT 23



**natraceutical**

## CERTIFICATE OF ANALYSIS

### COCOANOX EXTRACT
### 45% POLYPHENOLS

| | | | |
|---|---|---|---|
| Lot N°: | L61095 | | |
| Date of production: | 28/02/06 | Analysis N°: | |
| Date of analysis: | 27/02/06 | Shelf life: | 8/2008 |
| Contract N°: | | Certificate date: | 04/04/06 |

| Parameters | Specifications | Results |
|---|---|---|
| **Description** | | |
| Botanical name | THEOBROMA CACAO | |
| Part of plant used | NIB | |
| Appearance | BROWN POWDER | |
| **Physicochemical profile** | | |
| Total Polyphenols content (Folin Ciocalteu) (NTC) | >= 45.0 % | 56.3 % |
| Theobromine content (HPLC) (NTC) | >= 4.0 % | 5.3 % |
| Loss on drying ((EP)) | <= 5.0 % | 3.8 % |
| **Microbiological profile** | | |
| Total viable aerobic count / g ((EP)) | <= 10,000 c.f.u./g | 2,050 c.f.u./g |
| Yeasts and moulds / g ((EP)) | <= 100 c.f.u./g | 40 c.f.u./g |
| Enterobacteriacese / g ((EP)) | <= 100 c.f.u./g | 10 c.f.u./g |
| E. Coli / g ((EP)) | ABSENT | ABSENT |
| Salmonella / 25g ((EP)) | ABSENT | ABSENT |
| **Suggested storage conditions** | | |
| Storage | STORE FROM 4 TO 20°C IN ORIGINAL SEALED PACKAGE AVOID EXPOSURE TO LIGHT, HEAT AND AIR | |
| Shelf life | 8 MONTHS UNDER SUGGESTED STORAGE CONDITIONS ONCE OPENED | |

| Approved by: | Quality Control Dpt. | Quality Control Manager |
|---|---|---|
| Signature: | | |

Autovia A-3, Salida 343 · Camí de Torrent, s/n · 46930 Quart de Poblet · Valencia – SPAIN
Tel. +34 961 920 051 · Fax +34 961 920 445 · www.natraceuticals.com

# EXHIBIT 24

LEXSEE 2006 U.S. DIST. LEXIS 54210

**CHRISTIANA INDUSTRIES INC., Plaintiff, vs EMPIRE ELECTRONICS, INC., Defendant.**

**Case No: 06-12568**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION**

*2006 U.S. Dist. LEXIS 54210*

**August 4, 2006, Decided**
**August 4, 2006, Filed**

**PRIOR HISTORY:** *Christiana Indus. v. Empire Elecs., 443 F. Supp. 2d 870, 2006 U.S. Dist. LEXIS 50607 ( E.D. Mich., July 25, 2006)*

**COUNSEL:** [*1] For Christiana Industries, Incorporated, Plaintiff: David K. Callahan, Matthew J. Shiels, Kirkland & Ellis, Chicago, IL; Jordan S. Bolton, Ronald A. King, Clark Hill, Detroit, MI.

For Empire Electronics, Incorporated, Defendant: Daniel D. Quick, Robert L. Kelly, William H. Honaker, Dickinson Wright, Bloomfield Hills, MI; Douglas W. Sprinkle, Gifford, Krass, Troy, MI; John A. Artz, John S. Artz, Robert P. Renke, Artz & Artz, Southfield, MI; Kelley M. Haladyna, Dickinson Wright, Detroit, MI; Linda D. Bernard, Detroit, MI.

For Christiana Industries, Incorporated, Counter Defendant: Jordan S. Bolton, Clark Hill (Detroit), Detroit, MI. For Empire Electronics, Incorporated, Counter Claimant: Daniel D. Quick, Dickinson Wright, Bloomfield Hills, MI.

For Christiana Industries, Incorporated, Counter Defendant: Jordan S. Bolton, Clark Hill, Detroit, MI; Matthew J. Shiels, Kirkland & Ellis, Chicago, IL.

**JUDGES:** Honorable Victoria A. Roberts, United States District Judge.

**OPINION BY:** Victoria A. Roberts

**OPINION:**

**OPINION AND ORDER**

**I. INTRODUCTION**

This matter is before the Court on Defendant's Emergency Motion for reconsideration of the Court's Order granting a preliminary injunction and Emergency Motion to amend or correct the Order granting a preliminary injunction. For the following reasons, the Court: (1) **DENIES** Defendant's Motion for reconsideration; and (2) **GRANTS** its Motion to Amend the Order.

**II. BACKGROUND**

This action arise out of [*2] the alleged infringement by Defendant of Plaintiff's patent for potted lamp sockets.

The underlying facts are fully set forth in this Court's Opinion and Order granting preliminary injunction entered July 25, 2006 [Doc. 15].

On August 2, 2006, Defendant filed an Emergency Motion for reconsideration of the preliminary injunction. It claimed that the Court misapplied prosecution history estoppel and the doctrine of equivalents test in light of *Warner-Jenkinson Company, Inc. v. Hilton Davis Chemical Company, 520 U.S. 17, 117 S. Ct. 1040, 137 L. Ed. 2d 146 (1997)*, which held that when an amendment is added during prosecution, there is a presumption that prosecution history estoppel applies. Additionally, Defendant directs the Court to a recent Supreme Court case that it claims eliminates the presumption of irreparable harm after a showing of patent validity and infringement. Lastly, Defendant claims the Court did not adequately weigh the public interest because it contends Plaintiff is not a certified supplier to General Motors ("GM"). If the injunction is in effect, Defendant asserts GM may have to halt production because it would not be able to obtain lamp sockets from a certified [*3] supplier.

Defendant also filed an Emergency Motion to amend or correct the preliminary injunction Order. De-

fendant claims the language of the Order is too broad and the bond amount is inadequate.

## III. STANDARD OF REVIEW

(g) Motions for Rehearing or Reconsideration.

\* \* \*

(3) Grounds. Generally, and without restricting the court's discretion, the court will not grant motions for rehearing or reconsideration that merely present the same issues ruled upon by the court, either expressly or by reasonable implication. The movant must not only demonstrate a palpable defect by which the court and the parties have been misled but also show that correcting the defect will result in a different disposition of the case.

E.D. Mich. LR 7.1(g).

## IV. APPLICABLE LAW AND ANALYSIS

### A. Prosecution History Estoppel

Defendant's first allegation of palpable defect is that the Court misapplied prosecution history estoppel. Specifically, it argues that Plaintiff's addition of the "substantially perpendicular" language to claim 8 (later claim 3), is presumed to be a narrowing amendment. Thus, according to Defendant, because Plaintiff did not offer a reason for [*4] the amendment, the Court should presume that it was offered to narrow the claim. Under this presumption, Defendant contends the Court should not have applied the doctrine of equivalents.

Defendant is correct that *Warner-Jenkinson* held that "the burden is on the patent holder to establish the reason for an amendment required during patent prosecution." *Warner-Jenkinson, 520 U.S. at 33.* However, the Court also noted that where an explanation is established that the amendment was not related to patentability, prosecution history estoppel does not bar application of the doctrine of equivalents to that element. *Id.*

Plaintiff claimed that the amendment was not made to make the claim patentable, *i.e.* to get over prior art. Rather, it claims it was for the sake of clarity. [Transcript, p.86]. Defendant actually assisted in establishing that the 'substantially perpendicular' language was not added to make the claim patentable; it introduced several prior art patents disclosing perpendicular terminals at the hearing.

Accordingly, the Court concluded, in keeping with *Warner-Jenkinson*, that the amendment to add "substantially perpendicular" language did not [*5]  invoke prosecution history estoppel. This Court properly applied the doctrine of equivalents.

### B. Irreparable Harm

Defendant asserts that in *Ebay, Inc. v. Mercexchange, LLC, 126 S. Ct. 1837, 164 L. Ed. 2d 641 (2006)*, the Supreme Court eliminated the presumption of irreparable harm for preliminary injunctions upon a showing of validity and infringement.

Plaintiff argues, and this Court agrees, that *Ebay* did not invalidate the presumption. The *Ebay* Court addressed the proper analysis for *permanent* injunctive relief. It held that courts err by categorically granting permanent injunctive relief on a showing of infringement and validity, without analyzing the traditional four factors for injunctive relief. The Court reiterated that the grant or denial of injunctive relief rests with the equitable discretion of the Court, which must consider the four factors.

This Court did precisely that in its decision that Plaintiff was entitled to a preliminary injunction.

### C. Public Interest

Defendant's argument that the Court failed to properly assess the public interest factor is unavailing. On reconsideration, Defense counsel informs the Court that a [*6] grant of injunctive relief to Plaintiff could interrupt GM's production, evidence already considered by the Court.

Additionally, Plaintiff claims the situation is not as dire as Defendant would have the Court believe. It claims, and offers an affidavit in support, that it is certified to provide several parts. [Response, Exhibit 1]. For the parts that it is not certified to provide, Plaintiff offers to license its patent to Defendant until such time as it is certified.

### D. Emergency Motion to Amend or Correct the Order

Defendant contends that the language of the Order is too broad because it enjoins the Defendant from manufacturing or selling not only the lamp sockets considered by the Court at the hearing, but also "any other product that infringes, or induces or contributes to the infringement of" the '301 patent. [Doc. 18, p.2].

The Order will be amended to enjoin Defendant only as to the lamp socket designs considered by the Court at the hearing, as defined in the Order. The additional language, quoted above, will be stricken. See *International Rectifier Corporation v. IXYS Corporation, 383 F.3d 1312, 1316-1317 (Fed. Cir. 2004).*

Lastly, Defendant [*7] claims that the bond amount posted by Plaintiff, $ 100,000, is inadequate to protect it from potential losses. It argues that it is uncontested that it stands to lose $ 2.5 million. [Transcript, p. 74-75].

*FRCP 65(c)* provides:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

Because Plaintiff does not contest the amount presented by Defendant as its potential for loss, the bond will be increased to adequately cover that amount.

## V. CONCLUSION

For the foregoing reasons, the Court: (1) **DENIES** Defendant's Emergency Motion for reconsideration of the Order granting preliminary injunction; and (2) **GRANTS** Defendant's Emergency Motion to amend or correct the Order.

**IT IS SO ORDERED**.

/s/ Victoria A. Roberts

United States District Judge

Dated: August 4, 2006

# EXHIBIT 25

LEXSEE 2002 U.S. DIST. LEXIS 1431

**LAWMAN ARMOR CORPORATION, Plaintiff v. WINNER INTERNATIONAL, INC., Defendant**

**CIVIL ACTION NO. 01-1605**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*2002 U.S. Dist. LEXIS 1431*

**January 22, 2002, Decided**
**January 23, 2002, Filed, Entered**

**DISPOSITION:** Motion for preliminary injunction was granted.

**COUNSEL:** [*1] For LAWMAN ARMOR CORPORATION, PLAINTIFF: GARY A. ROSEN, AKIN GUMP STRAUSS HAUER & FELD, PHILA, PA USA.

For WINNER INTERNATIONAL, INC., DEFENDANT: DONALD R. PIPER, JR., DANN, DORFMAN, HERRELL AND SKILLMAN, PHILA, PA USA. JOHN F. HORNBOSTEL, JR., WINNER INTERNATIONAL LLC, SHARON, PA USA. REESE TAYLOR, RENNER KENNER GREIVE, ET AL, AKRON, OH USA. CHRISTOPHER A. ROTHE, DANN DORMAN HERRELL & SKILLMAN, P.C., PHILADELPHIA, PA USA. LAURA J. GENTILCORE, KENNER GRIEVE BOBAK, ET AL., AKRON, OH USA.

**JUDGES:** MARY A. McLAUGHLIN, J.

**OPINION BY:** MARY A. McLAUGHLIN

**OPINION:**

MEMORANDUM AND ORDER

McLAUGHLIN, J.

January 22, 2002

This dispute involves two manufacturers of auto security devices, Lawman Armor Corporation ("Lawman Armor") and Winner International, Inc. ("Winner"). At issue is a Winner product called "The Club Auto Brake Lock" (the "Accused Product"). This device is designed to be placed on the floor of a vehicle, where it traps the brake pedal shaft and prevents the brake pedal from being depressed. In this manner, it deters auto theft by depriving a would-be auto thief of braking ability. Lawman Armor claims that the Accused Product infringes its valid patent rights, both literally and under the doctrine of [*2] equivalents.

Presently before the Court is Lawman Armor's Motion for a Preliminary Injunction. In the motion, Lawman Armor seeks to enjoin Winner from selling, using, or distributing the Accused Product. On November 19 and 20, 2001, the Court held an evidentiary hearing on the motion. The Court concludes that Lawman Armor has shown a strong likelihood of success in proving that the Accused Product infringes Lawman Armor's Patent No. 6,298,696 (the "'696 Patent) under the doctrine of equivalents. Because Lawman Armor has otherwise shown that it is entitled to preliminary relief, the Court will grant Lawman Armor's motion and will enjoin the sale, use, or distribution of the Accused Product by Winner.

Pursuant to *Federal Rule of Civil Procedure 52(a)*, the Court's findings of fact and conclusions of law are set forth below. For ease of reference, certain findings of fact, including findings relevant to the Court's infringement analysis, are included under the appropriate headings in the Court's Conclusions of Law and Additional Findings of Fact section. Any other conclusion of law that should be construed as a finding of fact is hereby adopted as such.

FINDINGS OF FACT

I. The [*3] Parties

1. Plaintiff Lawman Armor Corporation ("Lawman Armor") was founded in 1997 by Robert Vito to manufacture and market an automobile anti-theft device that he invented. Hr'g Tr. I, at 22 (Vito). n1 Vito's invention

2002 U.S. Dist. LEXIS 1431, *

(the "Lawman Product") is sold by Lawman Armor under the trademarks "The Unbrakeable Autolock" and "The Unbrakeable Auto Lock Pro". Hr'g Tr. I, at 26, 29 (Vito); Ex. P-10. The Lawman Product functions by being placed on the floor of the vehicle where it traps the brake pedal shaft and immobilizes it, which deprives a would-be thief of the ability to use the car's brakes in operating the car. See Fig. A in Appendix.

n1 The testimony given at the Hearing held on November 19 and 20, 2001 has been transcribed in two volumes. Citations to the testimony will be given in the following form: Volume number (I or II), at page(s) (Witness Name). Exhibits introduced at the Hearing will be identified by the number they were given at the Hearing.

2. Auto brake locks constitute virtually 100% of Lawman [*4] Armor's business. Hr'g Tr. I, at 117 (Beichner).

3. Defendant Winner International, Inc. ("Winner") sells automotive anti-theft devices. Its signature product, "The Club", is a vehicle anti-theft device that affixes to the steering wheel of a car to prevent steering. The Club was invented by James Winner, the chairman of Winner, in 1986. Winner has sold over 30 million of The Club devices over the past 15 years. Hr'g Tr. II, at 31-32 (Hornbostel).

4. In February of 2001, Winner introduced an auto brake lock (the "Accused Product"), which it sells under the name "The Club Auto Brake Lock." Hr'g Tr. I, at 143, 150 (Linsley); Exs. P-3, P-8. Like the Lawman Product, Winner's auto brake lock functions by being placed on the floor of the vehicle where it traps the brake pedal shaft and immobilizes it, which deprives a would-be thief of the ability to use the car's brakes in operating the car. See Fig. B in Appendix.

5. Winner also sells a pedal to wheel lock, of a type commonly referred to as a "crook hook", which it has offered since 1988. This device hangs from the steering wheel and affixes to the brake pedal shaft, which prevents the brake pedal from being depressed. Hr'g Tr. [*5] I, at 146, 150 (Linsley); Ex. D-A.

6. Sales of these devices make up a relatively small part of Winner's business. For 2001, through November, Winner sold approximately 16,000 units of its pedal to wheel lock, and 12,000 units of its auto brake lock. Hr'g Tr. I, at 147, 150 (Linsley).

II. Development of the Lawman Product

7. Vito, who holds degrees in tax, finance and marketing, became interested in auto theft deterrence as a result of his own experiences as a victim of auto theft growing up in the City of Philadelphia. His premise was to develop a device using the brake pedal shaft, which is one of the strongest parts of the vehicle. Hr'g Tr. I, at 22-23 (Vito).

8. Vito mortgaged his house, used his entire savings and maxed out his credit cards, putting close to $ 700,000 of his own money into the company. Subsequently the company received an additional $ 1.5 million from outside investors, who now own 70% of the equity in the company. An additional round of financing brought in another $ 8 million. Hr'g Tr. I, at 23 (Vito).

9. Lawman Armor sought patent protection for its product as a means of protecting itself against larger companies entering the market for what it [*6] viewed as a unique product. Hr'g Tr. I, at 32-33 (Vito). Vito entered into an Exclusive Patent License Agreement with Lawman Armor that gave Lawman Armor, inter alia, the "power to institute and prosecute . . . suits for infringement of the Licensed Patent Rights . . . ." Ex. P-2. United States Patent No. 6,298,696 (the " 696 Patent") issued to Vito on October 9, 2001 . Ex. P-1.

10. The Lawman Product comprises a T-shaped base that can be placed on the floor of a vehicle, an inverted U-shaped housing extending vertically from the base which can be placed over a brake or clutch pedal shaft, and an L-shaped rod with a locking mechanism which fits under the pedal shaft. When the rod is raised by its handle and locked in position the pedal shaft is immobilized. Hr'g Tr. I, at 25-26 (Vito); Ex. P-9.; See Fig. A in Appendix.

11. The Lawman Product works by depriving the would-be thief of braking ability. In addition, the device exploits a common automobile safety feature known as Brake Pedal Shift Interlock ("BPSI"), which requires that the brake pedal be depressed before the car can be put into gear. Hr'g Tr. I, at 31-32 (Vito).

12. Vito began the development process with balsa [*7] wood models, and over time experimented with different heights, different types of metal and different types of locks. Lawman Armor worked with engineers at a facility operated by Allstate Insurance Company, which shares a board member with Lawman Armor, to get the product to the point where it would be "unbeatable." Hr'g Tr. I, at 24 (Vito).

13. Allstate referred Lawman Armor to a non-profit testing organization in England, the Thatcham Institute ("Thatcham"). Thatcham is funded by automobile manufacturers and insurers. Lawman Armor worked with Thatcham for over a year to achieve Thatcham approval

and certification. Lawman Armor's product was eventually approved and certified by Thatcham. Hr'g Tr. I, at 25 (Vito); Ex. P-10.

14. Vito's original base was rectangular. He discovered that such a base can slide all over the floor of the vehicle, possibly permitting removal of the device. He eventually developed a T-shaped base, with small protrusions on the underside, for better gripping and stability. Hr'g Tr. I, at 27-28 (Vito).

15. Thatcham found that the original locking rod handle on the Lawman Product could be defeated by pounding down on that handle with a hammer. As a result, [*8] Lawman Armor developed a new handle design with a hardened molded steel angle of 60 degrees, which could not be so easily defeated by pounding down on the handle with a hammer. Hr'g Tr. I, at 28 (Vito).

16. To obtain Thatcham approval, Lawman Armor uses hardened steel locks, rather than the more typical aluminum locks, and vending machine-type keys, which, according to Thatcham, provide the highest level of security. Hr'g Tr. I, at 28-29 (Vito). Depending on the model, Lawman Armor uses 3 to 4 millimeters of steel for the unit housing. Hr'g Tr. I, at 29 (Vito).

17. The Lawman Product cannot be used on certain car models due to their unusual brake pedal shaft designs. The product packaging lists those vehicles which the device will not fit. Hr'g Tr. I, at 29-31 (Vito); Ex. P-10.

18. In addition, some vehicles are equipped with the means to manually override the BPSI safety feature ("BPSI override"). Although such cars can be put in gear notwithstanding the installation of the Lawman Product, they cannot be safely driven because the brake pedal is immobilized, and the only means available for braking the car is the hand-or foot-operated emergency brake. Hr'g Tr. I, at 31-32 (Vito); [*9] Hr'g Tr. I, at 155-156 (Linsley).

19. Lawman Armor began marketing the Lawman Product in the Summer of 1998 through a two-minute "direct response" television commercial that cost $ 200,000 to produce and place. Hr'g Tr. I, at 35 (Vito).

20. After the Lawman Product was introduced, it began to receive free media exposure, receiving highly favorable notice in such magazines as Good Housekeeping, Time, and Popular Mechanics, as well as on national and local television broadcasts and cable. Hr'g Tr. I, at 35-37 (Vito); Exs. P-11 & P-12.

21. In November 1999, Lawman Armor expanded its television advertising, introducing a 30 minute infomercial (the "Lawman Infomercial") which was played nationally 200 to 500 times per week at cost of over $ 12

million. The campaign received an Infomercial of the Year award. Hr'g Tr. I, at 39-42 (Vito); Ex. P-13.

III. Discussions and Disputes Between the Parties

22. After Lawman Armor began advertising on television in the Summer of 1998, it received an invitation from Winner to meet to discuss a potential deal. A meeting was held in Pittsburgh. After this meeting, Winner's then-president, Chuck Quinn, advised Vito that Winner had determined [*10] that "brake pedals was not a category, or something that [Winner] wanted to pursue, and [Winner] believed that the steering wheel was the ultimate protection for a car." Hr'g Tr. I, at 38-39 (Vito).

23. The Lawman Infomercial introduced in November 1999 features several demonstrations of steering wheels being cut to defeat steering wheel locks of the type long sold by Winner. Ex. P-13. Approximately six months after Lawman Armor began airing the Lawman Infomercial, Winner filed suit against Lawman Armor for false advertising. Hr'g Tr. I, at 42 (Vito). At approximately the same time, Lawman Armor made its first penetration into the retail market when K-Mart agreed to carry the Lawman Product, an important toehold that led to placement with other retailers. Id.

24. In its suit against Lawman Armor, Winner International moved for a preliminary injunction against airing of the Lawman Infomercial. Ex. P-21. The gravamen of Winner's motion was not directed to the demonstration of steering wheel locks such as "The Club" being defeated, but rather to Lawman Armor's claim that a properly installed brake pedal lock renders a car undrivable. Winner argued:

> Lawman's assertion [*11] is false because on most of the limited number of cars on which it can even be applied, the Auto lock can be defeated in *one second*, or the time it takes to press a button. Indeed, most cars with a floor shift automatic transmission . . . are equipped with brake pedal shift interlock 'override' found adjacent to the floor gear shift . . . . Stated simply, because the Autolock can be defeated in the time it takes to press a button -- namely one second -- it is fifteen to thirty times *less* effective than The Club.

Ex. P-21, at 2-3 (emphasis in original).

25. Winner's critique of the Lawman Product's effectiveness is based on the premise that a car can be driven

2002 U.S. Dist. LEXIS 1431, *

with only the emergency parking brake available for stopping. Hr'g Tr. I, at 155-56 (Linsley).

26. Winner was not granted a preliminary injunction in the false advertising case, and Winner ultimately withdrew the case with prejudice without receiving any consideration therefor. Hr'g Tr. I, at 46 (Vito); Hr'g Tr. II, at 48-49 (Hornbostel).

27. After the false advertising case was dismissed, Winner indicated that they were interested in meeting with Lawman Armor to meet to discuss an acquisition. Prior to that [*12] meeting, Lawman Armor asked for and received a Nondisclosure Agreement. Hr'g Tr. I, at 47, 71-73 (Vito).

28. The terms of this Nondisclosure Agreement did not prevent Winner from competing with Lawman Armor in the field of auto brake lock devices. Hr'g Tr. I, at 69-70 (Vito); Hr'g Tr. II, at 42-43 (Hornbostel); Ex. D-G.

29. A meeting between the principals and attorneys of the two companies was held on December 27, 2000, during which Lawman Armor provided Winner with a merger and acquisition document containing financial and marketing information. At that meeting, Winner's representatives expressed an interest in the Lawman Product. A second meeting was arranged. Hr'g Tr. I, at 47-48, 69-70 (Vito).

30. The second meeting occurred on January 4, 2001. Present on behalf of Winner were James Winner, its chairman, and Karen Winner-Hale, its chief executive officer. Present on behalf of Lawman Armor were Vito, Lawman Armor's chief financial officer Joseph Bobrowski, and three investment bankers. Lawman Armor had insisted that no lawyers be present. Hr'g Tr. I, at 48 (Vito).

31. At the January 4th meeting, James Winner stated to Vito that Winner is "the dominant force in the anti-theft [*13] market . . . and that either [Lawman Armor] come to a license agreement or he would come out with a cheaper knockoff product, erode [Lawman Armor's] price points, erode [Lawman Armor's] profit margins, and [Lawman Armor would] be driven out of business." Hr'g Tr. I, at 49 (Vito).

32. James Winner further stated that he was not concerned about Lawman Armor's patents, and that if Lawman Armor got an injunction, Winner would design around it within a few months. Hr'g Tr. I, at 49 (Vito).

33. James Winner also showed Vito an advertising brochure for a Winner auto brake lock in which "The Club" trademark does not appear. Rather, the trade name "All Star Products" is used. Ex. P-14. When Vito asked him about this, Mr. Winner explained "that the product was junk and that they did not want to pull The Club

down. That their intention was to get out there with a cheap knockoff, erode the price points, erode the market share, and they didn't want anything getting on The Club brand equity they had built up over the years." Hr'g Tr. I, at 50-52 (Vito).

34. At the January 4th meeting James Winner also gave Vito a price sheet showing that Winner intended to offer its auto brake lock wholesale [*14] for $ 14.95, less than a third of the price that the Lawman Product retailed for. James Winner stated that it was not Winner's intention to make a profit, but rather to drive down the price points to where Lawman Armor could not be profitable and would have to go out of business. He stated that Winner did not need to make a profit on the product in order to be successful. Winner offered to take a license on the Vito patents at a royalty of 60 cents per piece, an offer which Lawman Armor rejected. Hr'g Tr. I, at 52-53 (Vito).

35. Vito observed that the photograph of the product on the brochure appeared to be doctored, and believed that the threat to bring out such a product was a bluff. Hr'g Tr. I, at 93-94 (Vito).

IV. Development and Introduction of the Accused Product

36. In February 2001, Winner introduced "The Club Auto Brake Lock" (the "Accused Product"). Hr'g Tr. I, at 150 (Linsley). The Accused Product comprises a T-shaped base that can be placed on the floor of a vehicle, a tubular housing extending vertically from the base, and a J-shaped locking rod which, when drawn up by the handle, traps the brake pedal shaft between the J-shaped portion of the locking rod and [*15] the housing. See Fig. B in Appendix.

37. In Mr. Vito's view, the Accused Product is inferior to the Lawman Product because although it uses a T-shaped base, the legs are too short to prevent slippage. Also, unlike the Lawman Product, the Accused Product is made from a metal that can be easily cut and uses a lock that provides less security. In addition, the handle is set at an angle that would permit it to be defeated by blows from a hammer. Hr'g Tr. I, at 53-54, 80-81 (Vito).

38. The Accused Product was invented by Winner's patent attorney, Robert Vickers, who attempted to come up with a design that did not infringe Lawman Armor's patents. Hr'g Tr. I, at 165-66 (Linsley); Hr'g Tr. II, at 4 (Marotto) & at 35 (Hornbostel).

39. The 696 Patent had not yet issued at the time Vickers invented the Accused Product, and Winner was not at that time aware of the 696 Patent. Hr'g Tr. II, at 34 (Hornbostel).

40. The Accused Product was designed to use certain parts already used in existing Winner products, including the lock housing, the metal rod, and the metal housing. This allows for certain economies of scale. Hr'g Tr. I, at 158 (Linsley); Hr'g Tr. II, at 6-7 (Marotto) & 36-37 (Hornbostel). [*16]

41. Winner has affixed its internationally known trademark "The Club (R) " to the accused product. Ex. P-3.

42. Winner has a quality control program in place at the company. There was no evidence presented, however, about the nature of this program or how it applies to the Accused Product. Winner has not received any customer complaints about the quality of its auto brake lock. Hr'g Tr. II, at 35 (Hornbostel); Hr'g Tr. I, at 150 (Linsley).

43. Winner offers no anti-theft guarantee with the Accused Product because Winner does not believe that, by itself, the Accused Product is an effective anti-theft device. Hr'g Tr. I, at 155, 166-67, 172 (Linsley).

44. Like the Lawman Product, the Accused Product is not suitable for use on certain models of cars due to their brake pedal design. Unlike the packaging for the Lawman Product, however, the Accused Product's packaging contains no information regarding models of cars on which the device cannot be used, instead stating only that "one size fits most". Hr'g Tr. I, at 54-55, 89-90 (Vito); Ex. P-8.

45. The Lawman Product and the Accused Product are both sold in retail stores such as Pep Boys, where they are displayed in close proximity on [*17] racks which also display an assortment of Winner steering wheel lock products. Hr'g Tr. I, at 55-56 (Vito); Ex. P-16.

46. Since its introduction, retail prices for the Accused Product have ranged from between $ 39.99 to as low as $ 19.99. Hr'g Tr. I, at 56-57 (Vito); Exs. P-17, P-18 & P-19. In response, Lawman Armor has been forced to lower its retail price on the Lawman Product from $ 59.95 to $ 39.95. Hr'g Tr. I, at 57 (Vito). Lawman Armor has been required to provide rebates, so called "price protection" or "markdown money," to retailers to guarantee them the margins they had expected when they originally purchased the Lawman Product. Hr'g Tr. I, at 57-58 (Vito).

47. When the then-president of Winner, William Beichner, learned that Advance Auto -- the second largest automotive parts specialty retailer in the United States with 2700 stores -- intended to carry the Lawman Product, he advised them that Winner did not believe that the category of brake locks would hold up, and that Winner would be offering a lower-priced piece that

would cause price points to compress and force Lawman Armor to give up its infomercial strategy that was driving demand for such products. Hr'g Tr. I, [*18] at 106-09 (Beichner).

48. Beichner, as Winner's president, also advised Auto Zone -- the largest specialty retailer in the United States, with 3200 stores -- that Winner intended to implement a product recall of the Accused Product. Beichner told Auto Zone that Winner believed this recall would minimize, if not destroy, the auto brake lock category. Auto Zone questioned the logic of this strategy, and in particular was concerned that customers would be confused as to which products were being recalled. Winner never recalled the Accused Product. Hr'g Tr. I, at 110-13 (Beichner).

49. Beichner, as Winner's president, also dealt with Strauss Discount Automotive ("Strauss"). Initially, Winner sold Strauss units of the Accused Product at $ 19.99 each, with an expected retail price of $ 39.99, reflecting typical mark-ups in this market. Later, however, Winner offered Strauss "markdown money" to induce it to lower the retail price of the Accused Product. Winner had received no information that Strauss had any difficulty in selling the Accused Product at the expected retail price, and Strauss had never asked Winner for any price consideration. Following the offer of markdown money, Strauss' [*19] expected retail price for the Accused Product went down to $ 29, and Strauss advertised the Accused Product for a retail price of $ 19.99 on at least one occasion. Hr'g Tr. I, at 114-17 (Beichner); Ex. P-19.

50. Winner's website contains an extensive catalog of its product offerings. The Accused Product, however, does not appear. Hr'g Tr. I, at 58 (Vito) & 150 (Linsley); Ex. P-20.

51. Winner does no commercial advertising of the Accused Product. It has, on the other hand, devoted substantial resources to producing a full-length infomercial and a one-minute television commercial devoted to demonstrating Winner's theory that cars equipped with BPSI override can be driven notwithstanding the installation of the Lawman Product. These promotional materials do not mention that Winner offers its own auto brake lock, but rather tout the advantages of its steering wheel locks. There is no dispute that Winner's critique of the Lawman Product -- as set forth in the infomercial, in the one-minute commercial, and in the preliminary injunction motion previously filed in the false advertising case -- applies equally to the Accused Product. Hr'g Tr. I, at 45, 58-66 (Vito) & 163, 167, 169-70 (Linsley); [*20] Exs. P-22 & P-23.

52. Winner attempted to place its full-length infomercial on television. It was played for Winner's customers and sales representatives to show that Winner was

2002 U.S. Dist. LEXIS 1431, *

taking a very disparaging approach to the category. Hr'g Tr. I, at 110 (Beichner). Vito received a copy of it anonymously in the mail. Hr'g Tr. I, at 59 (Vito).

53. Winner's one-minute commercial was played at Winner's booth at a major automotive aftermarket trade show in Las Vegas, AAPEX, where retailers come to see the new product offerings of manufacturers. Hr'g Tr. I, at 63-64 (Vito).

## V. The Patent

54. Lawman Armor asserts that the Accused Product infringes, both literally and under the doctrine of equivalents, independent claims 1, 7, 14 and 19 of the 696 Patent (the "Asserted Claims"). The Asserted Claims read as follows:

> 1. A device for locking the pedal of a vehicle, the pedal being supported by a pedal shaft, the device comprising:
>
> a base, including a first elongated member and a second elongated member, the second elongated member being secured to and extending outwardly from a lateral side of the first elongated member at a predetermined angle, wherein the second member is secured [*21] to the lateral side of the first member, approximately midway along a length of the first member, the base for placement on a floor of the vehicle beneath the pedal and the pedal shaft;
>
> a housing extending from one of the first and second elongated members and having a slot therein for receiving the pedal shaft therein; and
>
> a locking mechanism for locking the pedal shaft within the slot, such that the pedal cannot be operably depressed.
>
> 7. A device for locking the pedal of a vehicle, the pedal being supported by a pedal shaft, the device comprising:
>
> a base, including a first elongated member and a second elongated member, the first elongated member including an upper surface and an opposite lower surface, the lower surface including at least one outwardly extending member to facilitate retention of the base on the vehicle floor, the second elongated member being secured to and extending outwardly from a lateral side of the first elongated member at a predetermined angle, the base for

placement on a floor of the vehicle beneath the pedal and the pedal shaft;

> a housing extending from one of the first and second elongated members and having a slot therein for receiving the pedal [*22] shaft therein; and
>
> a locking mechanism for locking the pedal shaft within the slot, such that the pedal cannot be operably depressed.
>
> 14. A device for locking the pedal of a vehicle, the pedal being supported by a pedal shaft, the device comprising:
>
> a base for placement on the floor of a vehicle beneath the pedal and the pedal shaft, the base having a lower surface for engaging the vehicle floor, the lower surface including at least one outwardly extending member to facilitate retention of the base on the vehicle floor;
>
> a housing extending from the base and including a slot therein for receiving the pedal shaft; and
>
> a locking mechanism for locking the pedal shaft within the slot such that the pedal cannot be operably depressed.
>
> 19. A device for locking the pedal of a vehicle, the pedal being supported by a pedal shaft, the device comprising:
>
> a base for placement on a floor of the vehicle beneath the pedal and the pedal shaft;
>
> a housing extending from the base and including a slot therein for receiving the pedal shaft;
>
> a locking mechanism for locking the pedal shaft within the slot such that the pedal cannot be operably depressed, the locking mechanism including a rod moveable [*23] within the housing between a first position wherein the pedal may be depressed and a second position wherein the pedal cannot be operably depressed and a lock located on the housing and spaced away from the slot for locking the rod in at least the second position, wherein the housing further includes an elongate spacer member positioned between the slot and the lock to position the lock at a location to facilitate access to the lock during installation of the device.

2002 U.S. Dist. LEXIS 1431, *

Ex. P-1.

55. Claims 1, 7, 14, and 19 of the 696 patent are the only claims at issue for the purpose of this motion.

56. The specific claim limitations in dispute here are:

> Claims 1 & 7: ". . . a housing extending from one of the first and second elongated members and having a slot therein for receiving the pedal shaft therein . . ."

> Claims 14 & 19: ". . . a housing extending from the base and including a slot therein for receiving the pedal shaft. . ."

Ex. P-1.

CONCLUSIONS OF LAW AND ADDITIONAL FINDINGS OF FACT

Where a party alleging patent infringement seeks a preliminary injunction, that party must show: (1) a reasonable likelihood of success on the merits; (2) irreparable harm if an [*24] injunction is not granted; (3) a balance of hardships tipping in its favor; and (4) an injunction's favorable impact on the public interest. E.g., *Amazon.com, Inc. v. Barnesandnoble.com, Inc., 239 F.3d 1343, 1350 (Fed. Cir. 2001).* n2 These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested to determine whether an injunction should appropriately issue. Id.

> n2 Jurisdiction and venue are proper in this district pursuant to *28 U.S.C. §§ 1331* & 1338(a), and *28 U.S.C. §§ 1391*(b) & (c) & 1400(b) respectively. In deciding a motion for preliminary injunction in a case involving claims of patent infringement, a district court must apply the substantive standards provided for by the Federal Circuit. *Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1451 n. 12 (Fed. Cir. 1998).*

I. Likelihood [*25] of Success on the Merits

In order to show a reasonable likelihood of success on the merits, Lawman Armor must show both the likelihood that the Accused Product infringes the 696 Patent, and that Lawman Armor is likely to withstand any challenges by Winner to the validity and/or enforceability of

the 696 Patent. *Hybritech Inc. v. Abbott Labs., 849 F.2d 1446, 1451 (Fed. Cir. 1998).* See *Bell & Howell Document Mgmt. Prods. Co. v. Altek Sys., 132 F.3d 701, 705 (Fed. Cir. 1997).*

A. Validity and Enforceability

Considering first the issue of validity, the Court concludes that Lawman Armor has shown that it is likely to withstand any challenge by Winner regarding the validity of the 696 Patent. Initially, a patent is entitled to a strong presumption of validity. *35 U.S.C. § 282.* This presumption exists at every phase of the litigation, including the preliminary injunction stage. *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc., 134 F.3d 1085, 1088 (Fed. Cir. 1998).* At the preliminary injunction stage, it is the challenger's burden to show that there is a "substantial question" of validity, at which point the [*26] burden shifts to the patentee to show that the defense "lacks substantial merit." *Genentech, Inc. v. Novo Nordisk, A/S, 108 F.3d 1361, 1364 (Fed. Cir. 1997); New England Braiding Co. v. A.W. Chesterton Co., 970 F.2d 878, 882-83 (Fed. Cir. 1992).*

Although Winner argued in its brief opposing Lawman Armor's motion for preliminary injunction that the 696 Patent is invalid under *35 U.S.C. § 103*, Winner did not introduce any evidence of invalidity, nor did Winner request any findings of fact or conclusions of law that the 696 Patent is invalid. Therefore, the Court concludes that Winner has not met its burden of showing that there is a substantial question on the issue of validity, and for that reason, Lawman Armor has shown that the 696 Patent is likely valid. See *Canon, 134 F.3d at 1088; Roper Corp. v. Litton Sys., Inc., 757 F.2d 1266, 1272-73 (Fed. Cir. 1985).*

The Court also concludes that Lawman Armor has established that it is likely to withstand any challenges made by Winner on the issue of enforceability. Winner has not challenged Lawman Armor's ownership right to assert the 696 Patent, [*27] nor has Winner introduced any evidence that might otherwise challenge Lawman Armor's right to enforce the 696 Patent. Therefore, it is reasonably likely that the 696 Patent is enforceable by Lawman Armor.

B. Infringement

The main issue is whether Lawman Armor has shown that the Accused Product likely infringes the 696 Patent. The infringement analysis is a two-step process. First, the Court must determine, as a matter of law, the correct scope of the claims at issue. This is known as claim construction. Next, the Court must compare the construed claims to the accused device to determine, as a matter of fact, whether all of the claim limitations are present in the accused device, either literally or by sub-

stantial equivalent. This is known as determining whether the claim limitations "read on" the accused device. *Rexnord Corp. v. Laitram Corp., 274 F.3d 1336,* (Fed. Cir. 2001). Here, Lawman Armor asserts that the Accused Product infringes the 696 Patent both literally and by substantial equivalent under the doctrine of equivalents.

1. Literal Infringement

Literal infringement will only be found where each and every limitation [*28] of the patent claim at issue is literally met in the accused device. *Novo Nordisk of North America, Inc. v. Genentech, Inc., 77 F.3d 1364, 1371 (Fed Cir. 1996).* The parties here dispute only whether a single limitation contained in the Asserted Claims can be read on the Accused Product. The disputed limitation requires that the device contain a "housing having [or including] a slot therein for receiving the pedal shaft [therein]." n3 Ex. P-1.

n3 The language of this limitation varies slightly in the claims at issue. In claims 1 and 7, the language reads "a housing extending from one of the first and second elongated members and having a slot therein for receiving the pedal shaft therein". In claims 14 and 19, the language reads "a housing extending from the base and including a slot therein for receiving the pedal shaft". There is no dispute that the housing of the Accused Product extends from its base (the first and second elongated members). The other differences in the language, namely the substitution of "including" for "having" and the elimination of "therein" following shaft, do not change the meaning of the limitation, and neither party asserts that it does. The Court's construction, then, applies equally to claims 1, 7, 14 and 19.

[*29]

The preferred embodiment of the 696 Patent describes a device with an inverted U-shaped housing, with the slot being defined by the space between the two vertical arms of the housing. The Lawman Product employs such an inverted U-shaped housing. See Fig. A in Appendix. The Accused Product, on the other hand, is comprised of a tubular housing and a J-shaped locking rod, with its "slot" being defined by the space framed by the tubular housing and the vertical portion of the J-shaped locking rod. See Fig. B in Appendix.

The task before the Court is to construe the scope of the "housing having [or including] a slot therein for receiving the pedal shaft [therein]" limitation, and then to determine whether this limitation, so construed, can be

read onto the Accused Product's tubular housing and J-shaped locking rod configuration.

a. Claim Construction

In construing the meaning of the language of a claim, there are two types of evidence that the Court can consider: intrinsic and extrinsic. See, e.g., *Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305-08 (Fed. Cir. 1999); Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1581-82 (Fed. Cir. 1996).* [*30] There are three sources of intrinsic evidence. The first, and most important, is the language of the claims themselves. The second is the specification, which is the written description of the claims including a description of a preferred embodiment of the protected invention. The third and final source of intrinsic evidence is the file (or prosecution) history, which is the record created during the process of applying for the patent. *Vitronics Corp., 90 F.3d at 1582.* The file history is only considered if it is made available to the Court. Id.

Extrinsic evidence consists of all other sources of evidence regarding the meaning of the claim terms. *Id. at 1584.* Typical examples of extrinsic evidence include prior art (other patents and inventions relevant to or related to the patent in question) and expert testimony. Expert testimony on claim construction, however, is disfavored. Prior art documents are deemed a more objective and reliable guide than testimonial evidence. Unlike expert testimony, these sources are accessible to the public in advance of litigation. Therefore, "opinion testimony on claim construction should be treated with the utmost [*31] caution, for it is no better than opinion testimony on the meaning of statutory terms." *Id. at 1585.*

The Court must first consider the intrinsic evidence. If based on a review of the intrinsic evidence the Court can fairly determine the meaning of claim terminology, the inquiry ends. Thereafter, it is improper to rely on extrinsic evidence to contradict such definitions. *Id. at 1583.* Extrinsic evidence may be relied upon only if genuine ambiguity remains after a review of the intrinsic evidence. *Pitney Bowes, 182 F.3d at 1308-09.*

In considering the intrinsic evidence, the Court must look first to the language of the claims, which define the scope of the protected invention. *Bell Atlantic Network Servs., Inc. v. Covad Communications Group, Inc., 262 F.3d 1258, 1267 (Fed. Cir. 2001); Bell Communications Research, Inc. v. Vitalink Communications Corp., 55 F.3d 615, 619 (Fed. Cir. 1995).* The words of the claims are given more weight than any other evidence. *Eastman Kodak Co. v. Goodyear Tire & Rubber Co., 114 F.3d 1547, 1552 (Fed. Cir. 1997),* overruled on other grounds by *Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1454-55 (Fed. Cir. 1998)* [*32] (en banc).

When construing the language of the claims, there is a "heavy presumption" that the claim terms should be accorded their ordinary meaning to one of ordinary skill in the art. *Bell Atlantic, 262 F.3d at 1268.* This presumption is only overcome: (1) where the patentee has chosen to be his or her own lexicographer by defining the terms in a different manner; or (2) where a claim term so deprives the claim of clarity that there is no means by which the scope of the claim may be ascertained from the language used. Id. Dictionary definitions can be helpful to understand how one of ordinary skill in the art construes claim terms, and can be consulted by the Court for this purpose at any time. *Vitronics Corp., 90 F.3d at 1584 & n. 6.* See, e.g., *Envirco Corp. v. Clestra Cleanroom Inc., 209 F.3d 1360, 1365 (Fed. Cir. 2000); Rexnord Corp., 274 F.3d 1336, 1341, 1342.*

Another principle of claim construction teaches that the Court should give claim terms their ordinary and customary meaning unless the specification or file history clearly discloses any special or alternative meaning. *Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1331 (Fed. Cir. 2001);* [*33] *Vitronics Corp., 90 F.3d at 1582.* See *Zelinski v. Brunswick Corp., 185 F.3d 1311, 1315 (Fed. Cir. 1999).* Here, the file history was never introduced into evidence. Therefore, it cannot serve to limit the meaning of the Asserted Claims. The specification is, of course, before the Court as part of the 696 Patent, and must be considered at the appropriate time.

Turning to the plain language of the claims, the Court concludes, and the parties agree, that it is appropriate to consult dictionary definitions to construe the meaning of the claim limitation in dispute. The language to be construed is "a housing having [or including] a slot therein for receiving the pedal shaft [therein]." The ordinary meaning of the term "slot" as used in the Asserted Claims is "a narrow opening or groove" or "a narrow passage, enclosure, or space." See Webster's Third New Int'l Dictionary 2146 (1993). The ordinary meaning of the term "therein", as used in the Asserted Claims, is "in or into that place, or, in or into that thing." Id. at 2372. Therefore, the plain language of the Asserted Claims requires that the device have a "narrow opening or groove" or a [*34] "narrow passage, enclosure, or space" (a slot), and that this slot located in the housing of the device. n4

n4 Winner concedes that the Accused Product has a housing, and the meaning of the term was not disputed by the parties. Therefore, the Court need not construe the meaning of the term "housing." See *Vivid Techs., Inc. v. American Sci. & Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir.*

*1999)* ("only those terms need be construed that are in controversy").

Nothing in the file history or the specification discloses a different meaning to be given to the language of the claims at issue. Although the specification illustrates a preferred embodiment of the claimed invention that is similar to the commercial Lawman Product, with an inverted U-shaped housing and a slot between two legs of the housing, this description should not be read to narrow the definition of the language used in the relevant patent claims. See *Interactive Gift Express, 256 F.3d at 1331-32.* When considering whether [*35] the specification discloses any special or alternative meaning to be given to the claim terms, the Court cannot import into the claims limitations or features found in the specification, but not in the claims themselves. Id.

This prohibition exists because the claims, not the particular detailed examples or preferred embodiments disclosed in the specification, define the scope of the invention. *Kraft Foods, Inc. v. Int'l Trading Co., 203 F.3d 1362, 1366 (Fed. Cir. 2000); American Permahedge, Inc. v. Barcana, Inc., 105 F.3d 1441, 1444 (Fed. Cir. 1997).* Therefore, when the claim language is broader than the particular embodiments appearing in the specification, those more narrow embodiments will not limit the claims. See *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 1054 (Fed. Cir. 1994);* see also *Al-Site Corp. v. VSI Int'l, Inc., 174 F.3d 1308, 1323 (Fed. Cir. 1999); SRI Int'l v. Matsushita Elec. Corp. of America, 775 F.2d 1107, 1121 (Fed. Cir. 1985)* (en banc). Nothing in the language of the claims requires the device to have a U-shaped housing, and the Court will not read [*36] that requirement into the language based on the preferred embodiment discussed in the specification.

Because the Court concludes, and the parties agree, that neither the specification nor the file history discloses any special or alternative meaning to be given to the terms used in the Asserted Claims, the Court will accord the terms their ordinary meaning. Therefore, the Court construes claims 1, 7, 14 and 19 of the 696 Patent to require that the device contain a narrow opening, groove, passage, enclosure or space, and that this narrow opening, groove, passage, enclosure or space be located in the housing of the device. Because the meaning of this language is plain, and no ambiguity remains, the Court will not rely on any extrinsic evidence to further define these terms. n5

n5 The main extrinsic evidence introduced was the testimony of Winner's expert, Mr. Marotto. Mr. Marotto testified that the accused prod-

2002 U.S. Dist. LEXIS 1431, *

uct had a "narrow path" for the pedal shaft. Hr'g Tr. II, at 11-12 (Maratto). Although Mr. Marotto also testified that a "slot" requires structural members on opposing sides, no objective evidence in the form of literature or technical dictionaries were introduced that supports such a narrow definition of the term. For that reason, and because the meaning of the term is clear after reviewing the intrinsic evidence, the Court will afford the term "slot" the full scope of its common and ordinary meaning. See *Rexnord Corp., 274 F.3d 1336, 1342.* In addition, the Court finds that Mr. Marotto's testimony is of limited value. Although he had many years of experience with door locks, he had none with automotive locks such as those at issue here. The only similarity between the products at issue and those with which he worked is the key cylinder, which is not at issue here. Hr'g Tr. I, at 177 & II, at 10 (Marotto).

[*37]

b. Reading the Claims on the Accused Product

Now that the claims at issue have been construed, the Court must determine, as a matter of fact, whether the Accused Product reads on, or contains all the limitations of, the construed claims. As opposed to the Lawman Product, and the preferred embodiment described by the specification of the 696 Patent, the Accused Product does not utilize an inverted U-shaped housing and slot configuration. Rather, it utilizes a tubular housing and J-shaped locking rod configuration. Winner argues that this configuration of the Accused Product does not contain a slot, and that even if it does contain a slot, its slot is not located in the housing of the device. The Court agrees with the latter point.

The Court finds that the Accused Product does contain a narrow opening, passage or space that is designed to receive the brake pedal shaft. Both Winner's expert, Mr. Marotto, and product manager, Mr. Linsley, testified that the Accused Product has a "narrow path" or "narrow space" that receives the brake pedal shaft. See Hr'g Tr. I, at 166 (Linsley); Hr'g Tr. II, at 11-12 (Maratto). This narrow opening or passage is framed by the tubular housing [*38] with its horizontal projection, and the J-shaped portion of the locking rod. In the plain and ordinary sense of the word, this narrow opening or passage is a slot.

The Accused Product's configuration does not, however, have a slot that is located in the housing of the device. Rather, as described above, the slot of the Accused Product is framed by the housing and the J-shaped locking rod. Because its slot is not located in its housing, the

Accused Product does not literally read on every claim limitation of the 696 Patent. Therefore, Lawman Armor has not shown a reasonable likelihood of success in proving literal infringement.

Lawman Armor relies on a patent treatise, Landis on Mechanics of Patent Claim Drafting, to argue that the term "therein" is simply a broad way of claiming the empty space of the slot, and as such, it should not limit the claim by requiring that the slot be located in the housing. This argument is unpersuasive. Landis simply teaches that when claiming empty space or a hole, it is sometimes helpful to define such a space or hole in terms of the structure that forms it. Robert C. Faber, Landis on Mechanics of Patent Claim Drafting § 26 (4th Ed. [*39] 1999). The particular language selected to so define a space or hole (here, a slot) is the province of the patentee. Mr. Vito could have chosen the language "framed by the housing" or some other formulation, instead of requiring that the device have a housing with a slot "therein." Having chosen the language of the claims, and having chosen not to further define this language, the patentee cannot now argue that the language should read more broadly than its ordinary meaning dictates. See, e.g., *DeMarini Sports, Inc. v. Worth Inc., 239 F.3d 1314, 1334 (Fed. Cir. 2001).*

2. Infringement Under the Doctrine of Equivalents

Because the Court has determined that Lawman Armor has not shown a reasonable likelihood of proving literal infringement, the Court must consider whether there is a reasonable likelihood of success under the doctrine of equivalents. n6 E.g., *Rexnord Corp., 274 F.3d 1336, 1342.*

> n6 The doctrine of equivalents exists to prevent a fraud on a patent. *Wilson Sporting Goods Co. v. David Geoffrey & Assocs., 904 F.2d 677, 684 (Fed. Cir. 1990).* It accomplishes this by preventing a party from effectively stealing a patented invention by making unimportant and insubstantial changes and substitutions to the patent simply in order to avoid a finding of literal infringement. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 607, 94 L. Ed. 1097, 70 S. Ct. 854 (1950).*

[*40]

The doctrine of equivalents requires that the accused product contain each limitation of the claim or its equivalent. "An element in the accused product is equivalent to a claim element if the differences between the two are 'insubstantial' to one of ordinary skill in the art". *Overhead Door Corp. v. Chamberlain Group, Inc., 194 F.3d 1261, 1269 (Fed. Cir. 1999)* (citation omitted).

2002 U.S. Dist. LEXIS 1431, *

One common test for determining the substantiality of the differences is the so-called "function-way-result", or "triple identity" test. This test asks whether the allegedly equivalent structure performs substantially the same function, in substantially the same way, with substantially the same result, as the claimed structure. *Warner-Jenkinson Co. v. Hilton Davis Chemical Co., 520 U.S. 17, 39, 137 L. Ed. 2d 146, 117 S. Ct. 1040 (1997)*. The triple identity test is particularly suitable and helpful for conducting equivalency analysis for mechanical devices like those at issue here. *Id. at 39-40*.

The Court finds that the configuration of the Accused Product's housing and slot performs substantially the same function as the housing and slot configuration [*41] of the claimed structure. The ultimate function of both the housing and slot configuration taught by the 696 Patent and the housing and slot configuration contained in the Accused Product is the same. Each housing and slot configuration functions to receive the brake pedal shaft, which is thereafter immobilized by the drawing up of the locking rod. Winner's expert testified to this effect. Hr'g Tr. II, at 14-16 (Marotto). Because the housing and slot configuration of the Accused Product performs the same function as that taught by the housing and slot configuration of the 696 Patent, the first prong of the triple identity test is met.

There is no dispute that the housing and slot configuration of the Accused Product operates to achieve substantially the same result as the housing and slot configuration taught by the 696 Patent. Both result in the brake pedal shaft being trapped in a slot and bounded on all four sides, and therefore immobilized. Winner's expert testified to this effect. Hr'g Tr. II, at 14-16 (Marotto). Therefore, the third prong of the triple identity test is also met.

The parties dispute whether the second prong, requiring that the function be performed in substantially [*42] the same way, is met in the Accused Product. Winner's expert and product manager testified that the Accused Product's housing and slot configuration operates in a substantially different way than that described by the 696 Patent because the configuration of the Accused Product is more "user friendly" in that it does not require slight lateral travel to capture the pedal shaft in the slot, as is required by the Lawman Product's configuration. Hr'g Tr. I, at 144-45 (Linsley); Hr'g Tr. II, at 17, 19 (Marotto). The Court finds this reasoning unpersuasive.

In each configuration, once the brake pedal shaft is positioned in the slot, the locking rod is drawn up, locking the brake pedal shaft into place and immobilizing it. The fact that the Accused Product's housing and slot configuration requires slight lateral travel to capture the brake pedal shaft does not render the way in which it functions substantially different than the way in which the configuration claimed by the 696 Patent functions. The Court finds this difference in the way that the two housing and slot configurations function to be insubstantial to one of ordinary skill in the art.

In support of this conclusion, the Court [*43] notes that Winner's expert, Mr. Marotto, agreed that one with experience and knowledge in the lock field would have recognized that the housing and slot configuration of the Lawman Product could be achieved by the J-shaped hook configuration of the Accused Product. Hr'g Tr. 22, at 20 (Marotto). Such evidence is persuasive evidence of equivalence. *Warner-Jenkinson Co., 520 U.S. at 35-37; Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 609, 94 L. Ed. 1097, 70 S. Ct. 854 (1950); Sofamor Danek Group, Inc. v. DePuy-Motech, Inc., 74 F.3d 1216, 1222 (Fed. Cir. 1996)*.

Because the Court finds that the housing and slot configuration of the Accused Product performs substantially the same function, in substantially the same way, to produce substantially the same result as the housing and slot configuration taught by the 696 Patent, the Court concludes that Lawman Armor has satisfied the triple identity test and made a prima facie showing that it is likely to succeed in proving infringement under the doctrine of equivalents.

Nonetheless, Winner asserts that a finding of infringement under the doctrine of equivalents is inappropriate [*44] because such a finding would allow Lawman Armor to "capture" Winner's prior art crook hook devices. Winner's argument is that to read the housing and slot configuration of the Accused Product, which includes a J-shaped hook on the locking rod, as an equivalent to the configuration claimed by the 696 Patent would capture the "hook" element of its crook hooks, which have been on the market since 1988 and are in the public domain. The Court finds this argument unpersuasive.

It is true that a patentee may not assert a range of equivalents that encompasses prior art. E.g., *Wilson Sporting Goods Co. v. David Geoffrey & Assocs., 904 F.2d 677, 684 (Fed. Cir. 1990)*. The reason for this limitation is that "a patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the PTO by literal claims." Id. This limitation satisfies the "fundamental principle that no one deserves an exclusive right to technology already in the public domain." *Marquip, Inc. v. Fosber America, 198 F.3d 1363, 1367 (Fed. Cir. 1999)*.

Once a patentee has made a prima facie showing of infringement under the doctrine [*45] of equivalents, however, the burden is upon the alleged infringer to

come forth with prior art evidence that shows that the asserted range of equivalence would encompass the prior art. *Nat'l Presto Indus., Inc. v. West Bend Co., 76 F.3d 1185, 1192 (Fed. Cir. 1996).* See *Streamfeeder, LLC v. Sure-Feed Sys., Inc., 175 F.3d 974, 981 (Fed. Cir. 1999).* The burden of proving infringement, however, remains at all times with the party asserting the patent. *Streamfeeder, 175 F.3d at 981.* Winner has come forward only with its crook hook devices as prior art evidence. This evidence is insufficient to convince the Court that it is improper to find that the Accused Product infringes the 696 Patent under the doctrine of equivalents.

In determining whether the range of equivalents asserted by the patentee is precluded by the prior art, the Court "must apply standards of patentability consistent with [the Federal Circuit's] jurisprudence regarding anticipation and obviousness." *Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1577 (Fed. Cir. 1994).*

A "claim is anticipated only if each and every claim element as set forth in the claim [*46] is found, either expressly or inherently described, in a single prior art reference." *Verdegaal Bros., Inc. v. Union Oil Co. of California, 814 F.2d 628, 631 (Fed. Cir. 1987).* Although the prior art crook hook devices contain a hook that is used to trap the brake pedal shaft, these devices contain no base, elongated housing extending from the base, or locking rod, and they are designed to function in a substantially different way than the devices at issue here. Therefore, they do not anticipate the 696 Patent or the range of equivalents asserted by Lawman Armor.

Nor is there any suggestion in the evidence that the crook hook devices, alone or in combination with other prior art references, make obvious to one of ordinary skill in the art the 696 Patent or the range of equivalents asserted by Lawman Armor. A claim is made obvious by the prior art if, in view of the prior art, the claimed invention as a whole would have been obvious to one of ordinary skill in the art. See *Conroy, 14 F.3d at 1577; Grain Processing Corp. v. American Maize-Prods. Co., 840 F.2d 902, 907 (Fed. Cir. 1988).* The fact that the crook hook devices utilized [*47] a hook to capture the brake pedal shaft is not enough to show that the range of equivalents asserted by Lawman Armor would have been obvious to one of ordinary skill in the art. Indeed, virtually all patent claims are combinations of elements, each of which individually can be found in the prior art. *Medtronic, Inc. v. Cardiac Pacemakers, Inc., 721 F.2d 1563, 1566 (Fed. Cir. 1983).* It is clear that an invention may contain a particular element of prior art without necessarily being obvious in view of it. E.g., *Conroy, 14 F.3d at 1577.* Because the crook hook devices do not alone, or in combination with other prior art, suggest to one of ordinary skill in the art the invention and range of equivalents asserted by Lawman Armor, the Court finds that the

application of the doctrine of equivalents is not inappropriate here. n7

n7 In addition, the fact that Mr. Vickers was awarded a patent for an invention similar to the Accused Product, with a housing and slot configuration incorporating a J-shaped hook, supports the argument that such a configuration is not anticipated or made obvious by prior art such as the crook hook devices sold by Winner and other manufacturers. Exs. D-A, D-B, D-D & D-F; *Nat'l Presto Indus., Inc. v. West Bend Co., 76 F.3d 1185, 1192 (Fed. Cir. 1996)* ("Indeed [the alleged infringer] does not reconcile the asserted unpatentability of a hypothetical claim the covers its device with its argument that its device itself is patented.").

[*48]

Because the housing and slot configuration of the Accused Product is the substantial equivalent of the housing and slot configuration claimed by the 696 Patent, and because all other claim limitations are literally met by the Accused Device, Lawman Armor has shown a strong likelihood of success of proving infringement under the doctrine of equivalents.

Given Lawman Armor's uncontested showings of ownership and validity, and its strong showing of infringement under the doctrine of equivalents, Lawman Armor has shown a clear likelihood of success on the merits.

## II. Irreparable Harm

In patent cases irreparable harm is presumed where the patentee has clearly shown that it is likely to prevail on the merits. *Bell & Howell, 132 F.3d at 708; Polymer Techs., Inc. v. Bridwell, 103 F.3d 970, 973 (Fed. Cir. 1996).* This presumption is peculiar to preliminary injunctions in patent cases and "acts as a procedural device which places the ultimate burden of production on the question of irreparable harm onto the alleged infringer." *Polymer Techs., 103 F.3d at 974 (quoting Reebok Int'l Ltd. v. J. Baker, Inc., 32 F.3d 1552, 1556 (Fed. Cir. 1994)* [*49] (citations omitted)). As the Federal Circuit has explained, this presumption is grounded in the patent itself:

Because of the very nature of a patent, which provides the right to exclude, infringement of a valid patent inherently causes irreparable harm . . . .

Years after infringement has begun, it may be impossible to restore a patentee's (or an exclusive licensee's) exclusive position by an award of damages and a permanent injunction.

*Polymer Techs. 103 F.3d at 975-76* (citations omitted).

Accordingly, this presumption is overcome only where the court makes a "finding clearly negating" the presumption. In Polymer Technologies, the Federal Circuit set forth examples of what could constitute clear negation: the non-movant has or will stop infringing; the movant has granted non-exclusive licenses under its patent "such that it may be reasonable to expect that invasion of the patent right can be recompensed with a royalty rather than with an injunction"; or the movant has delayed in bringing suit. *Id. at 974.*

Because Lawman Armor has clearly shown that it will likely succeed on the merits of its infringement claim, it is entitled to a presumption of irreparable harm. [*50] Winner has made no showing that this presumption should be negated. Winner has not alleged or proved that Lawman Armor has granted non-exclusive licenses under its patent, or that Lawman Armor delayed in bringing suit. Nor has Winner alleged that they have or will stop infringing the 696 Patent. For that reason, Lawman Armor is entitled to a presumption of irreparable harm.

Even without this presumption, the Court finds that Lawman Armor has shown that irreparable harm would result without the issuance of a preliminary injunction. Irreparable harm can be shown by demonstrating that monetary damages are an inadequate remedy or are difficult to compute. A number of factors can be considered in making this determination. Among these are whether continuing infringement will damage the plaintiff's position in the market or its market share; whether continued infringement would threaten the survival of the plaintiff's business; whether the plaintiff and the defendant are direct competitors trying to influence the same group of consumers; whether the plaintiff spent a large sum of money on market development; whether continued infringement would have a harmful impact on the plaintiff's [*51] market share and pricing structure; whether the plaintiff will lose substantial profits from continued infringement; and, whether continued infringement would disparage the reputation of the plaintiff or its product. See, e.g., *Canon Computer Sys., 134 F.3d at 1090* (potential loss of market share as basis for finding of irreparable harm not error); *Telebrands Direct Response Corp. v. Ovation Communications, Inc., 802 F. Supp. 1169, 1178 (D.N.J. 1992)* (damage to reputation by knock-off products); *Jacobson v. Cox Paving Co., 1991 U.S. Dist. LEXIS 17787, 19 U.S.P.Q.2D (BNA) 1641,*

*1653 (D. Ariz.), aff'd 949 F.2d 404 (Fed. Cir. 1991)* (listing factors and cases). See also, John G. Mills, The Developing Standard for Irreparable Harm in Preliminary Injunctions to Prevent Patent Infringement, *81 J. Pat. & Trademark Off. Soc'y 51, 65-66 (Jan. 1999)* (listing factors).

In this case, numerous factors support a finding of irreparable harm. Lawman Armor presented credible evidence that Winner's aim in introducing the Accused Product was to damage the entire auto brake lock market. Further, Lawman Armor presented evidence that [*52] Winner has taken actions with regard to the Accused Product which could damage the entire auto brake market, a harm that could not be compensated by money damages. Among this evidence are James Winner's statements that he would enter the auto brake market to erode the price points and drive Lawman Armor out of business; Winner's failure to advertise or otherwise promote the Accused Product; Winner's circulation in the trade of promotional materials designed to disparage auto brake locks, all of which criticism applies equally to the Accused Product; Winner's aborted plan to recall the Accused Product to harm the category of auto brake locks; and Winner's use of cash incentives to retailers to induce them to lower retail prices of the accused product, forcing Lawman to respond and lower prices, eroding the profit margin of the category.

In addition, Lawman Armor spent a significant amount of money to develop a market for its auto brake lock, and damage to that market would threaten the survival of Lawman Armor's business, which consists exclusively of its auto brake lock products. Further, the harm threatened to Lawman Armor by Winner's efforts to use the Accused Product as leverage [*53] to damage the entire market category of auto brake locks would be difficult to quantify in monetary terms. All of these factors favor a finding of irreparable harm unless a preliminary injunction issues.

For these reasons, the Court concludes that the threatened and potential harm to the market category of auto brake locks if a preliminary injunction does not issue weighs in favor of an award of a preliminary injunction.

III. Balance of Hardships

After considering the likelihood of success on the merits and irreparable harm, a court must balance the hardships the respective parties will suffer from granting or withholding the injunction. E.g., 7 Donald S. Chisum, *Chisum on Patents § 20.04*[l] at 20-661 (1999). Even where a court concludes that neither party has a "clear advantage" as to the hardship factor, the court may enter

2002 U.S. Dist. LEXIS 1431, *

a preliminary injunction. *Hybritech, 849 F.2d at 1457-58.*

Here, a preliminary injunction would prevent Winner, pending trial on the merits, from selling a product which it does not promote, does not back up with a guarantee, and which belongs to a product category that Winner has actively disparaged. This is not a "harm" [*54] of which equity should take cognizance.

In addition, the Accused Product constitutes a small fraction of Winner's business, while the Lawman Product is Lawman Armor's entire business. While Lawman Armor has invested millions of dollars in developing and promoting its product, the Accused Product was designed by Winner's patent attorney to avoid infringement of then-issued patents and to utilize its already existing parts inventory. The Accused Product is not advertised at all. Any cognizable harm to Winner by issuance of a preliminary injunction would consequently be small in comparison to the harm to Lawman Armor in the absence of a preliminary injunction.

Accordingly, the Court finds that the balance of hardships favors Lawman Armor.

IV. Public Interest

In patent cases, "the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech, 849 F.2d at 1458.* Courts have only in rare instances exercised their discretion to deny injunctive relief in order to protect the public interest, generally in instances where the public health was [*55] at stake. *Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1547-48 (Fed. Cir. 1995)* (en banc) (citing instances).

Where a likelihood of infringement has been shown, the public interest is almost always served by vindicating the patentee's rights. See *Smith Int'l, Inc. v. Hughes Tool Co., 718 F.2d 1573, 1581 (Fed. Cir. 1983); Pittway v. Black & Decker, 667 F. Supp. 585, 593 (N.D. Ill. 1987).* The public policy behind granting a patent monopoly is vitiated if infringers are permitted, under the court's tacit permission, to take out a "litigation license" for which the patentee never negotiated or bargained. See *Augat, Inc. v. John Mezzalingua Assocs., Inc., 642 F. Supp. 506, 508 (N.D.N.Y. 1986).* In addition, the fact that an infringer is selling a lower-priced product does not justify allowing it to infringe valid patent rights. See *Payless Shoesource, Inc. v. Reebok Int'l Ltd., 998 F.2d 985, 991 (Fed. Cir. 1993)* (noting that such a justification for patent infringement would cause most injunctions to be denied "because copiers universally price their products lower than innovators").

Because Winner [*56] is not actively promoting the Accused Product, is selling relatively few units of the Accused Product, and has spent resources in disparaging the entire category of auto brake locks, market competition in this category will not be measurably harmed by the grant of a preliminary injunction. Rather than lessening competition in the auto brake lock category, a preliminary injunction would likely help preserve the vitality of that category.

Accordingly, because the Court concludes that there is no critical public interest that would be harmed by the grant of a preliminary injunction, the Court finds that the public interest favors granting preliminary injunctive relief.

CONCLUSION

Because Lawman Armor has established each of the requisite elements for obtaining a preliminary injunction, the Court will grant Lawman Armor's motion. The Court finds that, because Winner is not promoting the Accused Product, is not selling many units of the Accused Product, and has made efforts to disparage the entire category of auto brake locks, a bond pursuant to *Federal Rule of Civil Procedure 65(c)* in the amount of $ 50,000 is appropriate.

An appropriate Order follows.

ORDER OF PRELIMINARY INJUNCTION [*57]

AND NOW, this 22nd day of January, 2002, upon consideration of Lawman Armor Corporation's Motion for a Preliminary Injunction (Docket # 8), Winner International, Inc.'s response thereto, and following an evidentiary hearing held on November 19 & 20, 2001, and the filing of proposed findings of fact and conclusions of law by the parties, IT IS HEREBY ORDERED that, for the reasons contained in the accompanying memorandum of today's date, Lawman Armor Corporation's Motion is GRANTED. It is therefore ORDERED that:

Winner International, Inc., together with its agents, officers, employees, servants, and all those acting under its control, on its behalf, or in concert with it, are HEREBY PRELIMINARILY ENJOINED AND RESTRAINED, pending the final hearing and determination of this cause or until further Order of this Court, from selling, offering for sale, licensing, using, or otherwise distributing in the United States any device or product embodying or constituting the inventions claimed in U.S. Patent No. 6,298,696, including, without limitation, devices or products sold under the name "The Club Auto Brake Lock" and other similar automobile anti-theft brake or clutch pedal locking devices [*58] which compete directly with Lawman Armor Corporation's automobile brake or clutch pedal locking devices and infringe claims of Patent No. 6,298,696.

2002 U.S. Dist. LEXIS 1431, *

Lawman Armor Corporation shall within ten (10) days of this Order of Preliminary Injunction post a bond with the Clerk of the Court in an amount of $ 50,000, pursuant to *Federal Rule of Civil Procedure 65(c)*. This Order of Preliminary Injunction shall take effect upon the posting by Lawman Armor Corporation of the $ 50,000 bond.

BY THE COURT:
MARY A. Mc LAUGHLIN, J.

# EXHIBIT 26



**FoodSmarty** SM
IFT 2007 ANNUAL MEETING & FOOD EXPO

July 28 - August 1, 2007
McCormick Place
Chicago, IL

Home

## 2007 Exhibitors

| Company Name | Booth |
|---|---|
| A&B Ingredients | 3564 |
| A.R. Arena Products | 365 |
| AACC International | 5522 |
| Aalst Chocolate, Ltd. | 5353 |
| Aarhus Karlshamn USA, Inc. | 3373 |
| ABC Research Corporation | 2929 |
| ABF Ingredients Ltd. | 130 |
| Accurate Ingredients | 825, 826, 827,828, 829, 830, 925, 927, 929 |
| Aceto Corp. | 5128 |
| ACH Food Companies Inc. | 125 |
| ADI Systems Inc. | 4811 |
| ADM | 148, 153 |
| Advanced Ingredients, Inc. | 2965 |
| Advanced Instruments, Inc. | 3074 |
| Aeroglide Corporation | 2561 |
| Aerotek Scientific, LLC | 5350 |
| Agri-Mark Dairy Proteins | 4758 |
| AgroCepia/Cepia International | 958 |
| Agtron, Inc. | 3662 |
| Ag-West Bio Inc. | 1313 |
| AIB International | 3562 |
| AIYA America, Inc. | 2554 |
| Ajinomoto Food Ingredients LLC | 353 |

Schedule at a Glance

Registration

Housing and Transportation

International Attendees

Scientific Program

Pre-Annual Meeting Courses

2007 Exhibitors and Floor Plan

2007 Exhibitor List

2007 Floorplan

Exhibitor Prospectus

2006 Highlights

Employment Bureau

News Media

2/27/2007

2007 Exhibitor List

| Company | Number |
|---|---|
| Albanese Confectionery Group | 860 |
| Alcohol & Tobacco Trade Bureau | 5217 |
| Alfa Editores Technicos, S.A. DE C.V. | 5337 |
| Alfred L. Wolff | 4413 |
| All American Foods, Inc. | 4525 |
| Allied Biotech Corporation | 919 |
| Almond Board of California | 3476 |
| Alpha MOS | 2074 |
| Amano Enzyme USA Co. Ltd. | 3865 |
| Amax NutraSource, Inc. | 817 |
| Amelia Bay | 5325 |
| American Casein Company | 1027 |
| American Copak Corporation | 665, 1247 |
| American Dairy Products Inst. | 4022 |
| American Egg Board | 2226 |
| American Food Ingredients, Inc. | 3277 |
| American Fruits & Flavors/AFP | 953 |
| American Health & Nutrition | 422 |
| American Importing Co/Amport Foods | 4911 |
| American Int'l. Chemical | 3728 |
| American Italian Pasta Company | 1320 |
| American Laboratories, Inc. | 5342 |
| American Process Systems | 3234 |
| American Purpac Technologies | 2770 |
| AmeriFlax | 3773 |
| Amerivap Systems, Inc. | 5515 |
| Ametek T&CI | 2729 |
| Amley Food Corporation | 5543 |

2007 Exhibitor List

| Company | Booth |
|---|---|
| Anhui BBCA Biochemical Co. Ltd. | 5232 |
| ANKOM Technology | 3665 |
| Anresco Labs | 3233 |
| Anton Paar USA | 5129 |
| AOCS-American Oil Chemists' Society | 3872 |
| APAC Chemical Corp. | 1025 |
| Apple Flavors & Fragrances U.S.A. Corp. | 3575 |
| Aqualon | 5029 |
| Ariake USA, Inc. | 2362 |
| Arista Industries, Inc. | 5014 |
| Arizona Instrument, LLC | 1974 |
| Arro Corporation | 5238 |
| Artemis International, Inc. | 1860 |
| Artisan Industries, Inc. | 3671 |
| ASI Food Safety Consultants | 4558 |
| ATAGO U.S.A., Inc. | 2874 |
| Atlantic Chemicals Trading Of N.A. Inc. | 5139 |
| Atlantium Technologies, Ltd. | 5428 |
| Atwater Foods LLC | 1634B |
| Austrade, Inc. | 520 |
| Autocrat Coffee & Extracts | 1119 |
| Axxya Systems-Nutritionist Pro | 3228 |
| AZO/Amixon | 4358 |
| B.N.W. Industries | 5213 |
| Balchem Encapsulates | 1129 |
| Barrington Nutritionals | 4070 |
| Barry Callebaut USA LLC | 3140 |
| Bartek Ingredients | 4322 |
| BASF | 342 |
| Batchmaster Software | 5122 |
| BDS Natural Products | 5235 |

2/27/2007

2007 Exhibitor List

| | |
|---|---|
| Bedemco Inc. | 858 |
| Bell Flavors & Fragrances | 2148 |
| Bellingham & Stanley | 5126 |
| BGM Dehydrated Ingredients | 5158 |
| Bio Springer | 356 |
| Biocatalysts Ltd. | 3758 |
| Biocontrol Systems, Inc. | 3730 |
| Bioenergy | 758 |
| Bionutrigen Co., Ltd. | 5015 |
| Biorigin | 5313 |
| Birmingham Chamber of Commerce & Indust. | 570 |
| BK Giulini Corporation | 548 |
| Blackwell Publishing | 916 |
| Blendex Custom Blending | 2165 |
| Blommer Chocolate | 2422 |
| Blue California Co. | 5228 |
| Blue Pacific Flavors | 836 |
| Blue Planet Foods | 651 |
| BMG Labtech, Inc. | 5540 |
| Bolthouse Farms, Inc. | 1251 |
| Border Foods Inc. | 3660 |
| Bottom Line Process Tech., Inc | 3073 |
| Brady Enterprises Inc. | 4324 |
| Brechbuehler Inc. | 2174 |
| Brenntag North America | 2522 |
| Briess Malt & Ingredients Co. | 1760 |
| Buchi Analytical Inc. | 214 |
| Budenheim | 3132 |
| Buhler Inc. | 2273 |
| Buik Lift International, Inc. | 4829 |
| Bunge North America | 2317 |
| Burdock Group | 3722 |
| Butter Buds Food | 1361 |

Ingredients

| Exhibitor | Booth |
|---|---|
| C.W. Brabender Instruments | 3970 |
| California Cereal Products Inc | 553 |
| California Dried Plum Board | 3366 |
| California Natural Products | 773 |
| Camerican International, Inc. | 337 |
| Canola Info (Northern Canola) | 1156 |
| Cantox Health Sciences International | 3028 |
| Caravan Ingredients | 4536 |
| Caremoli USA, Inc. | 3118 |
| Cargill | 2348 |
| Carmi Flavor & Fragrance Co. | 2342 |
| Carrageenan Company | 1417 |
| Celebes Coconut Corporation | 5013 |
| CEM Corporation | 3024 |
| Centerchem, Inc. | 539 |
| Century Foods | 1032 |
| Cereal Ingredients, Inc. | 3966 |
| Certified Laboratories, Inc. | 3658 |
| CFAA/CCPIT-LSI (China Pavilion) | 1713,1714, 1716, 1717, 1719, 1720, 1722, 1723, 1724, 1726, 1727, 1728, 1729, 1730, 1813, 1814, 1816, 1817, 1819, 1820, 1822, 1823, 1824, 1826, 1827, 1828, 1829, 1830, 1913, 1917, 1922, 1925, 1928, 2113, 2117 |
| Cheema International | 5318 |
| Cheese Merchants of America | 5319 |
| Chefmaster | 3764 |
| Chemidex, Inc. | 1632B |
| China National Chemical Construction Corp. | 4528, 4532, 4732 |
| Chisso America, Inc. | 2824 |
| Chr. Hansen, Inc. | 1527 |

2007 Exhibitor List

| Exhibitor | Booth |
|---|---|
| Church & Dwight Co., Inc. | 4752 |
| Ciranda, Inc. | 634 |
| CJ America, Inc. | 1673 |
| Clark Food Safety | 3626 |
| Clasen Quality Coatings | 2528 |
| Clextral Inc. | 4422 |
| Clofine Dairy & Food Products | 432 |
| Clordisys Solutions, Inc. | 3177 |
| Clover Specialties | 4959 |
| Cognis Nutrition and Health | 3513 |
| Cole-Parmer Instrument Co. | 2922 |
| Colloides Naturels, Inc. | 2158 |
| Comarco Products, Inc. | 4020 |
| Comax Flavors | 3958 |
| Comexa Foods | 613 |
| Compusense Inc. | 1766 |
| Concord Foods, Inc. | 5348 |
| CONFOCO | 3375 |
| Conte Luna Foods | 2065 |
| Coombs Family Farms | 625 |
| Coperion Corporation | 3870 |
| Copesan Services | 3525 |
| Corn Products | 3348 |
| Cornell Agriculture and Food Technology Park | 5242 |
| Covance Laboratories, Inc. | 3529 |
| CP Kelco | 948 |
| CPC Ingredients-Concsa | 5520 |
| CPM - Century Extrusion | 5234 |
| CRC Press-Taylor & Francis | 4329 |
| Creative Research Management | 1159 |
| CSS/Datatelligence | 2565 |
| Culinary Farms Inc. | 1970 |

2/27/2007

2007 Exhibitor List

| | |
|---|---|
| D.D. Williamson & Co., Inc. | 1770 |
| Dahlgren & Co. Inc. | 859 |
| Dairy Management, Inc. | 4548 |
| DairyChem | 3566 |
| Dakota Prairie Organic Flour Co. | 526 |
| DataMonitor | 728 |
| David Michael & Co. | 1353 |
| Davisco Foods Int'l, Inc. | 4153 |
| Davos Life Science PTE, Ltd. | 4410 |
| Debelis Corp. | 525 |
| Decagon Devices, Inc. | 3522, 3920 |
| Decas Cranberry Products, Inc. | 332 |
| Degussa | 3017 |
| Denomega Nutritional Oils | 5310 |
| Desert King Int'l. | 1013 |
| Devansoy | 5226 |
| Diehl Inc. | 1358 |
| Dionex Corp. | 2822 |
| Dipasa USA, Inc. | 1062 |
| Divis Nutraceuticals | 5010 |
| Dixie Canner Company | 2566 |
| DKSH North America, Inc. | 760 |
| DMH Ingredients Inc. | 5651 |
| Dole Packaged Foods Company | 4417 |
| Domino Specialty Ingredients | 1570 |
| D'Orsogna Dolciaria SvrL | 5137 |
| Dow Chemical Co. | 722 |
| Dr. Harnisch Verlag | 5439 |
| Dr. Paul Lohmann, Inc. | 5517 |
| Draco Natural Products | 532 |
| DSM Nutritional Products | 4148 |
| Earthrise Nutritionals, Inc. | 3475 |

2/27/2007

2007 Exhibitor List

| | |
|---|---|
| Ecolab Inc. | 1958 |
| Ecom Cocoa-Atlantic (USA), Inc | 5450 |
| Ecom Manufacturing Corp. | 3272 |
| Edge Biologicals Inc. | 3322 |
| Edlong Dairy Flavors | 3953 |
| Electronic Sensor Technology | 4713 |
| elementar Americas | 3125 |
| ELISA Technologies, Inc. | 2724 |
| Elite Spice | 5033 |
| Ellab Incorporated | 5510 |
| Ellison Bakery | 4018 |
| Elsevier | 2222 |
| EMD Chemicals, Inc. | 1719B |
| Emerald Hilton Davis, LLC | 416 |
| Empresas Carozzi | 513 |
| Entech Instruments Inc. | 4623 |
| Environmental Micro Analysis | 3122 |
| Enzyme Development Corporation | 3918 |
| Erie Foods International, Inc. | 2152 |
| Escalade Ltd. | 2973 |
| ESHA Research, Inc. | 770 |
| Everson Spice Co. | 415 |
| Evesa | 5529 |
| Excelon International | 5548 |
| Farbest-Tallman Foods Corp. | 1370 |
| Fenchem Enterprises Ltd. | 3672 |
| First Choice Ingredients | 5251 |
| Florida Food Products | 659 |
| Fluid Imaging Technologies, Inc. | 3323 |
| FMC BioPolymer | 1348 |
| FONA International | 1113 |

2007 Exhibitor List

| Exhibitor | Booth |
|---|---|
| Fontana Flavors | 5338 |
| Food Allergy Res. and Res. Program | 2924 |
| Food Industry Technology | 3670 |
| Food Ingredient Solutions, LLC | 835 |
| Food Processing | 717 |
| Food Product Design Magazine | 1259 |
| Food Products Association | 2070 |
| Food Quality Magazine | 2827 |
| Food Safety Magazine | 3629 |
| Food Safety Net Services, Ltd. | 3222 |
| Food Technology Corporation | 5512 |
| Food Valley | 3162, 3361 |
| Foran Spice Company | 3065 |
| Forbest International USA, LLC | 4514 |
| Foreign Domestic Chemicals Corp. | 5544 |
| Foreign Trade Service Corp. | 3424 |
| Fortitech Inc. | 3313 |
| FOSS North America | 3329 |
| Freeman Industries, LLC | 856 |
| Freeze Dry Foods Ltd. | 3473 |
| French's Flavor Ingredients | 551 |
| Fuchs North America (formerly Baltimore Spice) | 2353 |
| FutureCeuticals | 3675, 5254, 5328 |
| G.S. Dunn Limited | 1016 |
| Gadot Biochemical Industries, Ltd. | 1326 |
| Gamay | 4817 |
| Garden Protein International | 554 |
| Gardner, Paul N. Co., Inc. | 4815 |

2/27/2007

2007 Exhibitor List

| Garuda International, Inc. | 2570 |
| Gehl's Guernsey Farms, Inc. | 315 |
| Gelita USA Inc. | 2758 |
| Gelnex | 5244 |
| Genius Food Ideas SRL | 1619B |
| Gilson Company Inc. | 3027 |
| Giorgio Foods | 2625 |
| Glanbia Nutritionals | 4112 |
| Glatt Air Techniques | 1153 |
| Global BioIngredients, Inc. | 861 |
| Global Organics, Ltd. | 622 |
| Glycemic Index Laboratories | 5153 |
| GMI Gelatin | 4760 |
| GNT USA | 2335 |
| Gold Coast Ingredients, Inc. | 2532 |
| Golden Brands, LLC | 1060 |
| Golden Peanut Co. LLC | 3828 |
| Goodpack USA, Inc. | 2958 |
| Grace Davison Discovery Sciences | 5114 |
| Graceland Fruit, Inc. | 562 |
| Graham Chemical Corp. | 3276 |
| Grain Millers, Inc. | 329 |
| Grain Processing Corporation | 164 |
| Grande Custom Ingredient Group | 2332 |
| Grayling Industries, Inc. | 4935 |
| Great Earth Chemical | 5236 |
| Greif Corporation | 5322 |
| Grey House Publishing | 5263 |
| Griffith Laboratories | 1554 |
| Grimmway Farms | 4313 |
| GTC Nutrition | 3148 |
| Guaranteed Gums | 5240 |

2007 Exhibitor List

| | |
|---|---|
| Guar-Tex | 517 |
| Guelph Partnership for Innovation | 4158 |
| Gumix Int'l., Inc. | 3829 |
| Hach Company | 3875 |
| Haifa Chemicals | 3922 |
| Hamilton Grant Software Ltd | 2828 |
| Hangzhou Sanhe Food Co., Ltd. | 658 |
| Hanna Instruments, Inc. | 2725 |
| Haubelt Laborgerate | 3876 |
| Hayashibara International | 4316 |
| Hazelnut Council Inc. | 4828 |
| Helm New York, Inc. | 1560 |
| Henry Broch | 5530 |
| Herb Trade, Inc. | 424 |
| Hilmar Ingredients | 3570 |
| Hilton Soy Foods | 5449 |
| Hong Kong Sheii Ltd. | 2823 |
| Hoogwegt US | 2373 |
| Hormel Foods Spec Prod Div | 932, 935 |
| Hort Research | 815 |
| HRS Process Technology, Inc. | 3274 |
| Huber Engineered Materials | 1047 |
| Huber Engineered Materials - Health & Nutrition | 1051 |
| Hunterlab | 2666 |
| ICL Performance Products LP/Astaris | 348 |
| IEH Laboratories & Consulting Group | 2925 |
| IFP Custom Processing Group | 4074 |
| Illinois Department of | 1513, 1613, 1717B |

2/27/2007

2007 Exhibitor List

| | |
|---|---|
| Agriculture | |
| Imperial Sugar Specialty Products Group | 5017 |
| Importers Service Corporation | 637 |
| in2food | 5123 |
| Indus Organics | 527 |
| Ingredientrade.com | 662 |
| Ingredients Solutions, Inc. | 2122 |
| Ingretec Ltd. | 1619 |
| Inland Empire Foods | 4072 |
| InnoCentive, Inc. | 5526 |
| Innophos, Inc. | 3155 |
| Innova/A Griffith Labs Co. | 1558 |
| Innovations In Food Technology | 5058 |
| Innovative Foods, Inc. | 4310 |
| Inst for Food Laws & Regs | 3129 |
| Interhealth Nutraceuticals, Inc. | 1526 |
| International Dairy Ingredients | 5224 |
| International Fiber Corp | 2970 |
| International Foodcraft Corp. | 5330 |
| International Nut and Dried Fruit Council Foundation | 1160 |
| International Paper | 973 |
| Int'l Dehydrated Foods, Inc. | 2128 |
| Int'l Food Info Cncl Foundatio | 3864 |
| Invertec Foods | 4729 |
| Iowa Dept. of Economic Dev. | 1122, 1322 |
| IQ Scientific Instruments, Inc. | 5415 |
| Islamic Food & Nutrition Council | 3528 |
| ISP Food Ingredients | 2917 |

2007 Exhibitor List

| J. Rettenmaier USA | 2713 |
| J.R. Short Milling Co. | 729 |
| Jedwards Int'l. | 423 |
| JLM Marketing Inc. | 3971 |
| Jogue Incorporated | 4920 |
| John B. Sanfilippo & Son, Inc. | 5219 |
| Joseph Adams Corp. | 1317 |
| Jungbunzlauer | 4842 |
| Kalsec, Inc. | 156 |
| Kansas State Univ/Master in Agribusiness | 2653 |
| Kelly Scientific Resources | 3972 |
| Kemin Food Ingredients | 137 |
| Kenko (QingDao) Co., Ltd. | 4659 |
| Kerr Concentrates Inc. | 873 |
| Kerry Ingredients | 2748, 3152 |
| KES Science & Technology | 3224 |
| Kett | 3558 |
| Kforce Scientific Staffing | 3676 |
| Kikkoman International, Inc. | 318 |
| KIMICA Corporation | 5148 |
| KOF-K Kosher Supervision | 5115 |
| Konson Konjac Gum Co., Ltd. | 5154 |
| Korean Society of Food Sci. & Tech. | 5343 |
| Kraft Food Ingredients | 1548, 1548A |
| KY International | 5214 |
| La Crosse Milling Company | 5253 |
| Lactalis Industrie U.S.A. | 4914 |
| Lallemand/Macco | 1219 |
| Lambent Technologies | 5336 |
| LaMotte Co. | 3128 |
| Land O'Frost, Inc. | 1773 |
| Land O'Lakes, Inc. | 3749 |
| Lascom Solutions, Inc. | 5654 |

2007 Exhibitor List

| | |
|---|---|
| Latitude 1 | 427 |
| LCI Corporation | 4611 |
| Leco Corporation | 5417 |
| Legacy Foods LLC | 1763 |
| Leiber GMBH | 5519 |
| Leprino Foods | 1565 |
| Levapan S.A. | 713 |
| Life Sciences Research Office | 4727 |
| Lionel Hitchen (Essential Oils) Ltd. | 4613 |
| Lithotype Company | 5332 |
| Littleford Day Inc. | 4522 |
| Lochhead Manufacturing Company | 3175 |
| Loders Croklaan | 1135 |
| Lonza Group | 1427 |
| Lovibono | 5317 |
| LUM Corporation | 5754 |
| LycoRed Corp. | 765 |
| MAFCO Worldwide Corporation | 639 |
| Malaysian Palm Oil Board, Wash | 4562 |
| Mantrose/Agricoat | 3554 |
| Maple Island, Inc. | 618 |
| Marathon Products, Inc. | 2829 |
| Marketing Systems Group | 5524 |
| Marron Foods | 4929 |
| Marroquin Int'l | 522 |
| Martek | 362 |
| Matsutani America, Inc. | 556 |
| McCain Foods USA, Inc. | 3376 |
| McClancy Seasoning Co. | 1329 |
| Medallion Laboratories | 2722 |
| Meduri Farms, Inc. | 616 |
| MGP Ingredients, Inc. | 4739 |

2007 / Exhibitor List

| | |
|---|---|
| Michael Foods, Inc. | 2370 |
| Michelson Laboratories | 1873 |
| Microbac Laboratories, Inc. | 2727 |
| Microbiology International | 1029 |
| Microdyn Technologies, Inc. | 5329 |
| Milk Products Trading BVBA | 5138 |
| Milne Fruit Products | 322 |
| Minnesota Grain, Inc. | 1154 |
| Minnesota Valley Testing Labs, Inc. | 3423 |
| Mintel | 3113 |
| MirOil | 4717 |
| Mitsubishi Gas Chemical America Inc. | 1965 |
| Mitsubishi Int'l. Food Ingred. | 3913 |
| Mitsui & Co., Ltd. | 4932 |
| Miyako Oriental Foods, Inc. | 2173 |
| Miyasaka Brewery | 5113 |
| MLG Enterprises Limited | 213 |
| Moisture Register Prods. | 3625 |
| Morton Salt | 2365 |
| Multisorb Technologies, Inc. | 1972 |
| Murzan Inc. | 3770 |
| Mushroom Canning Company | 4513 |
| Nantong Acetic Acid Chemical Co., Ltd. | 862 |
| Nasco Whirl-Pak | 3232 |
| National Association of Flavor | 5525 |
| National Center for Food Safety & Tech. | 3227 |
| National Food Laboratory, Inc. | 2170 |
| National Inst. of | 5152 |

2/27/2007

2/27/2007

2007 Exhibitor List

| | |
|---|---|
| Health/Office of Dietary Supplements | 5117 |
| National Raisin Company | 942 |
| National Starch | 813 |
| National Sunflower Association | |
| Nat'l Inst.of Stds & Tech | 3225 |
| Natra U.S. Inc. | 3716 |
| Natraceutical Group | 910 |
| Natreon, Inc. | 3775 |
| Naturex | 939 |
| NC Hyperbaric S.A. | 740 |
| NDC Infrared Engineering | 5222 |
| Neogen Corp. | 2730 |
| Nerac, Inc. | 218 |
| Nestle Branded Ingredients | 736 |
| Nexcel Food Ingredients | 664 |
| Nikken Food Co. | 3158 |
| Niro Inc. | 3318 |
| Nitta Gelatin NA Inc. | 3761 |
| Niutang Chemical/FDL | 710 |
| Northland Laboratories | 2830 |
| Novozymes | 3576 |
| Novum LLC | 4907 |
| NP Analytical Laboratories | 3127 |
| NutraCea | 3370 |
| Nutraceuticals World | 5225 |
| NutraGenesis | 959 |
| Nutrical S.A. de C.V. | 5448 |
| Nutrinova Inc. | 3354 |
| Nutrition 21, Inc. | 870 |
| Nutritional Outlook Magazine | 529 |
| Oat Ingredients, LLC | 957 |
| Ocean Cliff Corporation | 2665 |
| Ocean Nutrition Canada Limited | 1365 |

2007 Exhibitor List

| Company | Number |
|---|---|
| Ocean Optics | 4161 |
| Ocean Spray-Ingredient Technology Group | 3713 |
| Ogawa & Co., Ltd. | 2961 |
| Ohio State University | 2073 |
| OK Kosher Certification | 1019 |
| Old Fashioned Foods | 4958 |
| Olds Products Co. | 913 |
| OmegaPure | 2762 |
| OMIC USA Inc. Analytical Lab | 5420 |
| Omnimark Instrument Corp./Sartorius Group | 5344 |
| On Assignment Lab Support | 4510 |
| Orafti Active Food Ingredients | 4852 |
| Oregon Freeze Dry Inc. | 3137 |
| Oregon Potato Company | 3560 |
| Oregon Tilth | 623 |
| Organic Valley | 429 |
| Orthodox Union | 5444 |
| Oskaloosa Food Products | 2066 |
| Owl Software | 4615 |
| Oxy-Dry Foods Blends | 1513 |
| P&G Food Ingredients | 3816 |
| Pacific Spice Co. Inc. | 5320 |
| Palatinit of America | 4939 |
| Pall Corporation | 5135 |
| Paper Systems, Inc. | 3358 |
| Parker Vanilla Products, Inc. | 4622 |
| Parmalat | 3663 |
| Particle Control, Inc. | 5429 |
| Particle Sizing Systems | 3628 |
| Particle Technology Labs | 4658 |
| Par-Way/Tryson Co. Inc. | 4507 |

| | |
|---|---|
| Pat Vitamins, Inc. | 734 |
| PB Leiner | 4170 |
| Perfumer & Flavorist Magazine | 5442 |
| Pharmachem Laboratories, Inc. | 3777 |
| Phillips Gourmet, Inc. | 537 |
| Phoenix Regulatory Assocs., Ltd. | 2873 |
| Pick Heaters, Inc. | 516 |
| Pizzey's Milling | 2573 |
| PL Thomas & Co. | 970 |
| Polar Foods, Inc. | 1161 |
| Portion Pac | 4559 |
| Prayon | 2358 |
| Precision Research | 4619 |
| Premier Organics | 426 |
| Premium Ingredients International | 159, 559, 560 |
| Prepared Foods | 5110 |
| Primera Foods Corp. | 3963 |
| Procell Polymers | 220 |
| Process Sensors Corporation | 4960 |
| ProcessPro Software | 3023 |
| ProFood International Inc. | 5542 |
| Proliant Meat Ingredients | 922 |
| Purac America, Inc. | 2513 |
| Q Laboratories, Inc. | 3774 |
| Q Research Solutions, Inc. | 4075 |
| QA Products, Inc. | 5133 |
| QAI, Inc. | 530 |
| QORPAK | 2773 |
| Quadro Engineering | 5028 |
| Quali Tech, Inc. | 3765 |
| QUALISOY | 4424 |
| Quimica Amtex SA de CV | 762 |

# EXHIBIT 27

# Foodsmart
## IFT 2007 ANNUAL MEETING

July 28 - August 1, 2007
McCormick Place
Chicago, IL

Home

Schedule at a Glance

Registration

Housing and
Transportation

International Attendees

Scientific Program

Pre-Annual Meeting
Courses

2007 Exhibitors and Floor
Plan

Exhibitor Prospectus

2006 Highlights

Employment Bureau

News Media

**Natra U.S. Inc. - Booth Number 2597**
PO Box 122170
Chula Vista, CA 91912
U.S.A.

**Phone:** 619-3974120
**Fax:** 619-3974121

info@natraus.com
www.natraus.com

**Description:**
The Natraceutical Group is a multinational company composed of three different companies. Natraceutical SA is based in Valencia Spain and specializes in the production of Cocoa Derivatives, Natural Caffeine, Cocoa Butter and Botanical Extracts. Overseal Natural Ingredients, located in England, are experts in Natural Colors, Coloring Foodstuffs, Talin, and Dried Yeasts. The Swiss company Obipektin have produced Natural Pectins for over 70 years as well as Natural Fruit and Vegetable powders. The group has 5 production centers in England, Switzerland (2), Spain, and Brazil and has more than 20% of its resources dedicated to R&D. For more information visit www.natraceuticalgroup.com

**New Products:**
The CocoanOX line of cocoa polyphenols is the latest in innovation. CocoanOX 12% is a natural cocoa powder with a high concentration of cocoa polyphenols (minimum 12%). Its CocoanOX Extracts line varies from 30 to 70% in cocoa polyphenols. A recent clinical study validates the bioavailability of its polyphenols. Natraceutical is also launching Soluble Cocoa Fiber an all natural cocoa ingredient which contains 37-41% soluble fiber from cocoa. The ingredient has undergone pre-clinical trials which demonstrate it can act to lower LDL ("bad") cholesterol levels. Obipektin has launched a new range of fruit and vegetable powders with their Actisec line. Each variety guarantees a minimum quantity of phytonutrients.

**We are listed under the following Categories/Subcategories:**

ingredients, additives
- antioxidants
- bakery additives
- bakery mixes
- beverage bases, mixes
- botanicals
- coatings, chocolate

- coatings, confectionery
- cocoa, cocoa powder, chocolate
- confectionery ingredients
- extracts
- flavors, essential oils, aromatic chemicals, natural, synthetic
- flavors, sweet, fruit, citrus
- flavors, savory
- gravies, sauces
- non-GMO ingredients
- nutrients, supplements
- seasonings
- spices
- bakery fillings

**Areas where our products are distributed include:**
- Europe
- North America

# EXHIBIT 28

FoodSmarts℠

IFT 2007 ANNUAL MEETING & FOOD EXPO

July 28 - August 1, 2007
McCormick Place
Chicago, IL

FoodSmarts

Home

Schedule at a Glance

Registration

Housing and
Transportation

International Attendees

Scientific Program

Pre-Annual Meeting
Courses

2007 Exhibitors and Floor
Plan

Exhibitor Prospectus

Benefits

Request Information

Marketing

2006 Highlights

Employment Bureau

News Media

## Benefits

**Thousands of buyers will attend IFT next year...**

- **To see the products.**

  70% of IFT attendees go there to find new products.

  IFT is the only place where the hottest global food trends -- and the products geared to meet those trends -- are put on display. It is, in short, the future of food.

- **To witness the trends.**

  50% of IFT attendees go to no other trade shows.

  Why? Because IFT delivers the only true one-stop trends and information shop in the food world -- including Special Interest Pavilions specifically designed to showcase important and emerging foods and food technologies. This year's pavilions will include:

  o *Organic Food Ingredients Pavilion:* A showcase for certified organic products, one of the fastest-growing food industry

Benefits

Marketing

2007 Floorplan

Application and Contract
(pdf)

Sponsorship Guide (pdf)

Request Information

**Mark Your Calendar**

Exhibits:
July 29-31, 2007

Scientific Program:
July 29-31, 2007

Pre-Meeting Courses:
July 27-28, 2007

IFT FoodSmarts 2007: Benefits

segments.

o *Healthy Food Ingredients Pavilion:* The latest ideas to meet the demands of health-aware consumers, visited by 39% of all show attendees in 2005.

o *Food Safety & Quality Pavilion:* Food safety and quality is on everybody's mind. This pavilion showcases instrumentation, services, processing and packaging technologies.

o *International Pavilion:* Showcasing new products and vendors with the capacity to do business overseas.

• **To buy for their businesses.**

87% of IFT attendees make or have influence over their company's buying decisions.

What do they do?

| | |
|---|---|
| R&D / Scientific / Technical | 45% |
| Sales and Marketing | 16% |
| President, Owner, CEO | 12% |
| Education | 11% |
| Purchasing | 6% |
| Consultants | 6% |
| Government/Regulatory | 3% |
| Other | 1% |

What kind of ingredient influence do they have?

| Total buying influence | 68% |
| Select / approve / buy | 37% |
| Suggest / recommend | 35% |
| Determine need | 14% |
| Specify | 13% |

- **To talk shop with peers.**

Attendees spend an average of 9 hours visiting IFT exhibitors.

Face-to-face meetings are more important to business than they've ever been, says a new study by the Center for Exhibition Industry. Regardless of the value of new media technologies, in-person one-on-one dialogue has no substitute. Nowhere is this more apparent than at IFT, where buyers rely on exhibitors to help solve their problems and give new insight into their businesses.

Each year more than 2,000 exhibitors come to IFT with new product innovations in tow. Among them are over 500 ingredient companies representing 2,500+ newtechnology and applications ideas.

That's a lot of good thinking.

- **To do business with YOU.**

<< Back to Exhibitor Prospectus

# EXHIBIT 29

marketing

**Foodsmarts**
IFT 2007 & FOOD EXPO

July 28 - August 1, 2007
McCormick Place
Chicago, IL

**Foodsmarts**

Home

Schedule at a Glance

Scientific Program

IFT Food Expo

Professional Development Showcase

Special Events & Networking Opportunities

Pre-Meeting Short Courses

International Attendees

Additional Conferences & Events

Employment Bureau

Registration

Housing and Transportation

For Exhibitors Only

Exhibitor Prospectus

Benefits

## Marketing

IFT doesn't succeed if our exhibitors don't succeed. Which is why IFT offers marketing programs to help promote your participation in the show.

**Marketing Programs**

- NEW! Applied Science Presentations
- Free listing in Exhibitor Directory and Online Buyer's Guide
- Free Expo hall passes for customers and prospects
- Added meeting rooms
- Editorial opportunities in *Food Technology* magazine's official pre-show issue (with bonus distribution)
- Mailing list access
- Exhibitor New Product Showcases (in the convention center lobby)

**IFT's Pre-Show Promotions**

- Targeted direct mail campaigns
- Ads in 17 different trade publications
- Online advertising
- Direct marketing at niche symposia
- E-mail marketing
- Event calendar listings

Benefits

Marketing

2007 Floorplan

Application and Contract (pdf)

Sponsorship Guide (pdf)

Request Information

**Mark Your Calendar**

Exhibits:
July 29-31, 2007

Scientific Program:
July 29-31, 2007

Pre-Meeting Courses:
July 27-28, 2007

marketing

Request Information

Marketing

2007 IFT Food Expo
Innovation Awards

2007 AMFE Sponsors

Annual Meeting + Food
Expo Archive

News Media

- International partnerships
- PR & media relations

**Advertising and Sponsorships***

- Event sponsorships
- Web advertising
- Promotional signage
- Attendee giveaways
- On-floor recognition

*For information about sponsorships and advertising
opportunities, contact the IFT Sales Staff.

**<< Back to Exhibitor Prospectus**

# EXHIBIT 30

LEXSEE 2005 US DIST LEXIS 13566

**Allan Block Corporation, Plaintiff, v. E. Dillon & Co., Defendant.**

**Civ. No. 04-3511 (JNE/JGL)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA**

*2005 U.S. Dist. LEXIS 13566*

**July 1, 2005, Decided**

**SUBSEQUENT HISTORY:** Affirmed without opinion by *Allan Block Corp. v. E Dillon & Co., 2006 U.S. App. LEXIS 6964 (Fed. Cir., Mar. 9, 2006)*

**COUNSEL:** [*1] Cynthia L. Bauerly, Esq., Darren B. Schwiebert, Esq., and Kurt J. Niederleucke, Esq., Fredrikson & Byron, P.A., for Plaintiff Allan Block Corporation.

Kristan B. Burch, Esq. and Stephen E. Noona, Esq., Kaufman & Canoles, and Paula W. Theisen, Meagher & Geer, P.L.L.P., for Defendant E. Dillon & Co.

**JUDGES:** JOAN N. ERICKSEN, United States District Judge.

**OPINION BY:** JOAN N. ERICKSEN

**OPINION:**

ORDER

Allan Block Corporation brought this action against E. Dillon & Co. (Dillon) for breach of contract and patent infringement. The matter is before the Court on Allan Block's motion for a preliminary injunction. For the reasons set forth below, the Court grants the motion in part.

**I. BACKGROUND**

Allan Block is a Minnesota corporation involved in the development and licensing of a cement block (Block(s)) and related technology to be used in the construction of segmental retaining walls (SRW). n1 Allan Block owns *United States Patent Nos. 5,484,236* and *4,909,010*, titled "Method of Forming Concrete Retaining Wall Block" and "Concrete Block for Retaining Walls," respectively. The Blocks are used to create a setback retaining wall and they secure together by way of a raised front, top lip, and bottom [*2] notch. Allan Block licenses the Block, corresponding molds used to create the Block (Molds), and related technology to re-

gional manufacturers. Each regional manufacturer has the exclusive right to manufacture the Block in a particular area and to sell the Block in return for royalties.

> n1 SRW blocks are generally made by pouring concrete into a mold to form the block. SRW blocks allow for the construction of walls without the use of mortar, instead using interconnecting features to secure the wall.

Dillon is a Virginia corporation that has produced and sold specialized dolomitic limestone products for more than 100 years. In 1991, Allan Block and Dillon entered into a Production Agreement (Agreement), which granted Dillon a license to use and possess the Molds for the purpose of manufacturing and selling the Block. In return, Dillon agreed to pay Allan Block a royalty fee for each Block sold. Also under the Agreement, Dillon agreed to use Allan Block's "Technology, including but not limited to the Molds, only [*3] for the manufacture of the Block within the Territory and only for the sale of the Block under [Allan Block] Marks." The Agreement defines "Technology" as:

> The Molds, the application for the patent, the foregoing technology, and all other unpatented, related know-how, trade secrets, processes, designs, technical data and inventions, whether patentable or not, owned or used by Licensor in connection with the Block.

Dillon further agreed to promptly notify Allan Block of any improvement, betterment, or modification of the Block and/or Technology; not to utilize any such improvement without Allan Block's prior written consent; and that Allan Block shall own the rights to any such improvement. Finally, in the event of a termination of the

Agreement, Dillon agreed to immediately cease use of the Technology, return all Technology, and cease manufacture of the Block.

During the course of the Agreement, Allan Block provided components of its technology, such as product designs and specifications, Mold designs and specifications, construction specifications, mix designs, product testing information, and engineering support to Dillon and its exclusive distributors. Sometime [*4] in 2002, while continuing to manufacture the Block, Dillon began seeking ways to "compete in the cheap block market" and decided to create a new block to displace Allan Block business. Barry Link, Manager of Operations for Dillon, developed the new block, which was later named the StoneLoc block. Instead of using the "lip and notch" design of the Block, the StoneLoc block uses molded, wedge-shaped protrusions (lugs) on the bottom of the side walls of the block that extend downward into the cavity of the block beneath and behind the upper block to secure the blocks together. David Skidmore, President of Dillon, explained in a memorandum that Dillon's new block would be "performing the same function as the Allan Block lip and notch" and that "we cannot only make block [sic] that perform exactly the same but also look exactly the same, at least to the untrained eye." Dillon began to manufacture and sell the StoneLoc block in 2004 and continues to do so today.

Allan Block learned of Dillon's StoneLoc block in February 2004. In May 2004, Allan Block notified Dillon that the production and sale of the StoneLoc block was prohibited by law and the terms of the Agreement. Allan Block [*5] also demanded that Dillon stop the manufacture and sale of the StoneLoc block or it would terminate the Agreement in 120 days. After Dillon allegedly failed to make timely payments, Allan Block declared an Event of Default on July 27, 2004. Allan Block filed this lawsuit on August 2, 2004, and a motion for temporary restraining order the following day. On August 13, 2004, the Court denied Allan Block's motion. The parties agreed to conduct expedited discovery to develop a record for the current motion.

## II. DISCUSSION

Allan Block argues it is entitled to a preliminary injunction that: (1) prohibits Dillon from using Allan Block's Technology and from manufacturing and selling StoneLoc blocks; (2) compels Dillon to immediately return its Technology, including its Molds, as well as the technology and molds for the StoneLoc block; (3) requires Dillon to assign to Allan Block all patent applications filed by Dillon relating to modifications of the Block; and (4) enjoins further alleged infringement of its patents. The record here is sufficient to address whether Dillon should be prohibited from manufacturing and selling StoneLoc blocks. The Court will consider only Allan Block's [*6] contract claims as a basis for injunctive relief.

Injunctive relief may be granted only if the moving party can demonstrate: (1) a likelihood of success on the merits; (2) the movant will suffer irreparable harm absent the restraining order; (3) the balance of harms favors the movant; and (4) the public interest favors the movant. *Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 113 (8th Cir. 1981)*. Injunctive relief is an extraordinary remedy, *see Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc., 815 F.2d 500, 503 (8th Cir. 1987)*, and the party requesting the injunction bears the "complete burden" of proving all the factors listed above. *Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418 (8th Cir. 1987)*. While no one factor is determinative, likelihood of success on the merits is generally the touchstone inquiry. *Dataphase, 640 F.2d at 113; see also S & M Contractors, Inc. v. Foley Co., 959 F.2d 97, 98 (8th Cir. 1981)*.

## A. Likelihood of success on the merits

Allan Block argues Dillon breached the Agreement by modifying the Block, improperly using the Technology, failing to notify [*7] Allan Block that it had created a modified block, and failing to seek written consent to manufacture and sell the modified block. At the core of Allan Block's contract claims is its argument that Dillon breached paragraph 8.9 of the Agreement, which reads:

> Producer shall promptly notify Licensor of any improvement, betterment or modification of the Block and/or the Technology of which Producer is aware ("Producer's Improvement"). Producer may utilize Producer's Improvement only with the prior written consent of Licensor and at Producer's expense. Licensor shall own the rights to and Licensor may utilize Producer's Improvement without any payment to Producer. Licensor shall, in turn, promptly notify Producer of any improvements, betterment or modification of the Block and/or the Technology of which Licensor is aware ("Licensor Improvement"). Producer may utilize Licensor's improvement at Producer's expense.

Also relevant to this claim is paragraph 8.8, which provides: "Producer will use the Technology, including but not limited to the Molds, only for the manufacture of the Block within the Territory and only for the sale of the Block under the Marks."

2005 U.S. Dist. LEXIS 13566, *

Allan Block has submitted [*8] extensive evidence that Dillon's StoneLoc block is a modification of the Block that was created through the improper use of Allan Block Technology, including designs and drawings of the Block, mold parts, and other mold technology. For example, there is evidence that Link sent drawings of the Block to Columbia Machines, a third-party producer, for the purpose of designing the StoneLoc block. n2 In fact, Link testified that he sent a drawing to Columbia Machines that contained an overall layout of the Allan Block "footprint" and a locking mechanism of his own design. The drawing was actually an altered version of an Allan Block drawing. n3 In addition, Dillon sent an actual Allan Block drawing entitled "Allan Block Key Cap Block" to Columbia Machines. Although Dillon claims that this drawing was not sent in connection with the production of StoneLoc, it was faxed on July 17, 2003, precisely the time period that Dillon and Columbia Machines were designing the StoneLoc block. During the on-going process of designing the StoneLoc block, Dillon sent additional drawings and sketches of Allan Block designs to Columbia Machines bearing various alterations.

n2 The record reveals that Columbia Machines already possessed some of the drawings because it had manufactured the Block. Given Dillon's purpose in sending drawings to Columbia Machines, Columbia Machines' prior possession of these drawings is not significant.

[*9]

n3 A visual comparison of the Allan Block drawing and the altered version reveals that Allan Block's name was removed from the drawing, the drawing was re-titled "Lugged SRW" (which Dillon was using to refer to what would become StoneLoc), and certain modifications were made to the drawing to illustrate the "lug" design.

In addition, there is evidence that Dillon used Mold parts to produce its StoneLoc product. For example, Craig Coleman of Columbia Machines testified that for StoneLoc, Dillon used two frames (one for a corner and one for a cap) previously used to make Allan Block products. In August 2003, Link and Coleman discussed modified molds via telephone, and Link's notes from that conversation reveal that they discussed the Block. That same month, Columbia Machines provided Dillon with a quote for its newly developed StoneLoc molds, providing prices for a "set of parts to convert existing Allan Block corner mold" and a "set of parts to convert existing

Allan Block cap mold." Soon thereafter, Dillon placed the order for those molds.

Additional evidence in the record supports the conclusion [*10] that the StoneLoc block is a modification and that the Allan Block design and related Technology was used extensively in its development. For example, Columbia Machines' sketches for the StoneLoc block mold identify the same drilling holes as those found in Allan Block's design. Further, in developing marketing materials for the StoneLoc block, it was suggested that Dillon provide "current pieces of Allan Block literature, or competitive literature, that you should like to have 'duplicated' to fit the StoneLoc Product." There is also evidence that Dillon, through its distributor GeoSpec Environments (GeoSpec), intended to manufacture a complete line of new blocks that would closely correspond with Allan Block designs. In explaining the transition from Allan Block to StoneLoc, a representative of GeoSpec stated that "because the face and unit aesthetics once installed are so similar and the colors are the same, most dealers have determined not to replace any displays."

Dillon, on the other hand, argues that it created a wholly new and unique "lug" design locking mechanism for a block and that the StoneLoc block is not a modification of Allan Block's Block. Dillon concedes that it did [*11] reuse certain mold parts previously used to make Allan Block products and referenced drawings and designs of the Block during the creation of the StoneLoc block, but argues that it was permitted to do so because these parts and designs contained basic, non-proprietary features of the Block. Dillon argues that neither the Agreement nor its addendum (Addendum) prohibit the use of generic features of the Block. Instead, Dillon claims that the Agreement only prohibits the use of the Block's patented features and that the Addendum recognizes that the Molds include parts that are not part of Allan Block's Technology.

In making this argument, Dillon seems to suggest that the Agreement permitted it to modify or improve the Block under the Agreement, so long as any final product did not embody the proprietary features of the Block. Dillon claims that a broader reading of Agreement would amount to a perpetual non-compete in violation of public policy. Dillon's argument, however, depends on a reading of the Agreement and the Addendum that conflicts with their unambiguous language. *See Wessels, Arnold & Henderson v. Nat'l Med. Waste, Inc., 65 F.3d 1427, 1436 (8th Cir. 1995)* (noting [*12] that under Minnesota law, a court should determine the meaning of a contract in accordance with its plainly expressed intent); *Minneapolis Pub. Hous. Auth. v. Lor, 591 N.W.2d 700, 704 (Minn. 1999)* (unambiguous contract language is to be given its plain and ordinary meaning and shall be enforced even if

2005 U.S. Dist. LEXIS 13566, *

result is harsh). Technology is defined broadly in the Agreement as "the Molds, the application for the patent, the foregoing technology, and all other unpatented, related know-how, trade secrets, processes, designs, technical data and inventions, whether patentable or not, owned or used by Licensor in connection with the Blocks." In addition, paragraph 8.8 expressly prohibits Dillon from using any of this Technology for any purpose other than for the manufacture and sale of the Block under Allan Block's marks. On its face, the Agreement's definition of Technology is *not* limited to the patented features of the Block. Nor does the Agreement allow for the use of any Technology (patented or unpatented) to modify the Block or to develop a competing block.

Similarly, Dillon's reliance on the Addendum is misplaced. The Addendum provides:

> Notwithstanding anything contained [*13] in the Production Agreement, upon termination of the Production Agreement, and for (6) months thereafter, Producer shall have the right to sell those parts of the Molds that are specifically related to the Block or the Technology (including stripper shoes) to any other company which is then an authorized manufacturer of Allan Block, with the approval of Allan Block Corporation, provided that the purchaser shall agree that any Mold part purchased by it should be treated in the same manner as Molds then owned by it under any agreement that it has with Allan Block Corporation. In the event that any such parts are not sold within said six (6) month period following termination of the Production Agreement, Allan Block Corporation will have the right to acquire those mold parts that are specifically related to the Block or the Technology (including the stripper shoes) at Book Value. If Licensor does not exercise this, Producer shall have the right to retain such Mold parts, but Producer shall have no right to make use of such parts. Those parts of the Molds that are not specifically related to the Block or the Technology shall be the property of Producer, and Producer shall be free to use [*14] or sell such parts as it sees fit.

Dillon asserts that the Addendum gives it the right to use any "generic" parts of the Molds to design and develop its own Block. The Court disagrees. On its face, the Addendum divides Mold parts into "related" and "unre-

lated" parts only *upon termination* of the Agreement. Therefore, even if Dillon used only "unrelated" mold parts to develop the StoneLoc block, because Dillon used these parts during the life of the Agreement, the Addendum was not controlling. In addition, the Addendum in no way alters the Agreement's prohibition against the use of Technology (patented or unpatented) for any purpose *other than* for the manufacture and sale the Block. Nor does it equate "specifically related" parts with those covered by Allan Block's patents. Therefore, based on the clear language of the Agreement and the Addendum, Dillon was prohibited from developing the StoneLoc block by using any part of Allan Block's Molds or Technology.

The extensive evidence submitted by Allan Block supports a finding that Dillon modified the Block by replacing the "lip and notch" with a "lug" design. n4 Therefore, the Court concludes that Allan Block is likely [*15] to succeed on its claim that Dillon breached paragraph 8.9 by failing to notify Allan Block of this modification and failing to seek prior written consent to manufacture and sell the StoneLoc block. Because paragraph 8.9 also explicitly provides that Allan Block "shall own the rights to . . . Producer's Improvement," Allan Block is likely to succeed in demonstrating that it owns the rights to the StoneLoc block.

> n4 This conclusion is further supported by the opinions of Allan Block's experts, Paul Forsberg and Alain Dorais, who conclude that the StoneLoc block is a modification of the Block.

Paragraph 10.1 of the Agreement requires Dillon to cease use of the Technology, cease manufacture of the Block, and return all Technology, upon termination of the Agreement. Because Allan Block is likely to succeed in demonstrating that the StoneLoc block is a modification, it is also likely to succeed in demonstrating that Dillon breached paragraph 10.1 of the Agreement by continuing to manufacture and sell the StoneLoc [*16] block.

Because there is a substantial likelihood that Allan Block will prevail on the above-discussed breach of contract claims, this factor weighs heavily in favor of granting a preliminary injunction. n5

> n5 The Court declines to consider Allan Block's remaining breach of contract claims at this time.

2005 U.S. Dist. LEXIS 13566, *

## B. Irreparable harm

Having concluded that Plaintiff has met its burden of establishing a likelihood of success on the merits, the Court turns to the remaining *Dataphase* factors, beginning with irreparable harm. "To warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm." *Bandag, Inc. v. Jack's Tire & Oil, Inc., 190 F.3d 924, 926 (8th Cir. 1999)* (citation omitted). n6 A preliminary injunction should not be granted when any harm which the moving party will suffer between the time of the preliminary injunction and the trial can be adequately compensated by money damages and a permanent injunction. *Id.*

> n6 Dillon claims that Allan Block has failed to demonstrate actual harm. While probative on the issue of whether Allan Block can demonstrate a sufficient threat of irreparable harm, the Court emphasizes that, at this stage of the litigation, Allan Block need not demonstrate actual harm suffered, but rather that injury is imminent. *See Packard Elevator v. I.C.C., 782 F.2d 112, 115 (8th Cir. 1986).*

[*17]

Allan Block asserts that it is suffering irreparable harm from Dillon's breach of the Agreement in the form of consumer confusion, harm to reputation and goodwill, and harm to its licensing structure. Allan Block further asserts that this alleged harm cannot be fully compensated with monetary damages. Dillon, on the other hand, argues that any harm to Allan Block is speculative because the harm has not yet occurred and because Allan Block has not demonstrated that any harm is imminent.

There is little doubt that Allan Block will suffer harm if Dillon is allowed to continue to sell the StoneLoc block; the relevant inquiry is whether this harm is irreparable or whether money damages will make Allan Block whole. Paragraph 14 of the Agreement provides:

> Producer acknowledges and agrees that, because of the unique nature of the Technology, the Marks, the Confidential Information, and any other matters relating to the rights granted to Producer under this Agreement, Licensor shall be entitled to any and all appropriate equitable relief, whether or not an adequate remedy at law may be deemed to be available, in order to prevent a breach of this Agreement or to enforce the provisions [*18] hereof.

While this provision, alone, does not support a finding of irreparable harm, it does lend weight to Allan Block's contentions regarding the nature of the harm it will suffer because it is evident that the parties contemplated that a breach of the Agreement could cause irreparable harm. *See Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 356 F.3d 1256, 1266 (10th Cir. 2004).*

Allan Block has also submitted affirmative evidence of irreparable harm. For example, the risk that consumers will not be able to differentiate between the StoneLoc block and the Block is real and significant. Dillon, itself, admits that it is difficult to tell the blocks apart. In addition, a distributor for Dillon acknowledged the respective blocks' substantial similarity when he explained that "most dealers have determined not to replace any displays" because "the face and unit aesthetics once installed are so similar and the colors are the same." Finally, Allan Block has provided proof of such confusion via the Declaration of Mike Miller. n7 Miller, a general contractor in North Carolina, ordered approximately 300 Allan Block Blocks from a supplier it located on [*19] Allan Block's website. The supplier delivered StoneLoc blocks without indicating their true source. Instead, Miller was told that the blocks (which he believed were manufactured by Allan Block) were a lighter "re-design." It was not until Miller contacted Allan Block's engineering department for installation assistance that he discovered the blocks were not an Allan Block product. In light of this evidence, the Court finds that Allan Block has demonstrated that consumers will likely be unable to differentiate between its Block and the StoneLoc block. This likelihood of confusion is exacerbated by the fact that Dillon manufactured and sold the Block for over ten years and consumers will likely associate Allan Block products with Dillon.

> n7 On May 31, 2005, Allan Block made a motion for leave to file supplemental evidence-- the Declaration of Mike Miller--in support of its motion for preliminary injunction. Dillon opposes the submission of this evidence, arguing that it has been untimely submitted and that Dillon would be prejudiced by the late submission of evidence. Considering the nature of Allan Block's requested relief, the relevancy of the Miller declaration, and the fact that the events about which Miller testifies did not occur until after the motion hearing, the Court grants Allan Block's motion for leave to file supplemental evidence.

[*20]

In addition, the risk that Allan Block will lose control over the quality of its products and its reputation is imminent; particularly because consumers are likely to

be confused. The loss of intangible assets, such as harm to reputation, can constitute irreparable injury. *See United Healthcare Ins. Co. v. AdvancePCS, 316 F.3d 737, 741 (8th Cir. 2002).* This is because "harm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars." *Medicine Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc., 336 F.3d 801, 805 (8th Cir. 2003).* Allan Block argues that StoneLoc blocks are inferior to its Block because they have not undergone adequate testing to ensure against wall failures. According to Allan Block's expert Paul Forsberg, a consultant working for Keystone Retaining Wall Systems, Inc., the StoneLoc block is unproven and potentially inferior, and Dillon's "lug" design has not been fully tested or had enough practical experience to ensure safe installation. Despite the fact that there is no actual evidence of inferiority, the Court agrees that Allan Block will be irreparably harmed should the StoneLoc block fail or experience [*21] other technical problems because such a failure will likely be attributed to Allan Block. *See United Healthcare, 316 F.3d at 741* (affirming district court's finding of a threat of irreparable harm as a result of *potential* loss of reputation and goodwill, explaining threat is not speculative because of lack of complaints where it might take months for loss of goodwill to become manifest). This type of harm posed by a defect, or potential defect, has also been held to be irreparable in trademark cases. *See, e.g., Matrix Essentials, Inc. v. Emporium Drug Mart, Inc., 988 F.2d 587, 591 (5th Cir. 1993)* ("The common thread in [prior cases] where trademark infringement was found is that each involved some defect (or potential defect) . . . that the customer would not be readily able to detect."); *Minn. Mining and Mfg. Co. v. Rauh Rubber, Inc., 943 F. Supp. 1117, 1129, 1133 (D. Minn. 2004)* (holding plaintiff's loss of control over quality of its product risks damage to reputation). Those cases, by analogy, are persuasive here.

Finally, Allan Block argues that its licensing structure will be irreparably harmed if a preliminary injunction [*22] is not granted. Specifically, Allan Block claims that if Dillon's breach remains unchecked, other producers may follow its lead and develop and manufacture their own modified blocks. The Court is not persuaded that the threat that others will choose to breach their contracts represents an imminent harm because a denial of a preliminary injunction would not be an endorsement of any alleged breach on the part of Dillon. However, the Court does find that Dillon's sale of its StoneLoc block in violation of the Agreement will harm Allan Block's license network because it will harm its market position. *Cf. PPG Indus., Inc. Guardian Indus. Corp., 75 F.3d 1558, 1566 (Fed. Cir. 1996)* (affirming district court's finding in patent case that party was entitled to presumption of irreparable harm and that party's market position would be threatened). This is particularly true considering the evidence that StoneLoc blocks have been sold to at least one customer who specifically requested, through an Allan Block supplier, Allan Block Blocks. Therefore, it is likely that Allan Block is losing customers, even though the customers themselves are unaware that they are purchasing non-Allan [*23] Block products. The threat that this type of event will be, or has been, repeated is real and imminent.

Dillon, on the other hand, claims that Allan Block's licensing network precludes a finding of irreparable harm, arguing that any resulting damage could be compensated through a monetary award. The Court acknowledges that the Federal Circuit has held in patent infringement cases that evidence of licensing can suggest that any injury sustained due to infringement would be compensable in money damages. *See, e.g., High Tech Med. Instr. v. New Image Indus., Inc., 49 F.3d 1551, 1556-57 (Fed. Cir. 1995).* The Federal Circuit's decision in *High Tech,* however, is distinguishable from the case at hand for several reasons. First, the Federal Circuit noted that the district court's finding of irreparable harm was not based on any affirmative showing, but instead on a presumption stemming from the patentee's showing on the merits of its patent infringement claims. *Id. at 1556.* Second, the Federal Circuit held that the presumption was unavailable and explained that "aside from the presumption, the district court pointed to no evidence that would support a [*24] finding of irreparable injury." *Id.* Finally, the Federal Circuit went on to explain that a combination of factors, including an unexplained, substantial period of delay, the plaintiff's inactivity in the market and willingness to license, along with the absence of an indication that money damages would suffice, all suggested that there was no compelling need for preliminary relief. *Id. at 1556-57.*

Here, the Court is not relying on a presumption of irreparable harm and Allan Block has submitted affirmative evidence of a combination of harms caused by Dillon's breach, including consumer confusion, loss of quality control, harm to reputation and goodwill, and harm to its competitive market position. These harms, taken together, cannot be fully compensated by a monetary award. Further, a delay of six months from the time Allan Block discovered the StoneLoc block and to the filing of suit, under the circumstances presented, does not negate the existence of irreparable harm. Accordingly, the Court concludes that Allan Block has demonstrated a sufficient threat of irreparable harm.

## C. Balance of the harms

The Court recognizes that an injunction that halts [*25] the sale of StoneLoc blocks will harm Dillon's business. However, Dillon has represented that it manufactures a wide variety of concrete products and is free to

2005 U.S. Dist. LEXIS 13566, *

continue to manufacture products other than the StoneLoc block. In contrast, the Court has already determined that Allan Block will be irreparably harmed if Dillon is allowed to continue to manufacture and sell its StoneLoc blocks. On balance, this factor weighs in favor of injunctive relief.

### D. Public interest

Finally, the Court concludes that the public interest is served by upholding the parties' contractual obligations. *See N.I.S. Corp. v. Swindle, 724 F.2d 707, 710 (8th Cir. 1984)* (explaining that the public interest calls for the enforcement of valid agreements). Public policy "requires that freedom of contract shall remain inviolate, except only in cases which contravene public right or the public welfare." *Arrowhead Elec. Coop., Inc. v. LTV Steel Mining Co., 568 N.W.2d 875, 879* (Minn. Cf. App. 1997) (quoting *Weirick v. Hamm Realty Co., 179 Minn. 25, 228 N.W. 175, 176 (Minn. 1929)*). Indeed, a core component of the role of a court is to uphold valid contracts and, therefore, [*26] this factor weighs in favor of granting injunctive relief.

After weighing all of the factors discussed above, the Court concludes that Allan Block is entitled to a preliminary injunction. Accordingly, Dillon is enjoined from manufacturing and selling StoneLoc blocks. The preliminary injunction will be conditioned upon Allan Block posting a bond. The parties have not adequately addressed the issue of an appropriate bond amount. The Court therefore directs the parties to submit letter briefs on the issue of an appropriate bond amount. The Court stays the injunction until after the determination and posting of the bond.

### III. CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

> 1. Allan Block's motion for a preliminary injunction [Docket No. 89] is GRANTED IN PART.
>
> 2. Allan Block's motion for leave to file supplemental evidence [Docket No. 122] is GRANTED.
>
> 3. The parties shall submit letter briefs, not to exceed five (5) pages, no later than July 15, 2005, addressing the issue of an appropriate bond amount.
>
> 4. Dillon is preliminarily enjoined from manufacturing and selling the StoneLoc [*27] block. The injunction is STAYED pending a determination of an appropriate bond amount.

Dated: July 1, 2005

s/ Joan N. Ericksen

JOAN N. ERICKSEN

United States District Judge

# EXHIBIT 31

:: Acticoa :: What is Acticoa™ cocoa and chocolate ?
Case 2:04-cv-01574-SRC-PS    Document 5-11    Filed 04/12/2007    Page 68 of 69
Page 1 of 2



# What is Acticoa™ cocoa and chocolate?

Cocoa and chocolate is not only delicious, it offers potential health benefits too. In fact, this was already common knowledge in the ancient Mayan and Aztec cultures from which we inherited cocoa and chocolate. Today, scientific research confirms that a lot of truth lies in these ideas. From the more than 600 different substances in cocoa and chocolate, 230 probably have a positive effect on our health. For some of these components, scientific evidence already proved their beneficial impact on our health.

**Barry Callebaut** has developed a special ACTICOA™ process to preserve a maximum of the health-giving components in the cocoa bean. More specifically, ACTICOA™ products preserve large amounts of the polyphenols naturally present in cocoa beans. These cocoa polyphenols are powerful antioxidants and may help to protect our body against illness, disease, early ageing etc.



The ACTICOA™ process starts at the cocoa plantations. Together with the cocoa farmers, Barry Callebaut has investigated ways of growing, harvesting and treating the beans in such a way that a maximum amount of polyphenols in the beans is preserved, together with the taste and aromas. These are also maintained in every step throughout the entire process from cocoa to chocolate: in roasting, mixing and conching. **The end result is a particularly functional product: ACTICOA™ cocoa and chocolate. This combines excellent taste with a very high content of natural antioxidants. As a result, it offers great health benefits.**



Fresh cocoa beans contain very high amounts of polyphenols that have powerful antioxidant effects. After processing, a part has been captured in chocolate;

another part is lost.
ACTICOA™ makes the difference: this process preserves up to 70% of the naturally present polyphenols in the finished product. ACTICOA™ cocoa and chocolate therefore offers uniquely high amounts of the natural antioxidants from the cocoa bean.